IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**Case No. 12-56508**

---

SIGITAS RAULINAITIS and RIMA RAULINAITIS,

Plaintiffs-Appellants,

v.

THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, ET AL.,

Defendants-Appellees.

---

On Appeal from the United States District Court for the Central District of
California, the Honorable Michael W. Fitzgerald, Judge
Case No. CV 11-08026 MWF (JCGx)

---

**APPELLEE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT'S
SUPPLEMENTAL EXCERPTS OF RECORD**

---

JOHN F. KRATTLI, County Counsel
ROGER H. GRANBO, Assistant County Counsel
JENNIFER A.D. LEHMAN, Principal Deputy County Counsel
State Bar No. 191477
500 West Temple, Sixth Floor
Los Angeles, California 90012-2713
Tel: (213) 974-1908   Fax: (213) 626-2105

Attorneys for Defendant-Appellee
LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ("LASD")

# INDEX TO SUPPLEMENTAL EXCERPTS OF RECORD

| Vol. | | Document | Page(s) |
|---|---|---|---|
| 1 | | Defendant Los Angeles County Sheriff's Department's Separate Statement of Undisputed Facts & Conclusion of Law; Evidence in Support Thereon, filed May 7, 2012 (Document #18) | SER0001-SER0104 |
| 1 | | Defendant Los Angeles County Sheriff's Department's Rebuttal to Plaintiff's Separate Statement of Undisputed Facts & Conclusion of Law; Evidence in Support Thereof, filed May 25, 2012 (Document #26). | SER0105-SER0130 |
| 1 | | Objections to Plaintiff's Evidence in Opposition to LASD Defendant's Motion for Summary Judgment (Document #25) | SER0131-SER0140 |
| 1 | | Civil Docket for Case No. CV11-08026 MWF (JCGx) | SER0141-SER0149 |

1  JOHN F. KRATTLI, Acting County Counsel
   ROGER H. GRANBO, Assistant County Counsel
2  JENNIFER A.D. LEHMAN, Principal Deputy County Counsel
   (SBN 191477) • *jlehman@counsel.lacounty.gov*
3  648 Kenneth Hahn Hall of Administration
   500 West Temple Street
4  Los Angeles, California 90012-2713
   Telephone: (213) 974-1908 · Fax: (213) 626-2105
5
   Attorneys for Defendant
6  LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11 SIGITAS RAULINAITIS and RIMA       CASE NO. CV 11-08026 JHN(JCGx)
   RAULINAITIS,
                                      **DEFENDANT LOS ANGELES**
12         Plaintiffs,                **COUNTY SHERIFF'S**
                                      **DEPARTMENT'S SEPARATE**
13      v.                            **STATEMENT OF UNDISPUTED**
                                      **FACTS & CONCLUSIONS OF**
14 THE LOS ANGELES COUNTY             **LAW; EVIDENCE IN SUPPORT**
   SHERIFF'S DEPARTMENT,              **THEREOF**
15
           Defendant.                 [Filed concurrently with Notice of
16                                    Motion and Motion for Summary
                                      Judgment; Request for Judicial Notice;
17                                    Proposed Order]

18
                                      **MSJ Date:    June 11, 2012**
19                                    Time:         2:00 p.m.
                                      Ctrm:         790
20
                                      Action Filed: September 25, 2011
21                                    Trial Date:   September 4, 2012

22

23     Defendant Los Angeles County Sheriff's Department ("LASD") submits its

24 Separate Statement of Uncontroverted Facts & Conclusions of Law in support of its

25 Motion for Summary Judgment/Partial Summary Judgment pursuant to Local Rule

26 56-1.

27

28

HOA.880435.1

1   DATED: May 7 2012                    Respectfully submitted,

2
                                        JOHN F. KRATTLI
3                                       Acting County Counsel

4
                                        By
5
                                           JENNIFER A.D. LEHMAN
6                                          Principal Deputy County Counsel

7
                                        Attorneys for Defendant
8                                       LOS ANGELES COUNTY SHERIFF'S
                                        DEPARTMENT
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## LASD'S UNDISPUTED FACTS AND EVIDENCE

| **LASD's Undisputed Material Facts:** | **LASDs Supporting Evidence:** |
|---|---|
| 1.  At the time of Plaintiff's applications to the LASD, Larry L. Waldie was the Undersheriff for Los Angeles County. As part of his responsibilities as Undersheriff, he was designated to act as the Sheriff's sole authorized representative for reviewing applications for concealed weapons (CCW) licenses for the County of Los Angeles.  In that role, he and members of his staff evaluate CCW applications. While members of his staff make recommendations regarding applications, he is the final decision-maker. | 1.   Exh. A, Waldie Decl. ¶¶ 1-2. |
| 2.  As part of his evaluation of CCW applications, he would review the entire application packet and any and all supporting documentation. | 2.   Exh. A, Waldie Decl. ¶ 2. |
| 3.  In Los Angeles County, there are four distinct categories of CCW licenses:  Employment, Standard, Judges, and Reserve Police Officers. The Employment CCW license is issued only to a person who spends a | 3.   Exh. A, Waldie Decl. ¶ 3. |

HOA.880435.1

CV11-08026 JHN (JCGx)

SER0003

| **LASD's Undisputed Material Facts:** | **LASDs Supporting Evidence:** |
|---|---|

1    substantial period of time in his or her

2    principal place of employment or

3    business in Los Angeles County. The

4    Standard CCW license is issued to

5    residents of Los Angeles County or to

6    residents of a particular city within Los

7    Angeles County. The Judge CCW

8    license is issued to California judges,

9    full-time commissioners, and to federal

10    judges and magistrates of the federal

11    courts. The Reserve Police Officer

12    CCW license may be issued to reserve

13    police officers appointed pursuant to

14    California Penal Code § 830.6.

4.    If an applicant resides in an incorporated city not policed by the LASD, the applicant must apply to the chief of police of their city of residence for a concealed weapons license and have such application acted upon. Within 60 days after a denial of such application, such city resident may file a separate application with the LASD, attaching a copy of the application denied by the chief of police. The LASD will exercise independent

4.    Exh. A, Waldie Decl. ¶ 4; exh. 1 to Waldie Decl.

| | LASD's Undisputed Material Facts: | LASDs Supporting Evidence: |
|---|---|---|
| 1 | | |
| 2 | discretion in granting or denying | |
| 3 | licenses to such person but may review, | |
| 4 | consider, and give weight to the grounds | |
| 5 | upon which such denial was made. | |
| 6 | 5.　　California Penal Code sections | 5.　　Exh. A, Waldie Decl. ¶ 5. |
| 7 | 26150-26190 (formerly §§ 12050- | |
| 8 | 12054) set forth the general criteria that | |
| 9 | CCW applicants must meet.  Applicants | |
| 10 | must be of good moral character, be a | |
| 11 | resident of, or spend substantial time in | |
| 12 | the County they apply in, take a | |
| 13 | firearms course, and demonstrate good | |
| 14 | cause for the license. | |
| 15 | 6.　　The issuance of licenses enabling | 6.　　Exh. A, Waldie Decl. ¶ 6. |
| 16 | a private citizen to carry a CCW is of | |
| 17 | great concern to the LASD.  The | |
| 18 | LASD's overriding policy is that no | |
| 19 | CCW license should be granted merely | |
| 20 | for the personal convenience of the | |
| 21 | applicant.  No position or job | |
| 22 | application in itself shall constitute good | |
| 23 | cause for the issuance, or for the denial, | |
| 24 | of a CCW license. | |
| 25 | 7.　　The LASD defines "good cause" | 7.　　Exh. A, Waldie Decl. ¶ 6, see also |
| 26 | under California Penal Code section | exh. 1 to Waldie Decl. |
| 27 | 26150 (formerly 12050) as requiring | |
| 28 | | |

| | |
|---|---|
| **LASD's Undisputed Material Facts:** | **LASDs Supporting Evidence:** |

1  convincing evidence of a clear and
2  present danger to life or of great bodily
3  harm to the applicant, his spouse or
4  dependent child, which cannot be
5  adequately dealt with by existing law
6  enforcement resources and which
7  danger cannot be reasonably avoided by
8  alternative measures, and which danger
9  would be significantly mitigated by the
10  applicant's carrying of a concealed
11  firearm.

13  8.    Each CCW application is        8.    Exh. A, Waldie Decl. ¶ 6.
14  individually reviewed for cause.  The
15  LASD's definition of good cause has
16  been in existence since at least 2005,
17  and remains in existence to the present.
18  It is the Undersheriff's understanding
19  that this definition of good cause, or one
20  similar to it, is utilized by many other
21  counties within California, including
22  San Diego.

23  9.    In evaluating whether an        9.    Exh. A, Waldie Decl. ¶ 7.
24  applicant has presented good cause, an
25  applicant's stated reason of self-defense
26  is not enough.

27  10.    The applicant must demonstrate a   10.    Exh. A, Waldie Decl. ¶ 7.

28

HOA.880435.1

| **LASD's Undisputed Material Facts:** | **LASDs Supporting Evidence:** |
|---|---|
| credible threat of violence which would justify the need to possess a concealed weapon. If an applicant claims that he or she has been threatened, the LASD looks for documentation of that threat, such as police reports or other evidence. | |
| 11.   One of the purposes for the LASD's policy is to protect against gun violence to the community at large, as well as to protect officers conducting law enforcement operations on the streets. | 11.   Exh. A, Tanaka Decl. ¶ 8; see also Exh. B, Zimring Decl., ¶¶ 1-28. |
| 12.   Gun violence is a problem throughout the State of California and Los Angeles County is no exception. The vast majority of homicides in Los Angeles County are committed with the use of guns. Handguns are of particular concern because they are much more likely to be used than shotguns and rifles. Because handguns are small, easy to conceal, and deadly at short range, they are of paramount concern and danger. Further, most of the violent acts committed in this County involving the use of guns are by gang members. | 12.   Exh. A, Waldie Decl. ¶ 8; see also Exh, B, Zimring Decl., ¶¶ 3-10. |

| LASD's Undisputed Material Facts: | LASDs Supporting Evidence: |
|---|---|
| 13.   The presence of more guns on the streets of Los Angeles County creates many problems for law enforcement officers.  Officers are often charged with monitoring public gatherings as well as with breaking up public nuisances. Officers must act quickly whenever a disturbance occurs.  Often times, this involves isolating one or two problem individuals.  However, if multiple persons within a crowd are carrying concealed weapons, this creates an increased likelihood that guns will be brandished or used.  Thus, the increased presence of guns creates not only increased safety problems for officers but also for members of the community at large. | 13.   Exh. A, Tanaka Decl. ¶ 9; Exh,. B, Zimring Decl., ¶¶ 3-28. |
| 14.   It is the LASD's position that increasing the numbers of concealed weapons in the community increases the threat of gun violence to the community at large, to those who use the streets and go to public accommodations, and to law enforcement officers patrolling the streets.  Further, the increased presence | 14.   Exh. A, Waldie Decl. ¶ 10; Exh. B, Zimring Decl., ¶¶ 3-28. |

| LASD's Undisputed Material Facts: | LASDs Supporting Evidence: |
|---|---|
| of concealed handguns make law enforcement operations more difficult thus taking away valuable resources which would be better used conducting law enforcement operations. | |
| 15.   Los Angeles County's "good cause" requirement is intended to drastically restrict the number of persons who are secretly armed in the County. | 15.   Exh. A, Waldie Decl. ¶ 10; see also, e.g., Exh. B, Zimring Decl., ¶¶ 3-28. |
| 16.   In 2010, there was an average of approximately 400 concealed weapons permits that were issued by the LASD. The Undersheriff is informed and believe that the County's Chief Executive Office has estimated that the population of Los Angeles County as of January 2010 was 10,441,080 people. | 16.   Exh. A, Waldie Decl. ¶ 11. |
| 17.   On or about April 7, 2011, Plaintiff Sigitas Raulinaitis submitted a CCW application to the LASD. | 17.   Exh. A, Waldie Decl., ¶ 12, (and exh. 2 to Waldie Decl.) |
| 18.   In his application, Sigitas Raulinaitis stated that he should be allowed to carry a CCW because as a construction contractor, real estate broker, and attorney, he has to be | 18.   Exh. A to Waldie Decl., ¶ 12 (and exh. 2 to Waldie Decl., internal page 13) |

| **LASD's Undisputed Material Facts:** | **LASDs Supporting Evidence:** |
|---|---|
| present at, and travel to, homes in blighted areas where persons may forcibly deprive him of his property or otherwise pose a danger to him. He also stated that he has two homes which involve travel in sparsely populated areas where "self protection may be required without warning." He further stated that he sometimes transports large amounts of cash. | |
| 19.    The LASD reviewed Plaintiff's application and determined that he failed to show good cause as required by LASD policy, and as defined above. Specifically, Plaintiff failed to show convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm. | 19.    Exh. A, Waldie Decl., ¶¶ 12-13. |

HOA.880435.1

| | LASD's Undisputed Material Facts: | | LASDs Supporting Evidence: |
|---|---|---|---|
| 1 | | | |
| 2 | 20.    On November 10, 2010, Mr. | 20. | Exh. A, Waldie Decl. ¶ 14, exh. 4 to |
| 3 | Raulinatis sent a letter to the LASD | | Waldie Decl. |
| 4 | requesting that the LASD reconsider its | | |
| 5 | denial of his application.  In his letter, | | |
| 6 | he states that his claim of "self-defense" | | |
| 7 | is the only "good cause" he needs to | | |
| 8 | obtain a CCW.  Mr. Raulinatis provided | | |
| 9 | no other additional facts to justify his | | |
| 10 | CCW application. | | |
| 11 | 21.    On September 28, 2010, Plaintiff | 21. | Exh. A, Waldie Decl., exh. 5 to |
| 12 | Rima Raulinaitis (wife of Sigitas | | Waldie Decl. |
| 13 | Raulinaitis) submitted a CCW | | |
| 14 | application to the LASD. | | |
| 15 | 22.    In support of her application, Ms. | 22. | Exh. A, Waldie Decl., exh. 5 to |
| 16 | Raulinaitis stated two words as | | Waldie Dec. internal page 13. |
| 17 | justification: "Self Defense." | | |
| 18 | 23.    The LASD reviewed Ms. | 23. | Exh. A., Waldie Decl., ¶¶ 12-13; |
| 19 | Raulinaitis' application and determined | | exh. 6 to Waldie Decl. |
| 20 | that she failed to show good cause as | | |
| 21 | required by LASD policy, and as | | |
| 22 | defined above.  Specifically, Plaintiff | | |
| 23 | failed to show convincing evidence of a | | |
| 24 | clear and present danger to life or of | | |
| 25 | great bodily harm to the applicant, his | | |
| 26 | spouse or dependent child, which cannot | | |
| 27 | be adequately dealt with by existing law | | |
| 28 | | | |

HOA.880435.1

CV11-08026 JHN (JCGx)

SER0011

| **LASD's Undisputed Material Facts:** | **LASDs Supporting Evidence:** |
|---|---|

1  enforcement resources and which

2  danger cannot be reasonably avoided by

3  alternative measures, and which danger

4  would be significantly mitigated by the

5  applicant's carrying of a concealed

6  firearm.

7

8  24.    Julie Basco of the California          24.    Exh. B, Zimring Decl. ¶ 23, Exh. C,

9  Department of Justice supervised an          Basco Decl., ¶ 2-3.

10 analysis of all 122,948 adult felony

11 arrests in Los Angeles County for 2010

12 and divided these persons by whether

13 they had a pre-2010 felony conviction.

14 A total of 43,440 subjects had a prior

15 felony that would keep them from being

16 eligible in a "shall issue" mandate or

17 constitutional rule.  Sixty-five percent of

18 Los Angeles County felons do not have

19 a prior felony conviction when arrested.

20 These statistics indicate that almost

21 2/3rds of the known current felons

22 would not be screened out by a prior

23 felony from CCW permits without

24 further barriers.

25

## CONCLUSIONS OF LAW

1.    California Penal Code § 12050(a)(1)(A) authorizes a county sheriff to

issue a license to carry a concealed pistol, revolver, or other firearm capable of

1   being concealed upon the person (hereinafter "CCW permit") upon the existence of

2   good cause, and provided that the applicant meets other criteria provided for in the

3   Penal Code.

4       2.   Penal Code § 12050 gives extremely broad discretion to the sheriff

5   concerning the issuance of concealed weapons licenses, and explicitly grants

6   discretion to the issuing officer to issue or not issue a license to applicants meeting

7   the minimum statutory requirements. *Gifford v. City of Los Angeles*, 88 Cal.App.4th

8   801, 805 (2001).

9       3.   In *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 2788,

10  2822 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3044 (2010),

11  the United States Supreme Court held that the Second Amendment protects an

12  individual's right to possess firearms in the home for self-defense.

13      4.   The right to keep and bear arms is not a right to keep and carry any

14  weapon whatsoever in any manner whatsoever and for whatever purpose. *Heller*,

15  128 S.Ct. at 2816.

16      5.   Penal Code sections 12025(a) and 12031(a) have been upheld in

17  California against a Second Amendment challenge after *Heller*. *People v. Flores*,

18  169 Cal. App. 4th 568, 575-576 (2008); *People v. Yarbrough*, 169 Cal. App. 4th

19  303, 312-314 (2008).

20      6.   Unlike possession of a gun for protection within a residence, carrying a

21  concealed firearm presents a recognized "threat to public order," and is "prohibited

22  as a means of preventing physical harm to persons other than the offender.'

23  *Yarbrough*, 169 Cal.App.4th at 314, citing *People v. Hale*, 43 Cal.App.3d 353, 356

24  (1974).

25      7.   A person who carries a concealed firearm on his person or in a vehicle,

26  which permits the individual immediate access to the firearm but impedes others

27  from detecting its presence, poses an 'imminent threat to public safety. *Id.* at 313-

28  314.

1        8.     Intermediate scrutiny requires that the challenged statute or regulation

2   "be substantially related to an important governmental objective." *Clark v. Jeter*,

3   486 U.S. 456, 461 (1988).

4        9.     Maintaining public safety and preventing crime are clearly important (if

5   not paramount) government interests and the regulation of concealed firearms is a

6   critical factor in accomplishing that interest. *See, e.g., United States v. Salerno*, 481

7   U.S. 739, 750 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *Kelley v.*

8   *Johnson*, 425 U.S. 238, 247 (1976).

9        10.    The denial of a concealed weapons permit is not a deprivation of the

10   right to travel. See *Pencak v. Concealed Weapons Licensing Bd.*, 872 F.Supp.410,

11   414 (E.D. Mich. 1994).

12        11.    When a government's action does not involve a suspect classification

13   or implicate a fundamental right, even intentional discrimination will survive

14   constitutional scrutiny for an equal protection violation as long as it bears a rational

15   relation to a legitimate state interest. *New Orleans v. Dukes*, 427 U.S. 297, 303-04

16   (1976); *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990).

## DECLARATION OF JENNIFER A.D. LEHMAN

I, JENNIFER A.D. LEHMAN, declare as follows:

1.      I am an attorney at law, duly licensed to practice law in all of the Courts of the State of California.  I am employed by the County of Los Angeles as a Principal Deputy County Counsel in the Office of the County Counsel, and am counsel for Defendant Los Angeles County Sheriff's Department.

2.      I have personal knowledge of the facts set forth below and if called as a witness, I could and would testify thereto.

3.      Attached hereto as Exhibit A is the Declaration of Larry Waldie, and attached exhibits.

4.      Attached hereto as Exhibit B is the Declaration of Frank Zimring.

5.      Attached hereto as Exhibit C is the Declaration of Julie Basco.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Executed this 7th day of May, 2012 in Los Angeles, California.


JENNIFER A.D. LEHMAN

# EXHIBIT A

SER0016

1  JOHN F. KRATTLI, Acting County Counsel
   ROGER H. GRANBO, Assistant County Counsel
2  JENNIFER A.D. LEHMAN, Principal Deputy County Counsel
   (SBN 191477) • *jlehman@counsel.lacounty.gov*
3  648 Kenneth Hahn Hall of Administration
   500 West Temple Street
4  Los Angeles, California 90012-2713
   Telephone: (213) 974-1908 · Fax: (213) 626-2105
5
   Attorneys for Defendant
6  LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  SIGITAS RAULINAITIS AND RIMA       CASE NO. CV 11-08026 JHN(JCGx)
    RAULINAITIS
12                                     **DECLARATION OF LARRY L.**
            Plaintiff,                 **WALDIE**
13
         v.
14
    THE LOS ANGELES COUNTY
15  SHERIFF'S DEPARTMENT,

16          Defendants.

17

18  I, LARRY L. WALDIE, declare as follows:

19        1.    I was the Undersheriff of Los Angeles County from 2005 to

20  approximately 2011 when I retired from the Los Angeles County Sheriff's

21  Department (LASD) after over 40 years of service. As the Undersheriff, I was the

22  second in command of the LASD and the Sheriff's chief assistant. In the Sheriff's

23  absence, I also assumed his duties, in addition to my executive responsibilities

24  addressing LASD operational, budgetary and personnel matters.

25        2.    As part of my responsibilities as Undersheriff, I was designated to act

26  as the Sheriff's sole authorized representative for reviewing applications for carry

27  concealed weapons (CCW) licenses for the County of Los Angeles. In that role, I

28  and members of my staff, evaluated CCW applications. While members of my staff

HOA.880967.1                                    CV 11-08026 JHN(JCGx)

1  make recommendations regarding applications, I was the final decision-maker. As
2  part of my evaluation of CCW applications, I would review the entire application
3  packet and any and all supporting documentation.

4      3.    In Los Angeles County, there are four distinct categories of CCW
5  licenses: Employment, Standard, Judges, and Reserve Police Officers. The
6  Employment CCW license is issued only to a person who spends a substantial
7  period of time in his or her principal place of employment or business in Los
8  Angeles County. The Standard CCW license is issued to residents of Los Angeles
9  County or to residents of a particular city within Los Angeles County. The Judge
10  CCW license is issued to California judges, full-time commissioners, and to federal
11  judges and magistrates of the federal courts. The Reserve Police Officer CCW
12  license may be issued to reserve police officers appointed pursuant to California
13  Penal Code § 830.6.

14      4.    If an applicant resides in an incorporated city not policed by the LASD,
15  the applicant must apply to the chief of police of their city of residence for a
16  concealed weapons license and have such application acted upon. Within 60 days
17  after a denial of such application, such city resident may file a separate application
18  with the LASD, attaching a copy of the application denied by the chief of police.
19  The LASD will exercise independent discretion in granting or denying licenses to
20  such person but may review, consider, and give weight to the grounds upon which
21  such denial was made. A copy of the LASD Concealed Weapons License Policy is
22  attached hereto as Exhibit 1. This policy is also available on the LASD website at
23  www.lasd.org.

24      5.    California Penal Code sections 26150-26190 (formerly sections 12050-
25  12054) set forth the general criteria that CCW applicants must meet. Applicants
26  must be of good moral character, be a resident of, or spend substantial time in the
27  County they apply in, take a firearms course, and demonstrate good cause for the
28  license.

6.     The issuance of licenses enabling a private citizen to carry a CCW is of
great concern to the LASD.  The LASD's overriding policy is that no CCW license
should be granted merely for the personal convenience of the applicant.  No position
or job application in itself shall constitute good cause for the issuance, or for the
denial, of a CCW license.  The LASD defines "good cause" under California Penal
Code section 26150 (formerly section 12050) as requiring convincing evidence of a
"clear and present danger to life or of great bodily harm to the applicant, his spouse
or dependent child, which cannot be adequately dealt with by existing law
enforcement resources and which danger cannot be reasonably avoided by
alternative measures, and which danger would be significantly mitigated by the
applicant's carrying of a concealed firearm."  Each application is individually
reviewed for cause.  I am informed and believe that the LASD's definition of good
cause has been in existence since at least 2005, and remains in existence to the
present.  It is also my understanding that this definition of good cause, or one similar
to it, is utilized by many other counties within California, including San Diego.

7.     In evaluating whether a CCW applicant has presented "convincing
evidence of a clear and present danger to life or of great bodily harm to the
applicant, his spouse or dependent child, which cannot be adequately dealt with by
existing law enforcement resources and which danger cannot be reasonably avoided
by applicant's carrying of a concealed firearm," an applicant's stated reason of self-
defense is not enough.  The applicant must demonstrate a credible threat of violence
which would justify the need to possess a concealed weapon.  If an applicant claims
that he or she has been threatened, we look for documentation of that threat, such as
police reports or other evidence.

8.     One of the purposes for the LASD's policy is to protect against gun
violence to the community at large, as well as to protect officers conducting law
enforcement operations on the streets.  Gun violence is a problem throughout the
State of California and Los Angeles County is no exception.  The vast majority of

1   homicides in Los Angeles County are committed with the use of guns.  Handguns

2   are of particular concern because in my experience, they are much more likely to be

3   used than shotguns and rifles.  Because handguns are small, easy to conceal, and

4   deadly at short range, they are of paramount concern and danger.  Further, most of

5   the violent acts committed in this County involving the use of guns are by gang

6   members.

7         9.      In my experience as a law enforcement officer, the presence of more

8   guns on the streets of Los Angeles County creates many problems for law

9   enforcement officers.  Officers are often charged with monitoring public gatherings

10   as well as with breaking up public nuisances.  Officers must act quickly whenever a

11   disturbance occurs.  Often times, this involves isolating one or two problem

12   individuals.  However, if multiple persons within a crowd are carrying concealed

13   weapons, this creates an increased likelihood that guns will be brandished or used.

14   Thus, the increased presence of guns creates not only increased safety problems for

15   officers but also for members of the community at large.

16         10.     It is the LASD's position that increasing the numbers of concealed

17   weapons in the community increases the threat of gun violence to the community at

18   large, to those who use the streets and go to public accommodations, and to law

19   enforcement officers patrolling the streets.  Further, the increased presence of

20   concealed handguns make law enforcement operations more difficult thus taking

21   away valuable resources which would be better used conducting law enforcement

22   operations.  Los Angeles County's "good cause" requirement is intended to

23   drastically restrict the number of persons who are secretly armed in the County.

24         11.     In 2010, there was an average of approximately 400 concealed weapons

25   permits that were issued to citizens by the LASD while I was Undersheriff.  I am

26   informed and believe that the County's Chief Executive Office has estimated that the

27   population of Los Angeles County as of  January 2010 was 10,441,080 people.

28

1      12.     Attached hereto as Exhibit 2 is a copy of the September 1, 2010 CCW

2   application we received from Sigitas Raulinatis (redacted to conceal certain personal

3   information).  Mr. Raulinaitis' permit application was reviewed, analyzed, and

4   processed in the exact same manner in which every application is processed.  After

5   reviewing Mr. Raulinatis' application and supporting documentation, I determined

6   that he did not demonstrate "good cause" for the issuance of a permit as required by

7   the LASD policy.  Specifically, convincing evidence was not established of a clear

8   and present danger to life or of great bodily harm to the applicant, his spouse or

9   dependent child, which could not be adequately dealt with by existing law

10  enforcement resources and which danger cannot be reasonably avoided by

11  alternative measures, and which danger would be significantly mitigated by the

12  applicant's carrying of a concealed firearm.

13     13.     Attached hereto as Exhibit 3 is a copy of the October 22, 2010 letter the

14  LASD sent to Mr. Raulinatis denying his application.

15     14.     Attached hereto as Exhibit 4 is a copy of the November 10, 2010 letter

16  Mr. Raulinaitis sent requesting that the LASD reconsider its denial of his CCW

17  application.  The letter did not contain any further evidence of "good cause" as

18  required by the LASD policy.

19     15.     Attached hereto as Exhibit 5 is a copy of the September 28, 2010 CCW

20  application we received from Rima Raulinaitis. (redacted to conceal certain personal

21  information).  Ms. Raulinaitis' permit application was similarly reviewed, analyzed,

22  and processed in the exact same manner in which every application is processed.

23  After reviewing her application and supporting documentation, I determined that she

24  did not demonstrate "good cause" for the issuance of a permit as required by the

25  LASD policy.  Specifically, convincing evidence was not established of a clear and

26  present danger to life or of great bodily harm to the applicant, his spouse or

27  dependent child, which could not be adequately dealt with by existing law

28  enforcement resources and which danger cannot be reasonably avoided by

1   alternative measures, and which danger would be significantly mitigated by the

2   applicant's carrying of a concealed firearm.

3        16.    Attached hereto as Exhibit 6 is a copy of the October 22, 2010 letter the

4   LASD sent to Ms. Raulinatis denying her application.

5        I declare under penalty of perjury under the laws of the United States of

6   America that the foregoing is true and correct.

7   Executed in *Walnut*           , California on 4/29/12, 2012

8

9                                       _LARRY L. WALDIE_

10  LARRY L. WALDIE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOA.880967.1

                                                CV 11-08026 JHN(JCGx)
                              -6-

                                                        SER0022

                                                TOTAL P.02

# EXHIBIT 1

SER0023

# Los Angeles County Sheriff's Department

## Concealed Weapons Licensing Policy

The issuance of licenses enabling a private citizen to carry a concealed weapon (CCW) is of great concern to the Los Angeles County Sheriff's Department. The Department's overriding policy is that no concealed weapons license should be granted merely for the personal convenience of the applicant. No position or job classification in itself shall constitute good cause for the issuance, or for the denial, of a CCW license. Each application shall be individually reviewed for cause, and the applicant will be notified by writing within 90 days of the application, or within 30 days after receipt of the applicant's criminal background check from the Department of Justice, that the CCW license was either approved or denied.

In accordance with California Penal Code § 12050 et. seq., and subject to Department policy and procedures, any Los Angeles County resident may obtain a CCW application for authorization to carry a concealed weapon. Applications may be obtained from any sheriff's patrol station or directly from the Office of the Undersheriff. Completed applications may be submitted to any of these units for processing.

## Types of Licensing and Expiration Periods for CCWs

There are four distinct categories of CCW licenses: Employment, Standard, Judges, and Reserve Police Officers. The Employment CCW license is issued only by the sheriff of a county to a person who spends a substantial period of time in his or her principal place of employment or business in the county of issuance. The license is valid only in the county issued and for any period not to exceed 90 days. The Standard CCW license is issued to residents of the county or a particular city within the county. The license is valid for any period not to exceed 2 years. The Judge CCW license may be issued to California judges, full-time commissioners, and to federal judges and magistrates of the federal courts. The license is valid for any period not to exceed 3 years. The Reserve Police Officer CCW license may be issued to reserve police officers appointed pursuant to California Penal Code § 830.6. The license is valid for any period not to exceed 4 years, except that it becomes invalid upon the conclusion of the person's appointment as a reserve police officer.

## Training Requirements for a CCW License

Regardless of the category, all new license applicants for CCW's must now pass a specified course of training which is acceptable to the licensing authority, the Los Angeles County Sheriff's Department (See attached sheet, "Suggested Training Vendors"). New CCW license applicants must pass a specified course of training acceptable to the licensing authority. The course shall not exceed 16 hours, and the course shall include instruction on firearm safety, the law regarding the permissible use of a firearm and weapon proficiency. The licensing authority may also require

the applicant to attend a community college course certified by the Commission on
Peace Officer Standards and Training (POST), up to a maximum of 24 hours, but only if
required uniformly of all applicants without exception. For CCW license renewal
applicants, the course of training may be any course acceptable to the licensing
authority, shall be no less than 4 hours, and shall include instruction on firearms safety,
the law regarding the permissible use of a firearm and weapon proficiency.

## Qualifications for a CCW License

To qualify for a CCW, each applicant must demonstrate (1) proof of good moral character, (2)
that good cause exists, and (3) that the applicant is a resident of the count or a city within the
county, or, that the applicant spends a substantial period of time in the applicant's place of
employment or business in the county or a city within the county. In addition, the applicant must
complete the training requirements as listed above.

According to Los Angeles County Sheriff's Department policy (5-09/380.10) and the California
Supreme Court (CBS, Inc. v. Block, (1986) 42 Cal.3d 646), good cause shall exist only if there is
convincing evidence of a clear and present danger to life, or of great bodily harm to the
applicant, his spouse, or dependent child, which cannot be adequately dealt with by
existing law enforcement resources, and which danger cannot be reasonably avoided by
alternative measures, and which danger would be significantly mitigated by the
applicant's carrying of a concealed firearm.

The character requirement will be fulfilled by, but not limited to, a criminal history check through
the Bureau of Criminal Identification and Investigation. The good cause requirement will only be
fulfilled by thoroughly justifying the applicant's need to the Sheriff or his designee on the
application form. The residence requirement will be fulfilled upon presentation of an approved,
recognized identification card and at least one recently canceled item of United States mail.

If the applicant resides in an incorporated city, which is not policed by our Department, he or
she must first apply to the Chief of Police of their city of residence for a CCW license and have
the application acted upon. Within 60 days after a denial of the application, the city resident may
file a separate application with the Los Angeles County Sheriff's Department, attaching a copy of
the application denied by the Chief of Police. The Sheriff will exercise independent discretion in
granting or denying licenses to these applicants. Further, the Sheriff may review, consider, and
give weight to the grounds upon which the previous denial was made.

-2-

SER0025

## CCW License Subject to Restrictions

When a license is issued it will be subject to the following general restrictions.

While exercising the privilege granted under the terms of this license, licensees shall not:

1. Consume any alcoholic beverage. Represent to any person that they
2. are peace officers, unless they are in fact
   peace officers as defined by law.
3. Abuse this privilege by an unjustified display of a deadly weapon.
4. Violate any law of this State or Country.
5. Be under the influence of any medication or narcotic drug. Impede
6. law enforcement officers in the conduct or performance of their duty
   or activities.
7. Refuse to display their permits or to surrender their concealable
   firearm to any peace officer for inspection upon demand.

In addition, the Los Angeles County Sheriff's Department may place special limitations further limiting the time, the place, and the circumstances under which the license is valid. When each license is issued, general restrictions and any special limitations will be noted on the reverse side of the card.

Remember, it is a Privilege, not a right to carry a concealed weapon.

## Application for CCW License Form

Upon reviewing the attached policy and meeting all requirements, please complete the Standard Application form in its entirety and forward to Sheriff Headquarters, 4700 Ramona Boulevard, Monterey Park, California, 91754-2169, Attention: CCW Coordinator. A non-refundable fee of $10.00 must accompany this application. Those who successfully pass the initial screening will be charged a required follow-up processing fee.

Revised 9/99

-3-

SER0026

## Suggested Training Vendors

**Angeles Range 12651 Little Tujunga, Lakeview Terrace Phone: (818) 362-3650 or (800) 499-4486 Instructor: Don Emmer**

**L.A.X. Shooting Range 927 W. Manchester, Inglewood Phone: (310) 568-1515 Instructor: Danny Hudson**

**Sharpshooter 1827 W. 208 Street, Torrance Phone: (310) 618-9971 Instructor: Fred Darling**

**Centinel Services 18348 Eddy, Northridge Phone: (818) 238-9860 Instructor: Cecil Williams**

**Centinel Services 1060 N. Lake Street, Burbank Phone: (818) 954-981 0 Instructor: John Rives**

**The Firing Line 17921 Jamestown Lane, Huntington Beach Phone: (714) 841-2100 Instructor: Fred Donohue**

**Professional Security Training School 44633 Sierra Highway Lancaster, CA 93534 Phone: (661) 945-0600 Instructor: Cecil Williams**

**5040 Cornell Road Agoura Hills, CA 91301 (818) 707-9100**

THE CONTENT AND LENGTH OF THE COURSES OFFERED BY THE TRAINERS LISTED ABOVE ARE ACCEPTABLE TO THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ("LASD") IN ACCORDANCE WITH PENAL CODE SECTION 12050(a).

### DISCLAIMER

THE COUNTY OF LOS ANGELES AND THE LASD MAKE NO OTHER REPRESENTATIONS OR WARRANTIES ABOUT THE TRAINERS LISTED ABOVE OR THE FACILITIES OR EQUIPMENT THEY USE TO CONDUCT TRAINING.

- ◆ NONE OF THESE TRAINERS ARE EMPLOYEES OR AGENTS OF THE COUNTY OF LOS ANGELES OR LASD.

- ◆ NONE OF THESE TRAINERS WAS TRAINED IN THE USE OF FIREARMS BY THE COUNTY OF LOS ANGELES OR LASD.

- ◆ NONE OF THE FACILITIES AND EQUIPMENT USED BY THESE TRAINERS ARE OWNED, CONTROLLED OR INSPECTED BY THE COUNTY OF LOS ANGELES OR THE LASD.

NEITHER THE COUNTY OF LOS ANGELES NOR LASD CERTIFY OR CONTROL THE SAFETY OF THE TRAINING CONDUCTED BY ANY OF THESE TRAINERS.

YOU ASSUME FULLY THE RISK OF ANY LOSS, INJURY OR DAMAGE ATTRIBUTABLE TO (1) ANY ACT OR OMISSION OF ANY OF THESE TRAINERS OR ANY OF THEIR AGENTS OR EMPLOYEES OR (2) THE CONDITION ANY PREMISES OR EQUIPMENT USED BY ANY OF THESE TRAINERS. THE COUNTY OF LOS ANGELES AND LASD DISCLAIM ANY RESPONSIBILITY FOR ANY SUCH LOSS, INJURY OR DAMAGE.

LASD RECOMMENDS THAT BEFORE YOU BEGIN TRAINING, YOU FULLY INVESTIGATE THE TRAINER'S QUALIFICATIONS, TRAINING, SAFETY RECORD AND CONDITION OF PREMISES AND EQUIPMENT.

SER0027



## 5-09/380.10 APPLICATION REQUESTS

Any person may obtain the Department's Concealed Weapon License Application (form SH-AD-602 revised 2/95) from any station or the Undersheriff. Persons requesting such application shall be shown a copy of the application process.

Each applicant must demonstrate proof of residence and good character. In addition, good cause for the purposes of Penal Code section 12050 shall exist only if both of the following elements prevail:

- Convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm;
- A valid certificate from an Advanced Officer Training Institution, approved by the California State Bureau of Collection and Investigative Services, attesting to applicant's satisfactory completion of at least 24 hours of training,
  - Alternate proof of firearms proficiency may be submitted for review and possible acceptance in lieu of this certification.

If the applicant resides in an incorporated city not policed by this Department, they must apply to the chief of police of their city of residence for a Concealed Weapon License and have such application acted upon. Within 60 days after a denial of such application, such city resident may file a separate application with the Sheriff, attaching a copy of the application denied by the chief of police. The Sheriff will exercise independent discretion in granting or denying licenses to such persons but may review, consider and give weight to the grounds upon which such denial was made.

**04/01/96 MPP**

SER0028

# EXHIBIT 2

SER0029

State of California, Department of Justice

# Standard Application for CCW License

Official Use Only -Type of Permit
Requested ( ) Standard      ( ) Judge
( ) Reserve Officer ( ) 90 Day

## Public Disclosure Admonition

I understand that I am obligated to be complete and truthful in providing information on this application. I understand that all of the information disclosed by me in this application may be subject to public disclosure.

_____     9/1/2010
Applicant Signature                                    Date

_____     _____
Witness Signature / Badge Number                  Date

## Section 1 - Applicant Personal Information

Name:  Raulinaitis          Sigitas,      Jonas
       Last                 First                    Middle

If Applicable,
Maiden Name or Other Name(s) Used: _____

City and County                      Country of
of Residence:  City of Santa Clarita    Citizenship: U.S.

Date of Birth: REDACTED    Place of Birth: Los Angeles, Los Angeles Cty., CA
                                           City          County          state

Height:  6-2      Weight: 250      Color Eyes: Brown      Color Hair: Brown

## Section 2 - Applicant Clearance Questions

1.  Do you now have, or have you ever had a license to carry a concealed weapon (CCW)?
    No  X  Yes _____ (If yes, please indicate below. Use additional pages if necessary.)

Issuing Agency _____ Issue Date _____ CCW# _____

2.  Have you ever applied for and been denied a license to carry a concealed weapon?
    No  X  Yes _____ (If yes, give agency name, date and reason for denial.)

_____

_____

-3-

SER0030

State of California, Department of Justice
## Standard Application for CCW License

### Section 2  - Applicant Clearance Questions -   (continued)

3.   Have you ever held and subsequently renounced your United States citizenship?.
     No _X_ Yes_____ (If yes, explain):

_____

4.   If you served with the Armed Forces, were you ever convicted of any charges or was
     your discharge other than honorable? No _____ Yes _____ (If yes, explain):

_____

_____

5.   Are you now, or have you been, a party to a lawsuit in the last rive years?
     No_____Yes X_____ (If yes, explain):
     Plaintiff in breach of contract action (construction)Prevailed
     Defendant in frivolous personal injury suit (construction)
     Lawsuit withdrawn by plaintiffs and dismissed with predjudice.

_____

6.   Are you now, or have you been, under a restraining order(s) from any court?
     No _X_ Yes_____ (If yes, explain):

_____

_____

7.   Are you on probation or parole from any state for conviction of any offense including
     traffic? No _X_ Yes _____ (If yes, explain):

_____

_____

-4-

SER0031

State of California, Department of Justice

# Standard Application for CCW License

## Section 2 . Applicant Clearance Questions -   (continued)

8.   List all traffic violations (moving violations only) and motor vehicle accidents you have had in the last
five years. (Use additional pages if necessary.)

Date _2008?_   Violation / Accident  _LAPD_____   Agency / Citation # _____
_Rt turn across crosswalk with pedestrian at far side._

_____

_____

_____

_____

9.   Have you ever been convicted for any criminal offense (civilian or military) in the U.S. or any other
country?

No _X_ Yes_____ (If yes, explain including date, agency, charges, and disposition.)

_____

_____

10.  Have you withheld any fact that might affect the decision to approve this license?

No _X_  Yes_____(If yes, explain):

_____

_____

## Section 3 . Descriptions of Weapons:

List below the weapons you desire to carry if granted a CCW. You may carry concealed only the weapon(s)
which you list and describe herein, and only for the purpose indicated. Any misuse will cause an automatic
revocation and possible arrest. (Use additional pages if necessary.)

| | Make | Model | Caliber | Serial No. |
|---|---|---|---|---|
| 1. | Ruger | P-89 | 9mm | 30494974 |
| 2. | Kahr | PM9 | 9mm | IB4009 |
| 3. | | | | |

-5-

SER0032

**State of California, Department of Justice**
# Standard Application for CCW License

## Section 4 -   CCW License Conditions and Restrictions

The licensee is responsible for all liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the agency that issued the license. In the event any claim, suit, or action is brought against the agency that issued the license, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the agency that issued the license, its chief officer or any of its employees from such claim, suit, or action.

The licensee authorizes the licensing agency to investigate, as they deem necessary, the licensee's record and character to ascertain any and all information which may concern his/her qualifications and justification to be issued a license to carry a concealed weapon and release said agency of any and all liability arising out of such investigation.

While exercising the privileges granted to the licensee under the terms of this license, the licensee shall not, when carrying a concealed weapon:

- Consume any alcoholic beverage.
- Be in a place having a primary purpose of dispensing alcoholic beverages for on-site consumption.
- Be under the influence of any medication or drug, whether prescribed or not.
- Refuse to show the license or surrender the concealed weapon to any peace officer upon demand.
- Impede any peace officer in the performance of his/her duties.
- Present himself/herself as a peace officer to any person unless he/she is, in fact, a peace officer as defined by California law.
- Unjustifiably display a concealed weapon.
- Carry a concealed weapon not listed on the permit
- Carry a concealed weapon at times or circumstances other than those specified in the permit.

Pursuant to U.S. Government Code - Title 49, Chapter 26, Section 1472 (1) and Federal Aviation Regulation 121.583, a license to carry a concealed weapon does not authorize a person to carry a firearm, tear gas, or any dangerous weapon aboard commercial airlines. Further, a person must declare that he/she is carrying such firearm, tear gas, or dangerous weapon BEFORE entering the boarding area of an air terminal where the security checks are made. Such violation can result in arrest by law enforcement.

Any violation of these restrictions or conditions may invalidate the CCW license and may void any further use of the license until reinstated by the licensing authority. Any arrest for a felony or serious misdemeanor, including driving under the influence of alcohol and/or drugs, is cause for invalidating the license.

SER0033

State of California, Department of Justice
# Standard Application for CCW License

## Section 5 -  Applicable California Penal Code Sections

The following Penal Code sections are of special importance to the holder of a CCW license
regarding the use, carrying, and storage of firearms:

Penal Code Section 12051 - Applications for CCW Licenses; False Statements

(b) Any person who files an application required by subdivision (a) knowing that statements contained therein
are false is guilty of a misdemeanor.
(c) Any person who knowingly makes a false statement on the application regarding any of the following shall
be guilty of a felony:
   (1) The denial or revocation of a license, or the denial of an amendment to a license, issued pursuant to
      Section 12050.
   (2) A criminal conviction.
   (3) A finding of not guilty by reason of insanity.
   (4) The use of a controlled substance.
   (5) A dishonorable discharge from military service.
   (6) A commitment to a mental institution.
   (7) A renunciation of United States citizenship.

**Penal Code Section 192 - Manslaughter**
Manslaughter is the unlawful killing of a human being without malice.
(a) Voluntary - upon a sudden quarrel or heat of passion.
(b) Involuntary - in the commission of an unlawful act, not amounting to a felony; or in the commission of
   a lawful act which might produce death, in an unlawful manner, or without due caution and
   circumspection; provided that this subdivision shall not apply to acts committed in the driving of a
   vehicle.

**Penal Code Section 197 - Justifiable Homicide; Any Person**
Homicide is justifiable when committed by any person in any of the following cases:
1.   When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily
     injury upon any person; or,
2.   When committed in defense of habitation, property, or person, against one who manifestly intends or
     endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and
     endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the
     of offering violence to any person therein; or,
3.   When committed in the lawful defense of such person, or of a wife or husband, parent, child, master,
     mistress, or servant of such person, when there is reasonable ground to apprehend a design to
     commit a felony or to do some great bodily injury, and imminent danger of such design being
     accomplished; but such person, or the person in whose behalf the defense was made, if he was the
     assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any
     further struggle before the homicide was committed; or,
4.   When necessarily committed in attempting, by lawful ways and means, to apprehend any person for
     any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the
     peace.

-7-

**State of California, Department of Justice**
# Standard Application for CCW License

## Section 5 -  Applicable California Penal Code Sections -    (continued)

**Penal Code Section 198 - Justifiable Homicide; Sufficiency of Fear
(Limitation of Self-defense of Property Rule)**
A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to
prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must
be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the
influence of such fears alone.

**Penal Code Section 199 – Justifiable and Excusable Homicide; Discharge of Defendant**
The homicide appearing to be justifiable or excusable, the person indicted must, upon his trial, be fully
acquitted and discharged.

**Penal Code Section 12035 - Storage of Firearms Accessible to Children**
(a) As used in this section, the following definitions shall apply:
    (1) "Locking device" means a device that is designed to prevent the firearm from functioning and when
        applied to the firearm, renders the firearm inoperable.
    (2) "Child" means a person under the age of 16 years. (3) "Off-premises" means
    premises other than the premises where the firearm was stored.
    (4) "Locked container" has the same meaning as set forth in subdivision (d) of Section 12026.2.
(b)(1) Except as provided in subdivision (c), a person commits the crime of "criminal storage of a firearm of
        the first degree" if he or she keeps any loaded firearm within any premise which is under his or her
        custody or control and he or she knows or reasonably should know that a child is likely to gain
        access to the firearm without the permission of the child parent or legal guardian and the child
        obtains access to the firearm and thereby causes death or great bodily injury to himself, herself, or
        any other person.
    (2) Except as provided in subdivision (c), a person commits the crime of "criminal storage of a firearm of
        the second degree" if he or she keeps any loaded firearm within any premise which is under his or
        her custody or control and he or she knows or reasonably should know that a child is likely to gain
        access to the firearm without the permission of the child's parent or legal guardian and the child
        obtains access to the firearm and thereby causes injury, other than great bodily injury, to himself,
        herself, or any other person, or carries the firearm either to a public place or in violation of Section
        417.
(c) Subdivision (b) shall not apply whenever any of the following occurs:
    (1) The child obtains the firearm as a result of an illegal entry to any premises by any person.
    (2) The firearm is kept in a locked container or in a location that a reasonable person would believe to be
        secure.
    (3) The firearm is carried on the person or within such a close proximity thereto so that the individual can
        readily retrieve and use the firearm as if carried on the person.
    (4) The firearm is locked with a locking device that has rendered the firearm inoperable.
    (5) The person is a peace officer or a member of the armed forces or national guard and the child obtains
        the firearm during, or incidental to, the performance of the person's duties.
    (6) The child obtains, or obtains and discharges, the firearm in a lawful act of self-defense or defense of
        another person, or persons.
    (7) The person who keeps a loaded firearm on any premise which is under his or her custody or control
        has no reasonable expectation, based on objective facts and circumstances, that a child is likely to
        be present on the premise.

-8-

SER0035

State of California, Department of Justice
# Standard Application for CCW License

**Section 5 - Applicable California Penal Code Sections - (continued)**

**Penal Code Section 12036 -Firearms Accessed by Children and Carried Off-premises**
(a) As used in this section, the following definitions shall apply:
    (1) "Locking device" means a device that is designed to prevent the firearm from functioning and when
        applied to the firearm, renders the firearm inoperable.
    (2) "Child" means a person under the age of 16 years. (3) "Off-premises" means premises
    other than the premises where the firearm was stored.
    (4) "Locked container" has the same meaning as set forth in subdivision (d) of Section 12026.2.
(b) A person who keeps a pistol, revolver, or other firearm capable of being concealed upon the person, loaded
    or unloaded, within any premise that is under his or her custody or control and he or she knows or
    reasonably should know that a child is likely to gain access to that firearm without the permission of the
    child's parent or legal guardian and the child obtains access to that firearm and thereafter carries that
    firearm off-premises, shall be punished by imprisonment in a county jail not exceeding one year, by a
    fine not exceeding one thousand dollars ($ 1,000), or by both that imprisonment and fine.
(c) A pistol, revolver, or other firearm capable of being concealed upon the person that a child gains access to
    and carries off-premises in violation of this Section shall be deemed "used in the commission of any
    misdemeanor as provided in this code or any felony" for the purpose of subdivision (b) of Section 12028
    regarding the authority to confiscate firearms and other deadly weapons as a nuisance.
(d) This Section shall not apply if any one of the following circumstances exists:
    (1) The child obtains the pistol, revolver, or other firearm capable of being concealed upon the person as
        a result of an illegal entry into any premises by any person.
    (2) The pistol, revolver, or other firearm capable of being concealed upon the person is kept in a locked
        container or in a location that a reasonable person would believe to be secure.
    (3) The pistol, revolver, or other firearm capable of being concealed upon the person is locked with a
        locking device that has rendered the firearm inoperable.
    (4) The pistol, revolver, or other firearm capable of being concealed upon the person is carried on the
        person within such a close range that the individual can readily retrieve and use the firearm as if carried
        on the person.
    (5) The person is a peace officer or a member of the armed forces or national guard and the child obtains
        the pistol, revolver, or other firearm capable of being concealed upon the person during, or incidental
        to, the performance of the person's duties.
    (6) The child obtains, or obtains and discharges, the pistol, revolver, or other firearm capable of being
        concealed upon the person in a lawful act of self-defense or defense of another person or persons.
    (7) The person who keeps a pistol, revolver, or other firearm capable of being concealed upon the
        person has no reasonable expectation, based on objective facts and circumstances, that a child is likely
        to be present on the premises.

-9-

SER0036

State of California, Department of Justice

# Standard Application for CCW License

## Section 6 - Agreement to Restrictions   and to Hold Harmless

I accept and assume all responsibility and liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the agency that issued the license. In the event any claim, suit or action is brought against the agency that issued the license, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the agency that issued the license, its chief officer or any of its employees from such claim, suit, or action.

I understand that the acceptance of my application by the licensing authority does not guarantee the issuance of a license and that fees and costs are not refundable if denied. I further understand that if my application is approved and I am issued a license to carry a concealed weapon, that the license is subject to restrictions placed upon it and that misuse of the license will cause an automatic revocation and possible arrest and that the license may also be suspended or revoked at the discretion of the licensing authority at any time. I am aware that any use of a firearm may bring criminal action or civil liability against me.

I have read, understand, and agree to the CCW license liability clauses, conditions, and restrictions stated in this Application and Agreement to Restrictions and to Hold Harmless.

I have read and understand the applicable Penal Code sections regarding False Statements on a CCW Application, Manslaughter, Killing in Defense of Self or Property, Limitation on Self-defense and Defense of Property, and Child Access and Firearm Storage, stated in this application.

I have read and understand Attachment 1 - California Prohibiting Categories for a CCW License, Attachment 2 - California Prohibiting Misdemeanors, and Attachment 3 - Federal Prohibiting Categories for Possessing Firearms. I further acknowledge that these Prohibiting Categories can be amended or expanded by state or federal legislative or regulatory bodies and that any such amendment or expansion may affect my eligibility to hold a CCW.

_____        9-7-10
Applicant Signature                             Date

_____        _____
Witness Signature / Badge Number           Date

-10-

SER0037

State of California, Department of Justice
# Standard Application for CCW License

## Section 7 - Investigator's Interview Notes

Applicant
Name: __Raulinaitis, Sigitas, Jonas__

      Last            First           Middle

Date of Birth: _____    Age: 47 _____

Social Security No.: ___ _____

California DLAD No.: _____

Driver's License Restrictions: __Corrective Lenses_____

Residence Address:

_____ __Santa Clarita, CA   91351__
                       Apt.      City      State    Zip

Mailing Address (if different):

__142 W. Verdugo Ave_____ __Burbank, CA   91502__
   Number      Street            Apt     City     State    Zip

Home / Personal Phone Numbers: __(818 ) 731-1084_____

Spouse's Name and Address: __Rima Raulinaitis_____

_____

Applicant Occupation: __General Contractor, Attorney, Real Estate Broker__

Business / Employer Name: __MTI Builders, Inc._____

Business Phone Number: __( 818 ) 295-6991_____

Business Address:

__142 W. Verdugo Ave._____ __Burbank, CA   91502__
   Number      Street            Apt     City     State    Zip

1.    List all previous home addresses for the past five years.

_____                        _____

_____                        _____

_____

-11-

SER0038

**State of California, Department of Justice**
## Standard Application for CCW License

### Section 7 -  Investigator's Interview Notes -    (continued)

2. Have you ever been in a mental institution, treated for mental illness, or been found
not-guilty by reason of insanity ? No  X____  Yes  _____  (If yes, explain):

_____

_____

3. Are you now, or have you ever been, addicted to a controlled substance or alcohol, or have you
ever utilized an illegal controlled substance, or have you ever reported to a
detoxification or drug treatment program? No  X____  Yes  _____  (If yes, explain):

_____

_____

4. Have you ever been involved in an incident involving firearms?
No _____ Yes X_____ (If yes, explain):

_2003 I forgot to unpack a pistol after a hunting trip and it___

_was left in my case.  Unfortunately, I had a flight to catch__

_and it was found by security.  No charges filed, treated as a_

_detention, not an arrest._____

5. Have you been involved in a domestic violence incident?
No_ X _Yes_____(If yes, explain):

_____

_____

6. List any arrests or formal charges, with or without disposition, for any criminal offenses
within the U.S. or any other country (civilian or military).

_____

_____

_____

-12-

SER0039

State of California, Department of Justice

## Standard Application for CCW License

**Section 7 -  Investigator's Interview Notes   - (continued)**

If the CCW license is desired for self-protection, the protection of others, or for the protection of large sums of money or valuable property, you are required to explain and provide good cause for issuance of the license. For example, has your life or property been threatened or jeopardized? Explain incidents and include dates, times, locations, and names of police agencies to which these incidents were reported.

Details of Reason for Applicant Desiring a CCW License (use additional sheets if needed).

My professions are: Construction Contractor, Real Estate Broker, and Attorney.  My construction and real estate practice takes me to many different parts of the city, some not very good areas. This work requires inspecting properties such as apartment complexes and other buildings that may be vacant and could harbor squatters and trespassers that may pose a danger to me.  My presence at properties that are actively being foreclosed upon may result in confrontations with people that may be emotionally involved in a desperate situation.  Further, because the subject properties are in all areas of southern California, my presence including my manner of dress, and the type of car that I drive may single me out as being a person who might have property, money or other possessions that persons in blighted areas may attempt to forcibly deprive me of.  Acts such as this could put my physical safety in jeopardy.

Additionally, I have 2 residences.  One in Santa Clarita, CA, and the other is in Big Bear Lake, CA.  Travel between these 2 locations, often at night, requires travel through sparsely populated areas where self protection may be required without warning.
Further, I transport firearms for the purposes of hunting and target shooting often long distances and in remote locations where the protection of myself and my property can best be done by me.

As a landlord owning 2 rental properties, I am sometimes called out to make repairs at all hours of the night. Additionally, sometimes the rent is paid in cash and I am forced to transport large amounts of cash personally.

-13-

SER0040

State of California, Department of Justice
# Standard Application for CCW License

## Section 8 -   Certification and Release of Information

I hereby give permission to the agency to which this application is made to conduct a background investigation of me and to contact any person or agency who may add to or aid in this investigation. I further authorize persons, firms, agencies and institutions listed on this application to release or confirm information about me and statements I have made as contained in this application.

Notwithstanding any other provision of law and pursuant to the Public Records Act (Government Code section 6250 et seq.), I understand that information contained in this application may be a matter of public record and shall be made available upon request or court order.

I hereby certify under penalties of perjury and Penal Code section 1205 1 (b) and (c), that the answers I have given are true and correct to the best of my knowledge and belief, and that I understand and agree to the provisions, conditions, and restrictions herein or otherwise imposed.

_____     9 - 7 - 10
Applicant Signature                                                    Date


_____     _____
Witness Signature / Badge Number                            Date

-14-

SER0041

September 7, 2010


Los Angeles Sheriff's Department
Jocelyn Perez
4700 Ramona Blvd.
Monterey Park, CA 91754

Dear sir or madam:

Attached please find my application for CCW License, and a check for $10.00 made
payable to the Los Angeles County Sheriff's Department.

Thank you for your kind consideration.

Sincerely,

Sig-Raulinaitis

# EXHIBIT 3

SER0043



**County of Los Angeles**

**Sheriff's Department Headquarters**

**4700 Ramona Boulevard**

**Monterey Park, California 91754-2169**



LEROY D. BACA, SHERIFF

October 22, 2010

Mr. Sigitas J. Raulinaitis

Dear Mr. Raulinaitis:

Department Executives have reviewed your application for a concealed weapon license. The circumstances, as outlined in the application, do not satisfy the requirements for the existence of good cause and we must, pursuant to our policy, deny your request.

Our stated policy as to what constitutes good cause for the issuance of a permit is stated below for your information:

> "......specifically state under the section entitled "Qualifications for a CCW License" those circumstances which present convincing evidence of a clear and present danger to life, or of great bodily harm to the applicant, his/her spouse, or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by applicant's carrying of a concealed firearm."

Typically, the verbiage "convincing evidence of a clear and present danger...." refers to a current situation which involves a specific person(s) who has threatened an individual and who has displayed a pattern of behavior which would suggest that the threat(s) could be carried out. Situations which would suggest only a potential danger to one's safety, (e.g. carrying large amounts of money to the bank, profession/job, working late hours in a high crime rate area, etc.) are not consistent with the criteria for issuance of a concealed weapon license.

If I may be of further assistance, please do not hesitate to call me or Lieutenant Charles Antuna at (323) 526-5118.

Sincerely,

LEROY D. BACA, SHERIFF

LARRY L. WALDIE
UNDERSHERIFF

*A Tradition of Service*

SER0044

# EXHIBIT 4

SER0045

# Sig J. Raulinaitis
**Attorney at Law**
142 W. Verdugo Ave. Burbank, CA 91502
Phone: 818-295-6991 Fax: 818-295-3732 Email: sig@mtibuilders.com

November 10, 2010

County of Los Angeles Sheriff's Department
Sheriff Leroy D. Baca
Undersheriff Larry L. Waldie
Lt. Charles Antuna
4700 Ramona Blvd.
Monterey Park, CA  91754-2169

Regarding CCW Applications of Sigitas J. Raulinaitis and Rima L. Raulinaitis

Dear Sirs:

I am in receipt of your October 22, 2010 letters denying CCW licenses for the above referenced
individuals.  This letter serves to formally request that you review you decision and is based on
the following:

1. It appears from the language of your denial, that your department is using criteria set
   forth initially in 1977 in an opinion letter written by then Attorney General of California,
   Evelle J. Younger, as to what the responsibility of the a Sheriff or Police Chief is as it
   relates to Penal Code Section 12050 in the issuance of CCW licenses.  A copy is
   attached for your reference.
2. On June 28, 2010, the Supreme Court of the United States of America decided the case of
   McDonald et Al. vs. The City of Chicago, Il.  Case No. 08-1521.  Additionally, on June
   26, 2008, the Supreme Court of the United States of America also decided the case of
   District of Columbia et Al. vs. Heller, Case No. 07-290.  This pair of cases resolves,
   clearly and finally, the status of the Second Amendment to the U.S. constitution and the
   right of citizens to keep and bear arms for self defense purposes.
3. The above referenced cases hold that:
   a. The second amendment (the right to keep and bear arms) is an individual right.
   b. The second amendment is a fundamental right (much like the first amendment and
      the fifth amendment), and as such, the restriction of this right by a governmental
      entity can only be to further a compelling state interest.  Any restriction of this
      right must be narrowly tailored and be the least restrictive possible to achieve any
      compelling state interest.
   c. The second amendment is applied against the states through the 14th amendment.

In light of the above, it is obvious that the policy that you have referenced in denying the
applications for CCW's is outdated, and the application thereof results in a violation of the
fundamental right to keep and bear arms as guaranteed in the second amendment.  By applying a
standard of "Good Cause" that goes beyond any legal desire that the applicant may have to keep
and bear arms (such as self defense), without showing the furtherance of some compelling state
interest,  your department has violated not only the second amendment to the constitution, but

SER0046

also 42 U.S.C. section 1983.

Bear in mind that "good cause" as it relates to an applicant's situation no longer controls your discretion under 12050, since the above referenced supreme court decisions make it clear that self defense is *the* "good cause" and the intent of the second amendment, and therefore the law of the land. Only a restriction that furthers a compelling state interest can be considered to vitiate good cause. Your department's denial, does not enumerate any compelling state interest served by your denial.

This is a grave and serious transgression against the fundamental rights of Mr. and Mrs. Raulinaitis. I am requesting that your department re-align its policies to conform with the recent Supreme Court decisions, so that you are not in further violation of this important fundamental right. Further, I am requesting that you immediately issue CCW licenses to Mr. and Mrs. Raulinaitis, and continue to renew said licenses until such time that the Supreme Court reverses its decision or issues a holding contrary to its current holding. Since this serious violation of the Raulinaitis' rights can be rectified easily, I am expecting that you will do this within 30 days of your receipt of this letter.

Failure to comport your department's policies to the supreme law of the land is of no service to the people of the County of Los Angeles that you are sworn to serve. The continued violation of the rights of its citizens generally and Mr. and Mrs. Raulinaitis specifically, will result in a federal court action under 42 U.S.C. 1983 with a prayer for injunctive relief in the form of my request in this letter as well as costs and attorney's fees as allowed by Federal law.

Thank you for your timely review of this application. If you have any questions, I can be reached at 818-731-1084

Sincerely,

Sig Raulinaitis, Esq.

Attorney at Law

Cc: Mrs. Rima Raulinaitis

Attachment: Aug 23, 1977 Opinion Letter by E. Younger

OFFICE OF THE ATTORNEY GENERAL

## Department of Justice

3580 WILSHIRE BLVD
LOS ANGELES, CALIFORNIA 90010
(213) 736-2304

IL __77__-__122__

Formerly OP. __22/30/12__

August 23, 1977

OPINION NO. CR. 77/30 I.L.

The Honorable Robert G. Beverly
Senator, California State Senate
Room 2086
State Capitol
Sacramento, California 95814

Dear Senator Beverly:

You have requested the opinion of this office on the following question:

> In light of the Court of Appeal decision in Salute v. Pitchess, 61 Cal. App. 3d 557, what are the obligations of local sheriffs, police chiefs, and police commissions under Penal Code sections 12050 and 12051 when application for a concealed weapon license is made?

The conclusion is:

> A local sheriff, police chief, or police commission has the duty to consider, investigate, and make a determination, on an individual basis, as to every license application under section 12050.

## ANALYSIS

Penal Code section 12050 provides in relevant part as follows:

> "(a) The sheriff of a county or the chief or other head of a municipal police department of any city or city and county, upon proof that the person applying is of good moral character, that good cause

The Honorable Robert G. Beverly
Page 2

exists for the issuance, and that the
person applying is a resident of the county,
may issue to such person a license to carry
concealed a pistol, revolver, or other
firearm for any period of time not to exceed
one year from the date of the license.

"(b) A license may include any
reasonable restrictions or conditions
which the issuing authority deems warranted,
including restrictions as to the time,
place, and circumstances under which the
person may carry a concealed firearm."

Under this section, then, the "issuing authority" has the
discretion to issue concealed weapon licenses to applicants
who meet three criteria: (1) good moral character,
(2) residency in the county issuing the license, and
(3) good cause existing for issuing the permit.

Recently the California Court of Appeal (Second Appellate
District) reviewed the "fixed policy" of the Los Angeles
County Sheriff of not granting concealed weapon licenses
under section 12050 except for applicants who were judges
or certain other public office holders who had expressed
concern for their personal safety. Salute v. Pitchess
61 Cal. App. 3d 557, 559-60. In this decision the Court
of Appeal held that the sheriff's policy was a "refusal of
the sheriff to exercise the discretion given him by the
statute." Id. at 560. The court further stated that "to
determine, in advance, as a uniform rule, that only selected
public officials can show good cause is to refuse to consider
the existence of good cause on the part of citizens generally
and is an abuse of, and not an exercise of, discretion." Id.
Finally the court stated in the Salute decision: "It is the
duty of the sheriff to make . . . an investigation and
determination [as to the existence of good cause], on an
individual basis, on every application under section 12050."
Id. at 560-61.

The Salute case, thus, requires any "issuing authority" to
consider all applications for a concealed weapon license,
to investigate where necessary, and to determine whether
any applicant meets the three criteria for the license.
Initially, the issuing authority's investigation may
consist of no more than determining that the applicant
resides in the county and that, as to good moral character,

The Honorable Robert G. Beverly
Page 3

the applicant has not suffered criminal convictions.
Such an initial investigation may also seek to ascertain
that all information provided by the applicant in his
application is true and correct.

As to the first criterion for the license, definition of
"good moral character" is somewhat elusive.  One older
California decision concerning a civil service application
for employment as a police officer defined good moral
character as including all the elements essential to
make up such character, including honesty and sobriety.
Klevesahl v. Byington, 1 Cal. App. 2d 671, 675.  Certainly
it would also appear that a person who has committed acts
of moral turpitude lacks good moral character.  Moral
turpitude has been defined as anything contrary to justice,
honesty, modesty, or good morals.  In re O'Connell,
199 Cal. 538, 544; see also Resner v. State Bar, 67 Cal.
2d 799, 809.  Finally, conviction of a crime or even an
extensive record of arrests would indicate a lack of good
moral character.  See People v. Joseph, 173 Misc. 410,
17 N.Y.S. 2d 943, 944 (1940).  As to the applicant's
criminal arrest record, however, the issuing authority
should take cognizance of Business and Professions Code
section 461, which appears to apply to applications for
concealed weapon licenses.  That section reads as follows:

"No public agency, state or local,
shall, on an initial application form for
any license, certificate or registration,
ask for or require the applicant to reveal
a record of arrests that did not result
in a conviction or a plea of nolo contendere.
A violation of this section is a misdemeanor.

"This section shall apply in the case
of any license, certificate or registration
provided for by any law of this state . . . ."
(Emphasis added.)

This provision, however, does not appear to preclude considera-
tion of the record of arrest ascertained by other means.

Any issuing authority has great latitude in exercising its
discretion under section 12050 to determine when "good cause"
exists for the issuance of a license.  That discretion is
"very broad, particularly with respect to activities of harm-
ful propensities . . . ."  9 McQuillan, Municipal Corporations

The Honorable Robert G. Beverly
Page 4

(3d revised ed.)  158; see also Iscoff v. Police Commission,
222 Cal. App. 2d 395, 402.

It has been held that the control of licenses by a public
agency is for the protection of the public and not
primarily for purposes related to the potential licensee.
Ready v. Grady, 243 Cal. App. 2d 113, 116; Copeland v.
Department of Alcoholic Beverage Control, 241 Cal. App. 2d
166, 168.  With respect to the instant license, it was
judicially recognized early that the habit of carrying
concealed weapons is a menace to public safety and may
be prohibited although the bearing of arms in that manner
may be justified under the circumstances of some individual
cases.  Ex parte Luening, 3 Cal. App. 76, 78.

In evaluating good cause, the issuing authority may first
of all consider various factors associated with the
individual applicant.  The authority might initially
consider the applicant's experience and training in the
use of firearms.  Some certification of training might be
required.  Secondly, the authority could also inquire into
the applicant's physical and emotional stability (e.g.,
is the applicant's mental health good, or is he accident
prone, although such definitive findings here might prove
difficult).  Third, the authority might assure that danger
to or from third parties (e.g., children associated with
the applicant) would not be increased.  In a New York
decision involving an application for a concealed firearms
permit, the denial of the permit was upheld where investiga-
tion indicated the applicant had a juvenile delinquent son
who might gain access to the weapon.  In Application of
Grauling, 17 Misc. 2d 1021, 183 N.Y.S. 2d 654, 655-58 (1959).
Fourth, the issuing authority must determine whether the
threat to the applicant (or other causal situation) is as
real as the applicant asserts (e.g., is there a clear and
present danger to the applicant, his spouse, his family,
or his employees)?  Finally, if the danger is manifest,
the authority should determine whether that danger cannot
be significantly alleviated by alternative means of security
and whether the danger in fact can be lawfully mitigated by
the applicant's obtaining a concealed weapon license.  Some
of the alternative means of security which should be con-
sidered would be normal local law enforcement activity,
special police protection, or employment of a private escort
or security service.

The Honorable Robert G. Beverly
Page 5

A New Jersey denial of a concealed weapon permit was
upheld in Siccardi v. State, 59 N.J. 545, 484 A.2d 533,
535, 540 (1971), where it was determined that the threats
to the applicant were not serious, that there had been
no past incidents, and that there existed dangers of
misuse or accidental use.  In addition, that decision
focused on the fact that the threat, as such, could as
easily be alleviated by a police escort or the employment
of private security guards or escorts.   Id.

In addition to the foregoing factors and conditions
relating to the individual applicant's situation, the
issuing authority might well also consider local circum-
stances and general social conditions relating to the
dangers inherent in proliferation of concealable weapons.
The standards established by the issuing authority for
"good cause" might be based in part, at least, upon
such other considerations as viewed in the light of the
issuing authority's special knowledge and expertise
relating to weapons use in the community.   Hough v.
McCarthy, 54 Cal. 2d 273, 286.

Finally, the issuing authority should consider that under
subdivision (b) of Penal Code section 12050 it may include
in the license "any reasonable restrictions or conditions
which the issuing authority deems warranted, including
restrictions as to the time, place, and circumstances
under which the person may carry a concealed firearm."
For example, if an applicant required the firearm merely
to protect the delivery or deposit of funds in a bank
on certain occasions, the license could be properly
restricted to such occasions.  Other license limitations
as to time, place, or circumstances in which the firearm
might be carried lawfully concealed are easily conceivable.
In protecting the public such restrictions should always
be considered.

Very truly yours,

EVELLE J. YOUNGER
Attorney General

Roger W Boren

db

# EXHIBIT 5

SER0053

**State of California, Department of Justice**
# Standard Application for CCW License

Official Use Only -Type of Permit
Requested ( ) Standard    ( ) Judge
( ) Reserve Officer ( ) 90 Day

## Public Disclosure Admonition

I understand that I am obligated to be complete and truthful in providing information on this application. I understand that all of the information disclosed by me in this application may be subject to public disclosure.

Applicant Signature _____

Date  9/28/2010

Witness Signature / Badge Number _____

Date _____

## Section I - Applicant Personal Information

Name:  Raulinaitis          Rima          Laura
       Last              First          Middle

If Applicable,
Maiden Name or Other Name(s) Used:  Jasiukonis (maiden name)

City and County                    Country of
of Residence:  City of Santa Clarita    Citizenship: U.S.

Date of Birth:  REDACTED  Place of Birth: Los Angeles, Los Angeles Cty., CA
                                          City      County      state

Height: 5-7     Weight: 180     Color Eyes: Brown    Color Hair: Brown

## Section 2 - Applicant Clearance Questions

1. Do you now have, or have you ever had a license to carry a concealed weapon (CCW)?
   No X  Yes _____ (If yes, please indicate below. Use additional pages if necessary.)

Issuing Agency _____  Issue Date _____  CCW# _____

2. Have you ever applied for and been denied a license to carry a concealed weapon?
   No X  Yes _____ (If yes, give agency name, date and reason for denial.)

-3-

SER0054

State of California, Department of Justice
## Standard Application for CCW License

### Section 2 - Applicant Clearance Questions - (continued)

3. Have you ever held and subsequently renounced your United States citizenship?
   No  X   Yes_____  (If yes, explain):

   _____

4. If you served with the Armed Forces, were you ever convicted of any charges or was

   your discharge other than honorable? No _____ Yes _____  (If yes, explain):

   _____

   _____

5. Are you now, or have you been, a party to a lawsuit in the last rive years?
   No  X   Yes_____  (If yes, explain):

   _____

   _____

   _____

   _____

6. Are you now, or have you been, under a restraining order(s) from any court?
   No  X   Yes_____  (If yes, explain):

   _____

   _____

7. Are you on probation or parole from any state for conviction of any offense including

   traffic? No  X    Yes _____  (If yes, explain):

   _____

   _____

-4-

State of California, Department of Justice
# Standard Application for CCW License

## Section 2 . Applicant Clearance Questions - (continued)

8.  List all traffic violations (moving violations only) and motor vehicle accidents you have had in the last five years. (Use additional pages if necessary.)

Date _____  Violation / Accident _____  Agency / Citation # _____

_____

_____

_____

_____

9.  Have you ever been convicted for any criminal offense (civilian or military) in the U.S. or any other country?

    No  X   Yes_____  (If yes, explain including date, agency, charges, and disposition.)

_____

_____

10. Have you withheld any fact that might affect the decision to approve this license?

    No  X   Yes_____(If yes, explain):

_____

_____

## Section 3 . Descriptions of Weapons:

List below the weapons you desire to carry if granted a CCW. You may carry concealed only the weapon(s) which you list and describe herein, and only for the purpose indicated. Any misuse will cause an automatic revocation and possible arrest. (Use additional pages if necessary.)

| | Make | Model | Caliber | Serial No. |
|---|---|---|---|---|
| 1. | Ruger | P-89 | 9mm | 30494974 |
| 2. | Kahr | PM9 | 9mm | IB4009 |
| 3. | | | | |

-5-

SER0056

State of California, Department of Justice
## Standard Application for CCW License

### Section 4 -  CCW License Conditions and Restrictions

The licensee is responsible for all liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the agency that issued the license. In the event any claim, suit, or action is brought against the agency that issued the license, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the agency that issued the license, its chief officer or any of its employees from such claim, suit, or action.

The licensee authorizes the licensing agency to investigate, as they deem necessary, the licensee's record and character to ascertain any and all information which may concern his/her qualifications and justification to be issued a license to carry a concealed weapon and release said agency of any and all liability arising out of such investigation.

While exercising the privileges granted to the licensee under the terms of this license, the licensee shall not, when carrying a concealed weapon:
- Consume any alcoholic beverage.
- Be in a place having a primary purpose of dispensing alcoholic beverages for on-site consumption.
- Be under the influence of any medication or drug, whether prescribed or not.
- Refuse to show the license or surrender the concealed weapon to any peace officer upon demand.
- Impede any peace officer in the performance of his/her duties.
- Present himself/herself as a peace officer to any person unless he/she is, in fact, a peace officer as defined by California law.
- Unjustifiably display a concealed weapon.
- Carry a concealed weapon not listed on the permit
- Carry a concealed weapon at times or circumstances other than those specified in the permit.

Pursuant to U.S. Government Code - Title 49, Chapter 26, Section 1472 (1) and Federal Aviation Regulation 121.583, a license to carry a concealed weapon does not authorize a person to carry a firearm, tear gas, or any dangerous weapon aboard commercial airlines. Further, a person must declare that he/she is carrying such firearm, tear gas, or dangerous weapon BEFORE entering the boarding area of an air terminal where the security checks are made. Such violation can result in arrest by law enforcement.

Any violation of these restrictions or conditions may invalidate the CCW license and may void any further use of the license until reinstated by the licensing authority. Any arrest for a felony or serious misdemeanor, including driving under the influence of alcohol and/or drugs, is cause for invalidating the license.

-6-

SER0057

State of California, Department of Justice
# Standard Application for CCW License

## Section 5 -   Applicable California Penal Code Sections

The following Penal Code sections are of special importance to the holder of a CCW license
regarding the use, carrying, and storage of firearms:

Penal Code Section 12051 - Applications for CCW Licenses; False Statements

(b) Any person who files an application required by subdivision (a) knowing that statements contained therein
are false is guilty of a misdemeanor.
(c) Any person who knowingly makes a false statement on the application regarding any of the following shall
be guilty of a felony:
   (1) The denial or revocation of a license, or the denial of an amendment to a license, issued pursuant to
       Section 12050.
   (2) A criminal conviction.
   (3) A finding of not guilty by reason of insanity.
   (4) The use of a controlled substance.
   (5) A dishonorable discharge from military service.
   (6) A commitment to a mental institution.
   (7) A renunciation of United States citizenship.

**Penal Code Section 192 - Manslaughter**
Manslaughter is the unlawful killing of a human being without malice.
(a) Voluntary - upon a sudden quarrel or heat of passion.
(b) Involuntary - in the commission of an unlawful act, not amounting to a felony; or in the commission of
   a lawful act which might produce death, in an unlawful manner, or without due caution and
   circumspection; provided that this subdivision shall not apply to acts committed in the driving of a
   vehicle.

**Penal Code Section 197 - Justifiable Homicide; Any Person**
Homicide is justifiable when committed by any person in any of the following cases:
1.   When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily
     injury upon any person; or,
2.   When committed in defense of habitation, property, or person, against one who manifestly intends or
     endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and
     endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the
     of offering violence to any person therein; or,
3.   When committed in the lawful defense of such person, or of a wife or husband, parent, child, master,
     mistress, or servant of such person, when there is reasonable ground to apprehend a design to
     commit a felony or to do some great bodily injury, and imminent danger of such design being
     accomplished; but such person, or the person in whose behalf the defense was made, if he was the
     assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any
     further struggle before the homicide was committed; or,
4.   When necessarily committed in attempting, by lawful ways and means, to apprehend any person for
     any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the
     peace.

-7-

SER0058

State of California, Department of Justice

# Standard Application for CCW License

## Section 5 -  Applicable California Penal Code Sections -   (continued)

**Penal Code Section 198 - Justifiable Homicide; Sufficiency of Fear
(Limitation of Self-defense of Property Rule)**
A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

**Penal Code Section 199 - Justifiable and Excusable Homicide; Discharge of Defendant**
The homicide appearing to be justifiable or excusable, the person indicted must, upon his trial, be fully acquitted and discharged.

**Penal Code Section 12035 - Storage of Firearms Accessible to Children**
(a) As used in this section, the following definitions shall apply:
    (1) "Locking device" means a device that is designed to prevent the firearm from functioning and when applied to the firearm, renders the firearm inoperable.
    (2) "Child" means a person under the age of 16 years. (3) "Off-premises" means premises other than the premises where the firearm was stored.
    (4) "Locked container" has the same meaning as set forth in subdivision (d) of Section 12026.2.
(b)(1) Except as provided in subdivision (c), a person commits the crime of "criminal storage of a firearm of the first degree" if he or she keeps any loaded firearm within any premise which is under his or her custody or control and he or she knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child parent or legal guardian and the child obtains access to the firearm and thereby causes death or great bodily injury to himself, herself, or any other person.
    (2) Except as provided in subdivision (c), a person commits the crime of "criminal storage of a firearm of the second degree" if he or she keeps any loaded firearm within any premise which is under his or her custody or control and he or she knows or reasonably should know that a child is likely to gain access to the firearm without the permission of the child's parent or legal guardian and the child obtains access to the firearm and thereby causes injury, other than great bodily injury, to himself, herself, or any other person, or carries the firearm either to a public place or in violation of Section 417.
(c) Subdivision (b) shall not apply whenever any of the following occurs:
    (1) The child obtains the firearm as a result of an illegal entry to any premises by any person.
    (2) The firearm is kept in a locked container or in a location that a reasonable person would believe to be secure.
    (3) The firearm is carried on the person or within such a close proximity thereto so that the individual can readily retrieve and use the firearm as if carried on the person.
    (4) The firearm is locked with a locking device that has rendered the firearm inoperable.
    (5) The person is a peace officer or a member of the armed forces or national guard and the child obtains the firearm during, or incidental to, the performance of the person's duties.
    (6) The child obtains, or obtains and discharges; the firearm in a lawful act of self-defense or defense of another person, or persons.
    (7) The person who keeps a loaded firearm on any premise which is under his or her custody or control has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premise.

-8-

SER0059

State of California, Department of Justice
## Standard Application for CCW License

**Section 5 -   Applicable California Penal Code Sections -    (continued)**

**Penal Code Section 12036 -Firearms Accessed by Children and Carried Off-premises**
(a) As used in this section, the following definitions shall apply:
(1)."Locking device" means a device that is designed to prevent the firearm from functioning and when applied to the firearm, renders the firearm inoperable.
(2) "Child" means a person under the age of 16 years. (3) "Off-premises" means premises other than the premises where the firearm was stored.
(4) "Locked container" has the same meaning as set forth in subdivision (d) of Section 12026.2.
(b) A person who keeps a pistol, revolver, or other firearm capable of being concealed upon the person, loaded or unloaded, within any premise that is under his or her custody or control and he or she knows or reasonably should know that a child is likely to gain access to that firearm without the permission of the child's parent or legal guardian and the child obtains access to that firearm and thereafter carries that firearm off-premises, shall be punished by imprisonment in a county jail not exceeding one year, by a fine not exceeding one thousand dollars ($ 1,000), or by both that imprisonment and fine.
(c) A pistol, revolver, or other firearm capable of being concealed upon the person that a child gains access to and carries off-premises in violation of this Section shall be deemed "used in the commission of any misdemeanor as provided in this code or any felony" for the purpose of subdivision (b) of Section 12028 regarding the authority to confiscate firearms and other deadly weapons as a nuisance.
(d) This Section shall not apply if any one of the following circumstances exists:
(1) The child obtains the pistol, revolver, or other firearm capable of being concealed upon the person as a result of an illegal entry into any premises by any person.
(2) The pistol, revolver, or other firearm capable of being concealed upon the person is kept in a locked container or in a location that a reasonable person would believe to be secure.
(3) The pistol, revolver, or other firearm capable of being concealed upon the person is locked with a locking device that has rendered the firearm inoperable.
(4) The pistol, revolver, or other firearm capable of being concealed upon the person is carried on the person within such a close range that the individual can readily retrieve and use the firearm as if carried on the person.
(5) The person is a peace officer or a member of the armed forces or national guard and the child obtains the pistol, revolver, or other firearm capable of being concealed upon the person during, or incidental to, the performance of the person's duties.
(6) The child obtains, or obtains and discharges, the pistol, revolver, or other firearm capable of being concealed upon the person in a lawful act of self-defense or defense of another person or persons.
(7) The person who keeps a pistol, revolver, or other firearm capable of being concealed upon the person has no reasonable expectation, based on objective facts and circumstances, that a child is likely to be present on the premises.

-9-

SER0060

State of California, Department of Justice
# Standard Application for CCW License

## Section 6 - Agreement to Restrictions   and to Hold Harmless

I accept and assume all responsibility and liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the agency that issued the license. In the event any claim, suit or action is brought against the agency that issued the license, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the agency that issued the license, its chief officer or any of its employees from such claim, suit, or action.

I understand that the acceptance of my application by the licensing authority does not guarantee the issuance of a license and that fees and costs are not refundable if denied. I further understand that if my application is approved and I am issued a license to carry a concealed weapon, that the license is subject to restrictions placed upon it and that misuse of the license will cause an automatic revocation and possible arrest and that the license may also be suspended or revoked at the discretion of the licensing authority at any time. I am aware that any use of a firearm may bring criminal action or civil liability against me.

I have read, understand, and agree to the CCW license liability clauses, conditions, and restrictions stated in this Application and Agreement to Restrictions and to Hold Harmless.

I have read and understand the applicable Penal Code sections regarding False Statements on a CCW Application, Manslaughter, Killing in Defense of Self or Property, Limitation on Self-defense and Defense of Property, and Child Access and Firearm Storage, stated in this application.

I have read and understand Attachment 1 - California Prohibiting Categories for a CCW License, Attachment 2 - California Prohibiting Misdemeanors, and Attachment 3 - Federal Prohibiting Categories for Possessing Firearms. I further acknowledge that these Prohibiting Categories can be amended or expanded by state or federal legislative or regulatory bodies and that any such amendment or expansion may affect my eligibility to hold a CCW.

_____         9/28/2010
**Applicant Signature**                                                       **Date**


_____         _____
**Witness Signature / Badge Number**                          **Date**

-10-

SER0061

State of California, Department of Justice

# Standard Application for CCW License

## Section 7 -  Investigator's Interview Notes

Applicant
Name:  **Raulinaitis**     **Rima**     **Laura**
          Last          First          Middle

Date of Birth:                                    Age: 45

Social Security No.:

California DLAD No.:

Driver's License Restrictions:  None

Residence Address:

                                    Santa Clarita, CA   91351
                          Apt.          City          State   Zip

Mailing Address (if different):

Number          Street                    Apt          City          State   Zip

Home / Personal Phone Numbers:   (661)

Spouse's Name and Address:   Sigitas Raulinaitis

                                                        91351

Applicant Occupation:   General Contractor

Business / Employer Name:   MTI Builders, Inc.

Business Phone Number:   (818) 295-6991

Business Address:

   142 W. Verdugo Ave.                    Burbank, CA   91502
   Number          Street                    Apt          City          State   Zip

1.   List all previous home addresses for the past five years.

SER0062

State of California, Department of Justice
# Standard Application for CCW License

## Section 7 -  Investigator's Interview Notes -   (continued)

2.  Have you ever been in a mental institution, treated for mental illness, or been found
    not-guilty by reason of insanity ? No __X__   Yes _____ (If yes, explain):

    _____

    _____

3.  Are you now, or have you ever been, addicted to a controlled substance or alcohol, or have you
    ever utilized an illegal controlled substance, or have you ever reported to a
    detoxification or drug treatment program? No __X__   Yes _____   (If yes, explain):

    _____

    _____

4.  Have you ever been involved in an incident involving firearms?
    No __X__ Yes_____(If yes, explain):

    _____

    _____

    _____

5.  Have you been involved in a domestic violence incident?
    No __X__ Yes_____(If yes, explain):

    _____

    _____

6.  List any arrests or formal charges, with or without disposition, for any criminal offenses
    within the U.S. or any other country (civilian or military).

    _____

    _____

    _____

-12-

SER0063

State of California, Department of Justice
# Standard Application for CCW License

## Section 7 -  Investigator's Interview Notes    - (continued)

If the CCW license is desired for self-protection, the protection of others, or for the protection of large sums of money or valuable property, you are required to explain and provide good cause for issuance of the license. For example, has your life or property been threatened or jeopardized? Explain incidents and include dates, times, locations, and names of police agencies to which these incidents were reported.

Details of Reason for Applicant Desiring a CCW License (use additional sheets if needed).

Self Defense

-13-

SER0064

State of California, Department of Justice
# Standard Application for CCW License

## Section 8 -   Certification and Release of Information

I hereby give permission to the agency to which this application is made to conduct a background investigation of me and to contact any person or agency who may add to or aid in this investigation. I further authorize persons, firms, agencies and institutions listed on this application to release or confirm information about me and statements I have made as contained in this application.

Notwithstanding any other provision of law and pursuant to the Public Records Act (Government Code section 6250 et seq.), I understand that information contained in this application may be a matter of public record and shall be made available upon request or court order.

I hereby certify under penalties of perjury and Penal Code section 1205 1 (b) and (c), that the answers I have given are true and correct to the best of my knowledge and belief, and that I understand and agree to the provisions, conditions, and restrictions herein or otherwise imposed.

_____        9/28/2010
**Applicant Signature**                                 **Date**


_____        _____
**Witness Signature / Badge Number**                    **Date**

-14-

SER0065

September 28, 2010


Los Angeles Sheriff's Department
Jocelyn Perez
4700 Ramona Blvd.
Monterey Park, CA 91754

Dear sir or madam:

Attached please find my application for CCW License, and a check for $10.00 made
payable to the Los Angeles County Sheriff's Department.

Thank you for your kind consideration.

Sincerely,


Rima Raulinaitis
661-618-7462

# EXHIBIT 6

SER0067





# County of Los Angeles
### Sheriff's Department Headquarters
#### 4700 Ramona Boulevard
#### Monterey Park, California 91754-2169

LEROY D. BACA, SHERIFF

October 22, 2010

Mrs. Rima L. Raulinaitis
19614 Sunrise Summit Drive
Santa Clarita, California   91351

Dear Mrs. Raulinaitis:

Department Executives have reviewed your application for a concealed weapon license.  The
circumstances, as outlined in the application, do not satisfy the requirements for the existence of
good cause and we must, pursuant to our policy, deny your request.

Our stated policy as to what constitutes good cause for the issuance of a permit is stated below
for your information:

> ".....specifically state under the section entitled  "Qualifications for a CCW License"
> those circumstances which present convincing evidence of a clear and present danger
> to life, or of great bodily harm to the applicant, his/her spouse, or dependent child,
> which cannot be adequately dealt with by existing law enforcement resources and
> which danger cannot be reasonably avoided by alternative measures, and which
> danger would be significantly mitigated by applicant's carrying of a concealed firearm."

Typically, the verbiage "convincing evidence of a clear and present danger...." refers to a current
situation which involves a specific person(s) who has threatened an individual and who has
displayed a pattern of behavior which would suggest that the threat(s) could be carried out.
Situations which would suggest only a potential danger to one's safety, (e.g. carrying large
amounts of money to the bank, profession/job, working late hours in a high crime rate area, etc.)
are not consistent with the criteria for issuance of a concealed weapon license.

If I may be of further assistance, please do not hesitate to call me or Lieutenant Charles Antuna
at (323) 526-5118.

Sincerely,

LEROY D. BACA, SHERIFF

LARRY L. WALDIE
UNDERSHERIFF

*A Tradition of Service*

SER0068

# EXHIBIT B

SER0069

1    **DECLARATION OF FRANKLIN E. ZIMRING**

2    I, Franklin E. Zimring, declare as follows:

3          1.    My current academic appointment is William G. Simon Professor of

4    Law, Wolfen Distinguished Scholar and Chair of the Criminal Justice Research

5    Program at the University of California, Berkeley.  I have been studying the

6    relationship between firearms and violence, strategies of firearms control, and

7    patterns of gun commerce and civilian gun usage since 1967.  I have served as

8    director of research of the task force on firearms of the National Commission on

9    the Causes and Prevention of Violence in 1968-1969 and as a firearms and federal

10   criminal law expert for the National Commission on Reform of Federal Criminal

11   Laws.  I have published several empirical studies of firearms and violence and on

12   gun control, and I have co-authored three books with firearms issues at their

13   center, in 1969, 1986 and 1997.  I have served as an expert both on the relationship

14   between firearms and violence and on the design and evaluation of firearms

15   control.  I am providing expert opinions on both of these topics in this declaration.

16   I was elected a Fellow of the American Academy of Criminology in 1993 and to

17   the American Academy of Arts and Sciences in 1990.  A full curriculum vitae is

18   Appendix A of this declaration.

19         2.    This declaration will summarize the empirical evidence and my

20   expert opinions concerning four issues arising out of this litigation.

21         (1)  The relationship between firearms and violence and the

22   governmental interest in reducing the rate of gun use in crime.

23         (2)  The particular governmental concerns with handguns and other

24   concealable weapons because of their disproportionate involvement in life-

25   threatening crimes of violence, particularly in streets and other public

26   places.

27         (3)  The special threat posed by concealed handguns as weapons used

28   by criminals in streets and other public spaces.  Persons using the streets

SER0070

1   cannot avoid and police patrolling the streets cannot detect persons who

2   carry concealed handguns and later will find victims who are at risk when

3   concealed guns are displayed in robberies or assaults and not infrequently

4   discharged.  The governmental interest in limiting the number of persons

5   licensed to carry weapons hidden on their persons in public places is

6   substantially related to reducing the volume and deadliness of street

7   robberies and assaults.

8        (4)  A robust right to own a handgun in the privacy of one's own

9   home imposes whatever risks the gun poses on the owner and his family and

10  those who choose to visit those premises as long as the gun stays home.  But

11  unlimited freedom given to a person to carry a hidden handgun on the

12  streets subjects everybody else on the street to whatever risks that gun may

13  pose, and the others on the public fare have neither notice of the risk nor

14  power to control it.  This "externality" of unrestricted street carrying of

15  concealed weapons is probably the root cause of the longstanding and

16  broadly based history of restricting use of concealed weapons in public

17  places.

18  Firearms and the Death Rate from Violence.

19       3.   The overlap between firearms and crime in the United States is a

20  partial but important one.  Of all so-called "index" crimes reported to the police

21  nationwide (willful homicide, forcible rape, robbery, burglary, aggravated assault,

22  larceny over $50, motor vehicle theft, and arson), guns are known to be involved

23  in only about 4%.  But gun use is concentrated in violent crime, where about 20%

24  of all offenses involve guns.  And when only criminal acts that kill are counted,

25  guns account for almost 70% of all cases.  Why are gun cases seven out of every

26  ten lethal crimes, if firearms are used in only one out of five violent criminal acts?

27  Commonsense suggests that the greater dangerousness of guns when compared to

28  other frequently used instruments of attack such as knives and blunt instruments,

1   plays a major role in increasing the death rate from crimes, but there is an

2   alternative hypothesis, that robbers and assaulters who truly want to kill will

3   choose guns more often, and therefore that the greater death rate simply reflects

4   the more lethal intentions of those who use guns.  Which theory is better supported

5   by studying patterns of violent assault?

6       4.   A series of studies that were conducted under my supervision

7   addressed this issue from 1967 to 1988.  The first study compared knife and gun

8   attacks in Chicago over four police periods in 1967.  I found that when one only

9   compared gun and knife assaults to the same part of the body and controlled for

10  the number of wounds inflicted, the gun attacks were five times as likely to kill.[1]

11  Yet knives were the second most deadly instruments used in violent assault.  A

12  second study found that guns that fired smaller bullets were much less likely to kill

13  than guns firing larger bullets, again controlling for both the number of and the

14  location of the most life-threatening wound.  The central finding was that

15  instrumentality effects – the influences of weapon dangerousness independent of

16  measurable variations in the attacker's intent was an important influence in the

17  death rate from assault.[2]

18      5.   A second set of studies generated the same general results for the

19  weapons used in robberies.  Since the robber usually doesn't mean to inflict harm

20  if his demands are met, the death rate from all forms of robbery is much lower than

---

22  [1] Zimring, Franklin E. "Is Gun Control Likely to Reduce Violent Killings?"
23  *University of Chicago Law Review* 35:721 (1968).

24  [2] Zimring, Franklin E. "The Medium is the Message: Firearms Caliber as a
25  Determinant of the Death Rate from Assault," *Journal of Legal Studies* 1:97 (1972).
26  See Philip J. Cook, "The Technology of Personal Violence,' *Crime and Justice* 14:1
    (1991).

1  from aggravated assault, but robberies with firearms are much more likely to

2  produce a victim's death than robberies using knives or personal force.[3]  The

3  availability of guns may or may not influence the rate of robberies, but the

4  proportion of robberies that involve guns will have a major impact on the number

5  of victims who die in robberies, and lethal robberies are a major element in the

6  life-threatening violence that sets U.S. cities apart from the major metropolitan

7  areas of other developed nations.

8       6.    The governmental interest in restricting the use of guns in violent

9  crime is in reducing the number of deaths and life-threatening injuries that are

10  produced when guns rather than less deadly weapons became instruments of

11  robbery and assault.  This interest is clear, appropriate and important for both the

12  State of California and the County and City of Los Angeles.

13      <u>The Special Risks of Handguns.</u>

14       7.    All forms of firearms are very dangerous to life if they are used in

15  assaults and robberies, but the handgun is the major hazard, particularly in big

16  cities, because handguns are much more likely to be used in criminal violence than

17  shotguns and rifles.  Handguns are slightly more than one-third of all firearms

18  owned by civilians in the United States, but they are used in more than 75% of all

19  gun killings and in even larger portions of robberies.  The handgun is small, easy

20  to carry and conceal, and deadly at short range.  Handguns are the priority concern

21  of law enforcement everywhere.[4]

22

23

24     [3] Zimring, Franklin E. and James Zuehl. "Victim Injury and Death in Urban
Robbery: A Chicago Study," *Journal of Legal Studies* 15:1 (1986).

25     [4] Zimring, Franklin E. and Gordon Hawkins. Crime Is Not the Problem:

26  Lethal Violence in America, New York: Oxford University Press (1997), Chapters

27  1, 3 and 7. See also Zimring, Franklin E. and Gordon Hawkins, The Citizen's Guide
to Gun Control, New York: McMillan (1986), at Chapter 5, p. 38.

28

8.     The special dangers of handgun use in violence have produced a wide
variety of different legal strategies to minimize the rate of handgun misuse.  Many
nations attempt to restrict both the number of such firearms owned by citizens and
reasons why citizens might be permitted to own them.  But California, like most
U.S. states, allows competent adults to own handguns if they have no major record
of criminal conviction.

9.     Because California does not restrict eligibility of most citizens to own
handguns or the volume of guns owned, the state's first line of defense against the
use of such weapons in street crime is a series of restrictions on the time, place and
manner of handgun use.  California law prohibits the carrying of concealed deadly
weapons in public without a special permit.  The state law delegates the authority
to establish standards and make individual decisions in Los Angeles to county and
city law enforcement and government.  The goal here is to distinguish uses of
handguns that do not pose a special threat to the public (such as storage and use in
the owner's home) from uses that pose greater threats to public safety (such as the
carrying of concealed weapons in streets and public places).  The special danger of
a hidden handgun is that it can be used against persons in public robbery and
assault as well as transported to other indoor commercial and residential locations
to be used in attacks.  The concealment of a handgun means that other citizens and
police don't know it is in their shared space until it is brandished.  Concealed
handguns are a special problem for police because an armed police officer has no
warning that persons carrying concealed handguns are doing so.  A police officer
will be vulnerable to an element of surprise that will not be present if a person is
openly carrying a firearm.

10.     Of course not all of those carrying concealed handguns intend to use
them as instruments of public harm.  But the existence of a loaded weapon is a
hidden danger.  California's emphasis on controlling this risky use of guns rather
than restricting ownership itself is exactly opposite to the policy formerly pursued

1   by Washington, D.C. and disapproved in the *Heller* decision in 2008.  The

2   distinction between restricting ownership and restricting dangerous uses is

3   fundamental in the design of firearms control.  And no public law regulation of

4   firearms is as old or as pervasive as restrictions on public space use of firearms.

5       "The earliest and most numerous state and local laws relate to the
6       carrying or use of firearms.  In the 1600s, Massachusetts prohibited
        the carrying of defensive firearms in public places.  Kentucky in
7       1813, Indiana in 1819, Arkansas and Georgia in 1837 passed laws
        prohibiting the carrying of concealed weapons.  Many states and
8       most cities today have laws attempting to regulate what has been
        called the place and manner in which firearms may be carried or
9       used."[5]

10   Almost all places make special rules for concealed handguns in public places.

11       "Most often, state law prohibits the carrying of concealable firearms
        without a special permit and the discharge of guns within city
12       limits...Forty-nine states now impose some sort of restrictions on
        carrying a concealed gun."[6]

13

14   <u>The Public Danger of Concealed Firearms.</u>

15       11.    The previous section of this declaration documented the statistical

16   dominance of handguns in life-threatening violence but did not explain it.  Why are

17   handguns, a minority of all firearms, responsible for three-quarters of all firearms

18   deaths?  Why are handguns the overwhelmingly predominant firearm used in armed

19   robbery?

20       12.    This is a matter of simple criminal logistics.  Most firearms assaults

21   and almost all firearms robberies take place outside the offender's home, so that

22

23       [5] Newton, George and Franklin E. Zimring, *Firearms and Violence in
  *American Life,* staff report submitted to the National Commission on Causes and
24   Prevention of Violence, Washington D.C.: Government Printing Office (1969) at p.
  87 (citations in original omitted).

25       [6] Zimring, Franklin E. and Gordon Hawkins, *The Citizen's Guide to Gun
26   Control* (1986) at p. 123.  A more recent compendium lists 47 states with special
  permits, see www.lcav.org.

27

28

SER0075

1    using a firearm in crime requires transporting it to a non-home location.  But

2    carrying a loaded shotgun to a commercial location for a robbery or to somebody

3    else's home or on the street while looking for a target is a warning to potential

4    victims and a red flag to passersby and to any law enforcement personnel that the

5    armed pedestrian is not on an ordinary errand.  Other pedestrians and motorists can

6    avoid the visibly armed person and police can ask questions and subject the visibly

7    armed person to identity checks and surveillance.

8        13.    But the person with a concealed handgun in his pocket generates no

9    special notice until the weapon appears at his criminal destination.  The robber or

10   assaulter looks no different from any other user of common public spaces.  And this

11   ability to escape special scrutiny is the advantage that makes the concealed handgun

12   the dominant weapon of choice for gun criminals and a special danger to

13   government efforts to keep public spaces safe and secure.

14       14.    The necessity of carrying guns to crime sites without detection is one

15   reason why the National Violence Commission research reported that 86% of all the

16   firearms used in all assaults were handguns and an astonishing 96% of all firearms

17   robberies were committed with handguns in the ten large cities the task force

18   surveyed.[7]  What that robbery percentage means is that the problem of gun robbery

19   in American cities is almost exclusively a problem of concealable handguns.

20       15.    The stringent requirements that California and Los Angeles County and

21   cities within the county impose on persons wishing to have permits to carry loaded

22   and concealed guns have two strategic objectives.  The first and most important is to

23   restrict drastically the number of persons secretly armed on the streets of Los

24   Angeles County.

25       16.    Figure 1 shows the current control of the volume of California

26

27   [7] Newton, George and Franklin E. Zimring (1969), *Firearms and Violence in
American Life*, at Figure 8-1, p. 49.

28

HOA.879973.1                                     7

SER0076

1   concealed weapons (CCW) permits and the huge stakes of shifting to the standards

2   asserted as rights by the plaintiff in this litigation.  The current system of CCW

3   licensing allows citizens in Los Angeles to apply for CCW licenses either to the

4   county sheriff or to their local police.  For this reason, only countywide rates of

5   licensing can be determined without detail on the city of residence for all who obtain

6   county licenses.  Figure 1 provides countywide population and CCW data.

7   Figure 1. Population and Licenses to Carry in Los Angeles County.

8



18  Sources: population (U.S.Census Bureau, State and County Quickfacts, Los Angeles
    County, California, available at
19  http://quickfacts.census.gov/qfd/states/06/06037.html); permits (California
    Department of Justice, CCW Counts by County, 2000 through 2007, available at
20  http://ag.ca.gov/firearms/forms/pdf/ccwissuances2007.pdf)

21

22          17.    The rate per thousand adults of CCW permits is .16, indicating that

23  fewer than one of every 5,000 adults holds a permit.  By contrast, a system where all

24  persons without felony convictions, convictions for domestic violence crime or

25  involuntary mental health commitments would make more than 90% of Los Angeles

26  adults eligible for permits.  That would be just under seven million potential

27  carriers.

28          18.    Making the carrying of hidden deadly weapons into a very rare

1  privilege enables citizens not to worry that they must choose between carrying a gun

2  themselves or being unarmed in public spaces where many strangers are secretly

3  armed. Restricting the publicly entitled carriers of concealed handguns to a tiny

4  number also reinforces the practical monopoly of armed force by the police. And

5  the police are one of the primary groups protected by small rates of carrying

6  concealed guns since more than 90% of killings of police are with guns.[8]

7      19.     The special vulnerability of police to weapons concealed on a person is

8  the element of surprise in the event of an attack. An openly carried firearm is a

9  special danger to an officer, but it is a known danger. The police officer can be

10  prepared to draw or use his weapon when a weapon is on display. But the person

11  carrying a concealed handgun is a hidden danger to an officer. High rates of

12  carrying concealed weapons put the police on the horns of a dangerous dilemma—

13  either they (1) make no assumptions about persons being armed (in which case they

14  are surprised and at a disadvantage when a concealed weapon is drawn) or (2)

15  assume everybody is carrying a loaded gun in which case they will be much quicker

16  to draw and fire their own guns even if no weapons are in fact held by the person

17  being approached. So once a high rate of CCW takes place, the relationship

18  between armed police and citizens without any visible evidence of carrying guns

19  will get more dangerous for the police, for the citizen, or for both.

20      20.     The second strategic aim of a permit-to-carry requirement is to screen

21  those persons who do have special needs for concealed guns to make sure they will

22  not misuse the guns they carry. This kind of risk screening explains the good

23  character, minimum age and lack of criminal record requirements. But the central

24  reason to require a good reason for needing a gun is to reduce the number of secretly

25  armed citizens on the streets and sidewalks of one of the biggest urban areas in the

26  _____

27      [8] U.S. Department of Justice, Federal Bureau of Investigation, *Law
Enforcement Officers Killed and Assaulted* (2008), Table 27.

28

1   United States.

2        21.   There is one factual dispute of central importance in the distinction

3   between small and large volumes of CCW permits—the degree to which criminal

4   conduct is concentrated among formally identified felons. It is sometimes claimed

5   that simply excluding former felons would prevent persons with high risks of future

6   crime from being eligible to carry hidden handguns. This claim is false. A majority

7   of criminal homicides and other serious crimes are committed by individuals who

8   have not been convicted of a felony. The first published study on this question

9   found that in Chicago, 57% of those adults arrested for homicide did not have a

10  felony record.[9]

11       22.   It has more recently been reported that for all of New York State only

12  33% of all persons arrested for felonies have a felony conviction at the time of

13  arrest. Thus, about two-thirds of current felons would not be prohibited from

14  eligibility under "shall issue" criteria (meaning criteria wherein if a person has no

15  prior felony conviction, domestic violence conviction, or recent psychiatric

16  commitment, said person would automatically be entitled to a CCW permit).[10]

17       23.   What percentage of the persons committing serious crimes in Los

18  Angeles would be disqualified by reason of a felony conviction from a permissive

19  "right to carry" license standards? Julie Basco of the California Department of

20  Justice supervised an analysis of all 122,948 adult felony arrests in Los Angeles

21  County for 2010 and divided these persons by whether they had a pre-2010 felony

22  conviction. A total of 43,440 subjects had a prior felony that would keep them from

23

24       [9] P.J. Cook, J. Ludwig and A. Braqa, "Criminal Records of Homicide
25  Offenders," *Journal of the American Medical Association* 294(5), August 3, 2005.

26       [10] Reported in expert's declaration of Philip J. Cook in Kachalsky v. Cacase,
    Civil Action 10-cv-5413, Southern District of New York (2011).

27

28

1  being eligible in a "shall issue" mandate or constitutional rules.  Sixty-five percent

2  of Los Angeles County felons do not have a prior felony conviction when arrested.

3  These statistics indicate that Almost 2/3rds of the known current felons would not

4  be screened out by a prior felony from CCW permits without further barriers.  We

5  cannot divide the Department of Justice 35% into city and other-county segments,

6  but we are confident that 65% of Los Angeles County's felony suspects are not prior

7  felons:  The same general breakdown appears in the statewide New York findings.

8  Los Angeles is part of a general pattern.

9       24.    The State of California and the County of Los Angeles believes that it

10  would threaten the public health and safety to have hundreds of thousands of people

11  in the county carrying loaded handguns that the people who share the streets and

12  stores and parks of Los Angeles cannot see.

13       25.    Is this public choice consistent with *D.C. v. Heller's* conferral of a right

14  to handgun ownership under the Second Amendment?  Los Angeles has never tried

15  to restrict home possession, so it obviously believes that public places call for

16  different presumptive policies, and history is on Los Angeles' side.  Special

17  restrictions on carrying concealed weapons are venerable and almost universal.

18  Even the Plaintiff in this suit does not question the legitimacy of a special license for

19  carrying weapons.  The central question is whether publicly concealed weapons can

20  be restricted even if possession in the home is protected by *Heller*.

21       The External Dangers of Concealed Weapons in Public Spaces.

22       26.    The right of home possession announced in the *Heller* case does not

23  require citizens to purchase and own handguns in their houses but rather confers on

24  individuals the right to decide for themselves if the benefits of gun possession in the

25  home outweigh the risks.  So the Second Amendment liberty announced in *Heller*

26  puts the homeowner in a position of power to determine what risks to take.  As long

27  as the guns owned in the home stay there, Mr. Smith's gun is no risk to his

28  neighbors.  But the presence of loaded and concealed guns in public spaces is an act

SER0080

1 where Mr. Smith's decision will generate risks to others who use the streets, and go
2 to public accommodations.  And if the guns are concealed, the people who are
3 exposed to these risks won't have notice or any ability to avoid the armed presence
4 they confront.

5      27.    This "externality" means that the implications of concealed carrying are
6 spread over the community of users of public space and the only method of deciding
7 policy is a collective determination of whether concealed weapon carrying should be
8 allowed and under what circumstances.

9      28.    So government must be involved in public space regulation in a way
10 that is not necessary in the privacy of individual homes.  This is why concealed
11 weapons laws are the oldest form of legal regulation of gun use and the most
12 common.  There is a public choice that must be made to reduce the number of
13 persons carrying concealed weapons by limiting licenses.  But without a general rule
14 on the standard for licenses, there is no way that individual preferences for or
15 against high rates of permits can be translated into a regulatory framework.

16     I declare under penalty of perjury that the forgoing is true and correct.
17 Executed at *BERKELEY, California* this *24th* of April 2012.

18
19                FRANKLIN E. ZIMRING
20
21
22
23
24
25
26
27
28

# APPENDIX A

SER0082

# FRANKLIN E. ZIMRING                                    20 October 2011

**PERSONAL**    Born 1942, Los Angeles, California; married; two adult children.

**EDUCATION**    Los Angeles Public Schools; B.A. with Distinction, Wayne State University (1963); J.D. *cum laude*, University of Chicago (1967).

**PRESENT POSITION**    WILLIAM G. SIMON PROFESSOR OF LAW; WOLFEN DISTINGUISHED SCHOLAR and CHAIR, Criminal Justice Research Program, Institute for Legal Research (formerly the Earl Warren Legal Institute), Boalt Hall School of Law, University of California, Berkeley.

**OTHER WORK**    **Principal Investigator**, Center on Culture, Immigration and Youth Violence Prevention (2005-).

DIRECTOR, Earl Warren Legal Institute (1983-2002).

FACULTY OF LAW, University of Chicago (1967-85): KARL N. LLEWELLYN PROFESSOR OF JURISPRUDENCE (1982-85) and DIRECTOR, Center for Studies in Criminal Justice (1975-85).

MEMBER, MacArthur Foundation Research Program on Adolescent Development and Juvenile Justice (1997-2007).

FELLOW, Center for Advanced Studies in the Behavioral Sciences, Stanford, California (1979-80).

RAPPORTEUR, Task Force on Sentencing Policy for Young Offenders, Twentieth Century Fund (1978).

VISITING PROFESSOR OF LAW, University of California, Irvine (2004), University of South Africa (1993), University of California, Berkeley (1983-85), Yale University (1973), and University of Pennsylvania (1972).

DIRECTOR OF RESEARCH, Task Force on Firearms, National Commission on the Causes and Prevention of Violence (1968-69).

CONSULTANT: American Bar Foundation, Police Foundation, National Commission on Reform of Federal Criminal Laws, Institute for Defense Analysis, Department of Justice, Rand Corporation, Abt Associates, Federal Parole Commission, Federal Bureau of Prisons, Federal Bureau of Investigation, General Accounting Office, Canadian Institute for Advanced Studies, States of Alaska, California, Nebraska, Illinois, Virginia, and Washington, Cities of Chicago, New York and San Francisco.

**ADVISORY POSTS**    CURRENT: Campaign for Youth Justice (2007-); California Attorney General's Office (2001-); National Policy Committee, American Society of Criminology (1989-91 and 1993-); Board of Directors, Illinois Youth Services Association (Honorary) (1977-); Advisory Committee, National Pre-Trial Services Association (1975-).

PAST: Asian Pacific Violence Prevention Center, National Council on Crime and Delinquency (2001-2005); Advisory Committee, Sentencing Project, American Law Institute (2001-2003); Criminal Justice Policy Group, Advisory Board, National Campaign Against Youth Violence (2000-2002); Expert Panel Member, U.S. Department of Transportation, National Highway Traffic Safety Administration Panel on Crash Risk of Alcohol-Involved Driving (1994-2002); Expert Panel Member, U.S. Department of Education Panel on Safe, Disciplined, and Drug-Free Schools (1998-2001); National Research Council Panel on Juvenile Crime: Prevention, Intervention, and Control (1998-2001); Advisory Board, Center on Crime, Communities, and Culture, Open Society Institute (1998-2000); Affiliated Expert, Center for Gun Policy and Research, Johns Hopkins University (1995-98); Gun Violence Advisory Group, American College of Physicians (1995-98); Advisory Committee, Violent and Serious

Juvenile Offender Project, National Council on Crime and Delinquency (1994-1997); Panel on NIH Research on Anti-Social, Aggressive, and Violence-Related Behaviors and their Consequences (1997-); Task Force on Future Directions for the National Archive of Criminal Justice Data, Bureau of Justice Statistics, Department of Justice (1995); Panel on Antisocial, Aggressive, and Violence-Related Behaviors and Their Consequences, National Institute of Health (1993-94); Panel on Understanding and Control of Violent Behavior, National Research Council, National Academy of Sciences (1989-91); Research Advisory Committee, California Attorney General (1983-1990); Law Enforcement Committee, California Governor's Policy Council on Drug and Alcohol Abuse (1989-91); National Research Council, Working Group Crime and Violence (1985-88); Internal Revenue Service, Advisory Group Taxpayer Compliance Research (1983-87); Board of Directors, Eisenhower Foundation for the Prevention of Violence (1981-84); U.S. Secret Service Advisory Committee on Protection of the President (1981-82); Assembly of Behavioral and Social Sciences, National Academy of Sciences (1977-80); Executive Committee, Illinois Academy of Criminology (1968-71, 1977-78); Advisory Committee, Assessment Center for Alternatives to Juvenile Courts (1977-78) (chairman); Advisory Committee, Law and Social Science Program, National Science Foundation (1976-77); Advisory Committee, Vera Institute of Justice, Court Employment Project Evaluation (1976-77) (chairman); Panel on Deterrence and Incapacitation, National Academy of Sciences (1975-77); Legal Committee, American Civil Liberties Union, Illinois Branch (1967-70).

**EDITORIAL BOARDS**

CURRENT: Punishment and Society (1998-); Crime and Justice: An Annual Review of Research (1979-90, 1998-); Western Criminology Review (1997-); Buffalo Criminal Law Review (1996-); Homicide Studies (1996-); The Prison Journal (1992-); Journal of Research in Crime and Delinquency (1976-84, 1990-); Federal Sentencing Reporter (1988-); Studies in Crime and Justice (1980-); Journal of Criminal Justice (1978-).

PAST: Law and Society Review (1988-1998); British Journal of Criminology (1988-1996); Journal of Quantitative Criminology (1984-1989); Ethics, (1985-87); Encyclopedia of Crime and Justice (1979-83); Evaluation Quarterly (1976-84); Law and Behavior (1976-85).

**HONORS**

Edwin H. Sutherland Award, American Society of Criminology (2007); August Vollmer Award, American Society of Criminology (2006); Notable Book of the Year, *The Economist* (2003); Society of Research on Adolescence, Biannual Book Award (2002); Pass Award, National Council on Crime and Delinquency (1999); Donald Cressey Award, National Council on Crime and Delinquency (1995); Choice, Outstanding Academic Book Citation (1995 and 1982); Paul Tappan Award, Western Society of Criminology (1994); Fellow, American Society of Criminology (1993); Distinguished Alumni Award, Wayne State University (1989); Bustin Prize for Legal Research, University of Chicago (1981); Cooley Lecturer, University of Michigan Law School (1980); National Distinguished Alumnus Award, Delta-Sigma-Rho (1977); Ten Law Professors Who Shape the Future, *Time Magazine* (1977); Civilian Award of Merit for 1975, Chicago Crime Commission; Gavel Award Certificate of Merit, American Bar Association (1973).

**MEMBER**

American Academy of Arts and Sciences (1990-); California Bar Association (1968-); Order of the Coif (1967-); Phi Beta Kappa (1964-).

## BOOKS AND MONOGRAPHS

*The City That Became Safe: What New York Teaches About Urban Crime and Its Control*, New York: Oxford University Press (October 2011).

(with David T. Johnson) *The Next Frontier: National Development, Political Change, and the Death Penalty in Asia*, New York: Oxford University Press (January 2009).

(with Bernard E. Harcourt) *Criminal Law and the Regulation of Vice*, American Casebook Series, St. Paul: Thompson/West Publishers (2007).

*The Great American Crime Decline*, New York: Oxford University Press (2006).

*American Juvenile Justice*, New York: Oxford University Press (2005); (Korean translation) Prime Books (November 2009); (Chinese translation) Chinese People's Public Security University Press (2010).

*An American Travesty: Legal Responses to Adolescent Sexual Offending*, Chicago: University of Chicago Press (2004); paperback edition (2009).

*The Contradictions of American Capital Punishment*, New York: Oxford University Press (2003); paperback edition (2004); (Chinese translation) Shanghai Joint Publishing (2008); (Italian translation) Società editrice il Mulino, Bologna (2009).

(with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice*, Chicago: University of Chicago Press (2002); (Chinese translation) Beijing: The Commercial Press (2008).

(with Gordon Hawkins and Sam Kamin) *Punishment and Democracy: Three Strikes and You're Out in California*, New York: Oxford University Press (2001).

(with Jeffrey Fagan, ed.) *The Changing Borders of Juvenile Justice: Transfer from Juvenile to Criminal Court*, Chicago: University of Chicago Press (2000).

(with Sam Kamin and Gordon Hawkins) *Crime and Punishment in California: The Impact of Three Strikes and You're Out*, Berkeley: Institute of Governmental Studies (1999).

*American Youth Violence*, New York: Oxford University Press (1998); paperback edition (2000).

(with Gordon Hawkins) *Crime Is Not the Problem: Lethal Violence in America*, New York: Oxford University Press (1997); paperback edition (1999).

(with Gordon Hawkins) *Incapacitation: Penal Confinement and the Restraint of Crime*, New York: Oxford University Press (1995); paperback edition (1997).

(with Gordon Hawkins) *Prison Population and Criminal Justice Policy in California*, Berkeley: Institute of Governmental Studies (1992).

(with Gordon Hawkins) *The Search for Rational Drug Control*, New York: Cambridge University Press (1992); paperback edition (1995).

(with Gordon Hawkins) *The Scale of Imprisonment*, Chicago: University of Chicago Press (1991); paperback edition (1993).

(with Gordon Hawkins) *Pornography in a Free Society*, New York: Cambridge University Press (1988); paperback edition (1991).

SER0085

(with Michael Laurence and John Snortum, eds.) *Social Control of the Drinking Driver*, Chicago: University of Chicago Press (1988).

(with Gordon Hawkins) *The Citizen's Guide to Gun Control*, New York: Macmillan Publishing Company (1987); paperback edition (1992).

(with Gordon Hawkins) *Capital Punishment and the American Agenda*, New York: Cambridge University Press (1987); paperback edition (1989).

(with Mark Siegler, Steven Toulman, Kenneth Schaffner, eds.) *Medical Innovation and Bad Outcomes: Legal, Social, and Ethical Responses*, Ann Arbor, MI: Health Administration Press (1987).

(with Gordon Hawkins, ed.) *The Pursuit of Criminal Justice: Essays From the Chicago Center*, Chicago: University of Chicago Press (1984); Midway reprint edition (1986).

(with Michael Tonry, ed.) *Reform and Punishment: Essays on Criminal Sentencing*, Chicago: University of Chicago Press (1983).

*The Changing Legal World of Adolescence*, New York: The Free Press (1982); paperback edition (1985).

(with Richard Frase) *The Criminal Justice System: Materials on the Administration and Reform of the Criminal Law*, Boston: Little, Brown and Company (1980).

*Confronting Youth Crime: Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders*, New York: Holmes and Meier (1978).

(with Gordon Hawkins) *Deterrence: The Legal Threat in Crime Control*, Chicago: University of Chicago Press (1973); Phoenix edition (1976).

*Perspectives on Deterrence*, Washington, D.C.: National Institute of Mental Health (1971).

(with George P. Newton) *Firearms and Violence in American Life*, Task Force Report to the National Commission on the Causes and Prevention of Violence, Washington, D.C.: U.S. Government Printing Office (1969).

SCHOLARLY ARTICLES

How New York Beat Crime, *Scientific American,* August 2011, p. 75.

Executions without Legitimacy? Why the ALI Action Matters, Response to Jordan and Steiker, "No More Tinkering: The ALI and the Death Penalty Provisions of the Model Penal Code." Texas Law Review See Also 88:257 (2011); available at: <http://www.texaslrev.com/seealso/vol/88/responses/zimring>.

(with Rosemary Gartner and Anthony Doob) The Past as Prologue? Decarceration in California then and Now, *Criminology and Public Policy* 10:291-325 (2011).

The Scale of Imprisonment in the United States: 20th Century Patterns and 21st Century Prospects, *The Journal of Criminal Law & Criminology* 100:1225-1245 (2010).

The Power Politics of Juvenile Court Transfer: A Mildly Revisionist History of the 1990s, *Louisiana Law Review* 71:1-15 (2010).

(with Jeffrey Fagan and David T. Johnson) Executions, Deterrence, and Homicide: A Tale of Two Cities, *Journal of Empirical Legal Studies* 7:1-29 (March 2010).

SER0086

Delinquency, Opportunity and the Second Generation Immigrant Puzzle, in Frost, et al, eds., *Contemporary Issues in Criminal Justice Policy: Policy Proposals from the American Society of Criminology Conference,* Wasdworth/Cenage Learning (2010) 247-249.

Juvenile Crime, in Shweder, et al, eds., *The Child: An Encyclopedic Companion,* University of Chicago Press (2009) 217-219.

Debating a Federal Sentencing Commission circa 1978, *Federal Sentencing Reporter* 21:271 (April 2009).

(with Alex Piquero, Wesley Jennings and Stephanie Hays) Investigating the Continuity of Sex Offending: Evidence from the Second Philadelphia Birth Cohort, *Justice Quarterly* 26:59 (March 2009).

(with Chrysanthi S. Leon) A Cite Checker's Guide to Sexual Dangerousness, *Berkeley Journal of Criminal Law* 13:65 (Spring 2008).

Public Sentiment, Political Action, and Governmental Crime Policy–On the Origins and Significance of Mixed Feelings, *Criminology and Public Policy* 7:467 (August 2008).

Criminology and Its Discontents: The American Society of Criminology 2007 Sutherland Address, *Criminology* 46:255 (May 2008)

Violence and Drugs: Divide, Then Conquer? *Berkeley Review of Latin American Studies* pp. 40-41 (Spring 2008).

Handgun Control, The Second Amendment and Judicial Legislation in the D.C. Circuit: A Note on *Parker v. District of Columbia, New Criminal Law Review* 2:312 (2008).

(with David Johnson) Law, Society and Capital Punishment in Asia, *Punishment & Society* 10:103 (2008); also published in *Criminal Law Review* 19:109, (translated into Chinese by Richard Chiang for Peking University Press) (2006).

(with Gordon Hawkins) Crime Is Not the Problem: Lethal Violence in America, in Mary E. Vogel, ed., *Crime, Inequality and the State,* Routledge (2007).

Protect Individual Punishment Decisions from Mandatory Penalties, *Criminology and Public Policy* 6:881 (November 2007).

(with Alex Piquero and Wesley Jennings) Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood? *Criminology and Public Policy* 6:507 (August 2007).

Vollmer Award Address: The Necessity and Value of Transnational Comparative Study--Some Preaching from a Recent Convert, *Criminology and Public Policy* 5:615 (November 2006).

(with David Johnson) Taking Capital Punishment Seriously, *Asian Criminology* 1:89 (2006).

(with Cheryl Marie Webster and Anthony N. Doob) Proposition 8 and Crime Rates in California: The Case of the Disappearing Deterrent, *Criminology and Public Policy* 5:1501 (August 2006).

(with Jeffrey Fagan and Amanda Geller) Capital Punishment and Capital Murder:  Market Share and the Deterrent Effects of the Death Penalty, *Texas Law Review* 84:1803 (June 2006).

(with David Johnson) Public Opinion and the Governance of Punishment in Democratic Political Systems, *The Annals of The American Academy of Political and Social Science* 605:266 (May 2006).

(with David Johnson) On the Comparative Study of Corruption, *British Journal of Criminology* 45:793 (2005); also in the *Pacific McGeorge Global Business and Development Law Journal* 20:243 (2007) and in K. Padmaja, ed., *Corruption: Socio Legal Dimensions,* The ICFAI University Press (2008).

Penal Policy and Penal Legislation in Recent American Experience, *Stanford Law Review* 58:323 (2005).

Path Dependence, Culture and State-Level Execution Policy: A Reply to David Garland, *Punishment and Society* 7:377 (2005).

Minimizing Harm from Minority Disproportion, in Darnell F. Hawkins and Kimberly Kempf-Leonard, eds., *Our Children, Their Children: Confronting Racial and Ethnic Differences in American Juvenile Justice,* University of Chicago Press (2005).

Política Criminal y Legislación Penal en la Experiencia Estadounidense Reciente [Criminal Policy and Penal Legislation in the Recent American Experience], in José Luis Díez Ripollés, Ana María Prieto del Pino and Susana Soto Navarro, eds., *La Política Legislative Penal en Occidente: Una Perspectiva Comparada* [Legislative Penal Policy in the West: A Comparative Perspective], Tirant lo Blanch (2005).

In Memoriam: Norval Morris (1923-2004), *The University of Chicago Law Review* 72:459 (2005).

The Unexamined Death Penalty: Capital Punishment and Reform of the Model Penal Code, *Columbia Law Review* 105:1396 (2005).

Symbol and Substance in the Massachusetts Commission Report, *Indiana Law Journal* 80:115 (2005).

(with Michael Vitiello, Clark Kelso, Erwin Chemerinsky, Kevin Reitz, and Jonathan Turley) A Proposal for a Wholesale Reform of California's Sentencing Practice and Policy, *Loyola of Los Angeles Law Review* 38:903 (2004).

The Discrete Character of High-Lethality Youth Violence, *Youth Violence: Scientific Approaches to Prevention, Annals of the New York Academy of Sciences* 1036:290 (2004).

The Weakest Link: Human Rights and the Criminal Offender in Modern Democratic Government, in Gerben Bruinsma, Henk Elffers, and Jan de Keijser, eds., *Punishment, Places, and Perpetrators: Developments in Criminology and Criminal Justice Research,* Wilan Publishing (2004).

Firearms, Violence, and the Potential Impact of Firearms Control, *The Journal of Law, Medicine, and Ethics* 32:34 (2004).

(with Gordon Hawkins) Democracy and the Limits of Punishment: A Preface to Prisoners' Rights, in Michael Tonry, ed., *The Future of Imprisonment,* Oxford University Press (2004).

Continuity and Change in the American Gun Debate in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence,* Washington, DC: Brookings Institution Press (2003); also as Chapter 1 in Bernard E. Harcourt, ed., *Guns, Crime, and Punishment in America,* New York: New York University Press (2003).

The Peculiar Present of American Capital Punishment in Stephen P. Garvey, ed., *Beyond Repair? America's Death Penalty,* Durham, NC: Duke University Press (2003).

(with Sam Kamin) Facts, Fallacies, and California's Three Strikes, *Duquesne Law Review* 40:605 (2002).

(with Gordon Hawkins) Capital Punishment, in *Oxford Companion to American Law,* New York: Oxford University Press (2002).

The New Politics of Criminal Justice:  Of "Three Strikes," Truth-in-Sentencing, and Megan's Laws, *National Institute of Justice Research Report, Perspectives on Crime and Justice: 1999-2000 Lecture Series, Washington, DC*, Volume 4 (March 2001).

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century (Noriyoshi Takemura, translator), *Toin Law Review* 8:75 (2001)

Crime, Criminal Justice, and Criminology for a Smaller Planet: Some Notes on the 21st Century, *The Australian and New Zealand Journal of Criminology* 34:213 (2001)

Imprisonment Rates and the New Politics of Criminal Punishment, *Punishment and Society* 3:161 (2001); also as Chapter 10 in David Garland, ed., *Mass Imprisonment: Social Causes and Consequences*, London: Sage Publications (2001).

The Common Thread: Diversion in Juvenile Justice, *California Law Review* 88:2477 (2000); also as Chapter 5 in (with Margaret Rosenheim, David Tanenhaus, and Bernardine Dohrn, eds.) *A Century of Juvenile Justice*, Chicago: University of Chicago Press (2002).

(with Jeffrey Fagan) The Search for Causes in an Era of Declining Crime Rates: Some Lessons from the Study of New York City Homicide, *Crime and Delinquency* 46:446  (2000).

Incarceration Patterns, in *Mass Incarceration: Perspectives on U.S. Imprisonment, University of Chicago Law School Roundtable, A Journal of Interdisciplinary Legal Studies*, Volume 7 (2000).

Penal Proportionality and the Young Offender: Notes on Immaturity, Capacity, and Diminished Responsibility, in Thomas Grisso and Robert G. Schwartz, eds., *Youth on Trial*, Chicago: University of Chicago Press (2000).

The Punitive Necessity of Waiver, Chapter 6 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice*, Chicago: University of Chicago Press (2000).

(with Jeffrey Fagan) Transfer Policy and Law Reform, Chapter 12 in Fagan and Zimring, eds., *The Changing Borders of Juvenile Justice*, Chicago: University of Chicago Press (2000).

American Youth Violence:  Implications for National Juvenile Justice Policy, *Update on Law-Related Education* (American Bar Association publication) 23:6 (1999).

The Hardest of the Hard Cases: Adolescent Homicide in Juvenile and Criminal Courts, *Virginia Journal of Social Policy and the Law*, 6:437 (1999).

The 1990s Assault on Juvenile Justice: Notes from an Ideological Battleground, *Federal Sentencing Reporter* 11:260 (1999).

(with Jeffrey Fagan and June Kim) Declining Homicide in New York City: A Tale of Two Trends, *Journal of Criminal Law and Criminology* 88:1277 (1998); also (with Jeffrey Fagan) as Le Cause Della Diminuzione Dei Reati: Alcune Riflessioni Sull'Analisi Degli Omicidi a New York, in Marzio Barbagli, ed., *Perché È Diminuita La Criminalità Negli Stati Uniti?* Società Editrice Il Mulino (2000).

The Executioner's Dissonant Song:  On Capital Punishment and American Legal Values, Chapter 6 in Austin Sarat, ed., *Killing State:  Capital Punishment in Law, Politics, and Culture*, Oxford University Press (1999); also in *Institute for Philosophy and Public Policy Report* 19:1 (1999).

(with Gordon Hawkins) Public Attitudes Toward Crime:  Is American Violence A Crime Problem? in Edward Rubin, ed., *Minimizing Harm:  A New Crime Policy for Modern America*, Westview Press (1999).

Toward a Jurisprudence of Youth Violence, in Michael Tonry and Mark Moore, eds., *Youth Violence. Crime and Justice:  A Review of Research*, University of Chicago Press (1998).

SER0089

The Youth Violence Epidemic:  Myth or Reality?, *Wake Forest Law Review* 33:727 (1998).

(with Gordon Hawkins) Crime Is Not the Problem:  A Reply, *University of Colorado Law Review* 69:1177 (1998).

(with Gordon Hawkins) Lethal Violence and the Overreach of American Imprisonment, *National Institute of Justice Research Report, Presentations from the 1996 Annual Research and Evaluation Conference, Washington, DC*, July 1997.

Juvenile Violence in Policy Context, *Valparaiso University Law Review* 31:419 (1997).

The Doom of a Good Intention, *Politics and the Life Sciences* 16:44 (1997).

(with Gordon Hawkins) Concealed Handguns:  The Counterfeit Deterrent, *The Responsive Community*, Spring 1997, p. 46.

Kids, Guns, and Homicide:  Policy Notes on an Age-Specific Epidemic, *Law and Contemporary Problems* 59:25 (1996).

Populism, Democratic Government, and the Decline of Expert Authority:  Some Reflections on "Three Strikes" in California, *Pacific Law Journal* 28:243 (1996).

(with Gordon Hawkins) Is American Violence a Crime Problem?, *Duke Law Journal* 46:43 (1996); also in Edward Rubin, ed., *Minimizing Harm as a Goal for Crime Policy in California*, California Policy Seminar Policy Research Program Report (1997).

The Wages of Ambivalence:  On the Context and Prospects of New York's Death Penalty, *Buffalo Law Review* 44:303 (1996).

(with Adolfo Ceretti and Luisa Broli) Crime Takes a Holiday in Milan, *Crime and Delinquency* 42:269 (1996).

The Genetics of Crime, *Politics and the Life Sciences* 15:105 (1996).

(with Gordon Hawkins) Toward a Principled Basis for Federal Criminal Legislation, *The Annals of the American Academy of Political and Social Science* 543:15 (1996).

Firearms Control in Federal Law in the United States:  Current Conditions and Further Choices, *UNAFEI Resource Materials Series*, No. 46 (Materials Produced during the 96th International Seminar Course on the "Promotion of International Cooperation in Criminal Justice Administration), p. 117 (1995).

Reflections on Firearms and the Criminal Law, *Journal of Criminal Law and Criminology* 86:1 (1995).

(with William Nelson) Cigarette Taxes as Cigarette Policy, *Tobacco Control* 4:S25 (1995).

(with Gordon Hawkins and Hank Ibser) Estimating the Effects of Increased Incarceration on Crime in California, *California Policy Seminar Brief*, Volume 7, July 1995.

(with Johannes van Vuren and Jan van Rooyen) Selectivity and Racial Bias in a Mandatory Death Sentence Dispensation:  A South African Case Study, *Comparative and International Law Journal of Southern Africa* 28:107 (1995); Misleading Statistics and the Death Penalty -- Two Authors Reply to Henry Lever, *Comparative and International Law Journal of Southern Africa* 30:364 (1997).

(with Gordon Hawkins) The Growth of Imprisonment in California, *British Journal of Criminology* 34:83 (1994).

Policy Research on Firearms and Violence, *Health Affairs* 12:109 (1993).

SER0090

(with Gordon Hawkins) Crime, Justice, and the Savings and Loan Crisis, *Crime and Justice* 18:247 (1993).

(with Gordon Hawkins) Continuity and Focus in Criminal Justice Research, *Journal of Research in Crime and Delinquency* 20:525 (1993).

Comparing Cigarette Policy and Illicit Drug and Alcohol Control, in Robert Rabin and Stephen Sugarman, eds., *Smoking Policy: Law, Politics, and Culture*, Oxford University Press (1993).

On the Liberating Virtues of Irrelevance, *Law and Society Review* 27:9 (1993).

Drug Treatment as a Criminal Sanction, *University of Colorado Law Review* 64:809 (1993).

Prison Population and Criminal Justice Policy in California, *California Policy Seminar Brief*, Volume 4, August 1992.

Inheriting the Wind: The Supreme Court and Capital Punishment in the 1990s, *Florida State University Law Review* 20:1 (1992).

The Jurisprudence of Teenage Pregnancy, in Margaret Rosenheim and Mark Testa, eds., *Early Parenthood and Coming of Age in the 1990s*, Rutgers University Press (1992).

The Multiple Middlegrounds Between Civil and Criminal Law, *Yale Law Journal* 101:1901 (1992).

(with Gordon Hawkins) What Kind of Drug War?, *Social Justice* 18:104 (1991).

Firearms, Violence, and Public Policy, *Scientific American*, November 1991, p. 48; also in Robert K. Miller, ed., *The Informed Argument*, Harcourt Brace (1995); K. Ackley, ed., *Perspective on Contemporary Issues*, Harcourt Brace (1996).

Ambivalence in State Capital Punishment Policy: An Empirical Sounding, *New York University Review of Law and Social Change* 18:729 (1991).

(with Gordon Hawkins) The Wrong Question: Critical Notes on the Decriminalization Debate, in Melvyn Krauss and Edward Lazear, eds., *Search for Alternatives: Drug-Control Policy in the United States*, Hoover Institution Press (1991).

The Limits of Criminal Punishment: Some Ethical Issues for the 1990s, in David Gordis, ed., *Crime, Punishment, and Deterrence: An American-Jewish Exploration*, University of Judaism (1991).

The Treatment of Hard Cases in American Juvenile Justice: In Defense of Discretionary Waiver, *Notre Dame Journal of Law, Ethics and Public Policy* 5:267 (1991).

Punishing the Drinking Driver: Toward an Experimental Design, *Alcohol, Drugs, and Driving* 6:199 (1990).

(with Gordon Hawkins) On the Scale of Imprisonment: Downes's *Contrasts in Tolerance*, *Journal of the American Bar Foundation* 14:527 (1989).

The Problem of Assault Firearms, *Crime and Delinquency* 35:538 (1989).

Methods for Measuring General Deterrence: A Plea for the Field Experiment, in Martin Friedland, ed., *Sanctions and Rewards in the Legal System*, University of Toronto Press (1989).

(with Gordon Hawkins) The Path Toward the Abolition of Capital Punishment in the Industrial West, *Revue Internationale de Droit Penal* 58:669 (1988).

(with Gordon Hawkins) The New Mathematics of Imprisonment, *Crime and Delinquency* 34:425 (1988); Response to Zedlewski, *Crime and Delinquency* 35:316 (1989).

(with Gordon Hawkins) Murder, the Model Code, and the Multiple Agendas of Reform, *Rutgers Law Journal* 19:733 (1988).

Law, Society, and the Drinking Driver:  Some Concluding Reflections, in Michael Laurence, John Snortum, and Franklin Zimring, eds., *Social Control of the Drinking Driver*, University of Chicago Press (1988).

Principles of Criminal Sentencing, Plain and Fancy, *Northwestern University Law Review* 82:73 (1987).

Legal Perspectives on Family Violence, *California Law Review* 75:521 (1987); also as Toward a Jurisprudence of Family Violence, in Lloyd Ohlin and Michael Tonry, eds., *Family Violence*, University of Chicago Press (1989).

(with Gordon Hawkins) Dangerousness and Criminal Justice, *Michigan Law Review* 85:481 (1987).

Some Social Bases for Compensation Schemes, in Mark Siegler, Steven Toulman, Franklin Zimring, and Kenneth Schaffner, eds., *Medical Innovation and Bad Outcomes: Legal, Social, and Ethical Responses*, Health Administration Press (1987).

(with Gordon Hawkins) A Punishment in Search of a Crime:  Standards for Capital Punishment in the Law of Criminal Homicide, *Maryland Law Review* 46:1001 (1986).

Gun Control, *Bulletin of New York Academy of Medicine* 62:5 (1986).

(with James Zuehl) Victim Injury and Death in Urban Robbery:  A Chicago Study, *Journal of Legal Studies* 15:1 (1986).

(with Gordon Hawkins) Cycles of Reform in Youth Corrections:  The Story of Borstal, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Western European Perspectives on the Treatment of Young Offenders, in Peter Greenwood, ed., *The Juvenile Rehabilitation Reader*, Rand Corporation (1985).

(with Gordon Hawkins) Capital Punishment and the Eighth Amendment:  Furman and Gregg in Retrospect, *UC Davis Law Review* 18:927 (1985).

Violence and Firearms Policy, in Lynn Curtis, ed., *American Violence and Public Policy*, Yale University Press (1985).

(with Rayman Solomon) The Principle of the Thing: Goss v. Lopez, Student Rights, and Litigation in the Public Interest of Children, in Robert Mnookin, ed., *In the Interest of Children:  Advocacy, Law Reform, and Public Policy*, Part VI, W.H. Freeman (1985).

Youth Homicide in New York:  A Preliminary Analysis, *Journal of Legal Studies* 13:81 (1984).

Sentencing Reform in the States, in Franklin Zimring and Michael Tonry, eds., *Reform and Punishment:  Essays on Criminal Sentencing*, University of Chicago Press (1983).

(with Satyanshu K. Mukherjee and Barrik Van Winkle) Intimate Violence:  A Study of Intersexual Homicide in Chicago, *University of Chicago Law Review* 50:910 (1983).

Kids, Groups, and Crime:  Some Implications of a Well-Known Secret, *Journal of Criminal Law and Criminology* 72:867 (1981).

Handguns in the Twenty-First Century: Alternative Policy Futures, *The Annals of the American Academy of Political and Social Sciences* 455:1 (1981).

Secret Service "Dangerousness" Research, in Jane Takeuchi, Frederic Solomon, and W. Walter Menniger, eds., *Behavioral Science and the Secret Service: Toward the Prevention of Assassination*, National Academic Press (1981).

Notes Toward a Jurisprudence of Waiver, in John Hall, Donna Hamparian, John Pettibone, and Joseph White, eds., *Issues in Juvenile Justice Information and Training*, Academy of Contemporary Problems (1981).

Privilege, Maturity, and Responsibility: Notes on the Emerging Jurisprudence of Adolescence, in Lamar Empey, ed., *The Future of Childhood and Juvenile Justice*, University Press of Virginia (1980).

American Youth Violence: Issues and Trends, in Norval Morris and Michael Tonry, eds., *Crime and Justice: A Review of Research*, University of Chicago Press (1979).

(with Gordon Hawkins) Ideology and Euphoria in Crime Control, *Toledo Law Review* 10:370 (1979).

Pursuing Juvenile Justice: Comments on Some Recent Reform Proposals, *University of Detroit Journal of Urban Law* 55:631 (1978).

Policy Experiments in General Deterrence, 1970-1975, in Alfred Blumstein, Jacqueline Cohen, and Daniel Nagin, eds., *Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates*, National Academy of Science (1978).

Bad Checks in Nebraska: A Study of Complex Threats, in Greenburg, ed., *Punishment and Corrections*, Sage Publications (1977).

The Serious Juvenile Offender: Notes on an Unknown Quantity, in *The Serious Juvenile Offender: Proceedings of a National Symposium Held in Minneapolis, Minnesota on September 19 and 20, 1977*, U.S. Government Printing Office (1978).

Determinants of the Death Rate from Robbery: A Detroit Time Study, *Journal of Legal Studies* 6:317 (1977).

Making the Punishment Fit the Crime: A Consumer's Guide to Sentencing Reform, *Hastings Center Reports*, December 1976; also in University of Chicago Law School, *Occasional Papers*, No. 12 (1977); Hyman Gross and Andrew von Hirsch, eds., *Sentencing*, Oxford University Press (1981); Culbertson and Tezak, eds., *Order Under Law*, Waveland Press (1981).

(with Joel Eigen and Sheila O'Malley) Punishing Homicide in Philadelphia: Perspectives on the Death Penalty, *University of Chicago Law Review* 43:227 (1976); also in Hugo Bedau and Chester Pierce, eds., *Capital Punishment in the United States*, AMS Press (1976); *Civil Rights*, Staff Report of the Sub-Committee on Constitutional Rights of the Committee on the Judiciary, U.S. Senate (1976).

Street Crime and New Guns: Some Implications for Firearms Control, *Journal of Criminal Justice* 4:95 (1976).

Field Experiments in General Deterrence: Preferring the Tortoise to the Hare, *Evaluation Magazine*, Volume 3, Russell Sage Publications (1976).

Firearms and Federal Law: The Gun Control Act of 1968, *Journal of Legal Studies* 4:133 (1975); also in *Evaluation Annual*, Volume 1, Russell Sage Publications (1977); *Improving the Criminal Justice System in the United States*, 94th Congress, 2d Session, Library of Congress Document No. 94-171, at 273.

SER0093

Measuring the Impact of Pretrial Diversion from the Criminal Justice System, *University of Chicago Law Review* 41:224 (1974); also in *Crime and Justice Annual -- 1974*, Aldine (1975); Povl Boesen and Stanley Grupp, eds., *Community Based Corrections: Theory, Practice and Research*, Davis Publishing Company (1976).

Threat of Punishment as an Instrument of Crime Control, *Proceedings of the American Philosophical Society* 118:231 (1974).

(with Richard Block) Homicide in Chicago, 1965-70, *Journal of Research in Crime and Delinquency* 10:1 (1973); also in Lee Rainwater, ed., *Deviance and Liberty*, Aldine (1974).

Of Doctors, Deterrence, and the Dark Figure of Crime: A Note on Abortion in Hawaii, *University of Chicago Law Review* 39:699 (1972).

The Medium is the Message: Firearms Caliber as a Determinant of the Death Rate from Assault, *Journal of Legal Studies* 1:97 (1972).

(with Gordon Hawkins) The Legal Threat as an Instrument of Social Change, *Journal of Social Issues* 27:33 (1971); also in Ronald Akers and Richard Hawkins, eds., *Law and Control in Society*, Prentice-Hall (1974); June Louin Tapp and Felice Levine, eds., *Law, Justice, and the Individual in Society*, Holt, Rinehart (1977).

Firearms and Federal Criminal Law, *Working Papers of the National Commission on the Reform of Federal Criminal Laws*, Volume II, U.S. Government Printing Office (1970).

(with Norval Morris) Deterrence and Corrections, *Annals of the American Academy of Political Social Sciences* (1969).

(with Gordon Hawkins) Deterrence and Marginal Groups, *Journal of Research in Crime and Delinquency* 5:100 (1968).

Games with Guns and Statistics, *Wisconsin Law Review* 1968:1113 (1968).

Is Gun Control Likely to Reduce Violent Killings?, *University of Chicago Law Review* 35:721 (1968).

(with Edward H. Hunvald) Missouri Implied Consent Statutes, *Missouri Law Review* 33:323 (1968).

"Free Press-Fair Trial" Revisited: Defendant-Centered Remedies as a Publicity Policy, *University of Chicago Law Review* 33:512 (1966).

GENERAL

Preface to the Chinese edition of *American Juvenile Justice*, Chinese People's Public Security University (2010).

Juvenile Justice: Legal, Policy & Political Issues (expert participant), *Focus on Law Studies*, American Bar Association, Division for Public Education, Vol. XXV, No. 2, Spring 2010, p. 4.

Miraklet I New York, *Magasinet Neo*, No. 2, March/April 2010, p. 38.

Pulling the Plug on Capital Punishment, *The National Law Journal*, Vol. 32, No. 14, December 7, 2009, p. 42.

Foreword to Jane Sprott and Anthony Doob, *Justice for Girls? Stability and Change in the Youth Justice Systems of the United States and Canada*, University of Chicago Press (2009).

SER0094

(with Jeffrey Fagan) Myths of Get-Tough Law, *St. Petersburg Times,* October 30, 2009; also available online at http://www.tampabay.com/opinion/columns/myths-of-get-tough-law/1048326#.

Preface to the Korean edition, *American Juvenile Justice,* Oxford University Press (2009).

Book review of *The Death Penalty: A Worldwide Perspective* (Roger Hood and Carolyn Hoyle, Oxford University Press, 2008), *Punishment and Society,* Vol. 11, No. 2, April 2009, p. 280.

(with David T. Johnson) Last Days of the Hangman, *New Scientist,* March 14, 2009, p. 22; also available online at http://www.newscientist.com/article/mg20126995.100-capital-punishment-its-all-politics.html.

(with David T. Johnson) The Death Penalty's Future, *The Los Angeles Daily Journal,* January 16, 2009, p. 9.

Preface to the Chinese edition, *The Contradictions of American Capital Punishment,* Shanghai Joint Publishing, pp. 4-7 (2008).

Preface to the Chinese edition, *A Century of Juvenile Justice,* Beijing: The Commercial Press (2008).

Prison Policy Reform, *Issues in Science and Technology,* Vol. 25, No. 1, Fall 2008, p. 11.

A Sick System, *Los Angeles Times,* October 25, 2008, p. A23.

Guns: Liberty or Order? *The National Law Journal,* Vol. 30, No. 30, April 7, 2008, p. 23.

What Lies Behind the Case of Lethal Injection? *The Sacramento Bee,* Sunday, December 16, 2007, p. E1; reprinted in *The Police News* (Gulf Coast edition), Vol. V, No. 1, January 2008, p. 14.

A Tale of Two Despots, *The National Law Journal,* Vol. 29, No. 49, August 6, 2007, p. 23.

Little Changes, Big Results, *The New York Times,* April 8, 2007, p. 9.

Foreword to Peter Greenwood, *Changing Lives: Delinquency Prevention as Crime Control Policy,* University of Chicago Press (2005).

Capital Punishment: An American Dilemma, in "Shalt Thou Kill? An In-Depth Look at Capital Punishment," *Christian Networks Journal,* Fall 2005, p. 17.

Terri Schiavo and the Dilemma of "Life or Death" Litigation, *San Francisco Daily Journal,* June 15, 2005, p. 6.; *Los Angeles Daily Journal,* June 15, 2005, p. 6.

A Death Knell for the Death Penalty? *Newsday,* March 4, 2005, p. A47.

Review of Kathleen Auerhahn, *Selective Incapacitation and Public Policy: Evaluating California's Imprisonment Crisis, Contemporary Sociology* 34:62 (2005).

Foreword to Thomas Grisso, *Double Jeopardy: Adolescent Offenders with Mental Disorders,* University of Chicago Press (2004).

Three-Ring Capital-Punishment Circus, *Los Angeles Daily Journal,* February 20, 2004, p. 6.

Confessions of a Former Smoker, in Jane E. Aaron, *The Compact Reader: Short Essays by Method and Time* (Seventh Edition), Boston: Bedford/St. Martin's (2003);also as Hot Boxes for Ex-Smokers, *Newsweek,* My Turn, April 20, 1987, p. 12.

Train an Impartial Eye on Police Behavior, *Los Angeles Times,* July 12, 2002, p. A17.

SER0095

(with Gordon Hawkins) The Ethics of Criminal Justice: Aspects of Human Dignity, *International Encyclopedia of the Social and Behavioral Sciences,* Volume 5, p. 2949 (2002).

Review of David Garland, *The Culture of Control: Crime and Social Order in Contemporary Society*, *Criminal Justice* 1:465 (2001).

McVeigh's Execution Will Heal Neither Survivors Nor Public, *Los Angeles Times*, May 11, 2001, p. B17.

The Walking Plea of Wen Ho Lee, *San Francisco Chronicle*, October 2, 2000, p. A21

Contributor to M. Dwayne Smith, *A New Era of Homicide Studies? Visions of a Research Agenda for the Next Decade*, *Homicide Studies* 4:1 (2000).

It's Violence by All, Not Just Teen Violence, *Los Angeles Times*, August 8, 2000, p. B9.

Bring Courage Back into Fashion, *Los Angeles Times,* January 16, 2000, p. M5.

Capital Punishment, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1999).

Criminal Investigation Is Just a Human Art, *Los Angeles Times*, August 1, 1999, p. M5.

Curb Imperial Power of Prosecutors, *Los Angeles Times*, April 20, 1999, p. A15.

Mystery Terms, *Boston Review*, New Democracy Forum, April/May 1999, p. 17.

Marking Time on Death Row, *The 1999 World Book Year Book*, World Book, Inc. (1999).

What is the Aim of Criminal Law? *Los Angeles Times*, January 14, 1999, p. A15.

The Buck Stops with Prison Managers: Perspective on the Corcoran Report, *Los Angeles Times*, November 28, 1998, p. M5.

(with Gordon Hawkins) Review of Jacob Sullum, *For Your Own Good: The Anti-Smoking Crusade and the Tyranny of Public Health*, *The Responsive Community* 8:75 (1998).

A Gulag Mentality in the Prisons, *Los Angeles Times*, July 15, 1998, p. B9.

Thank You for Not Sneezing, *Los Angeles Times*, February 1, 1998, p. M5.

The Truth About Repeat Sex Offenders, *Los Angeles Times*, May 5, 1997, p. B5.

Review of Ugljesa Zvekic and Anna Alvazzi del Frate, eds., *Criminal Victimization in the Developing World*, *Contemporary Sociology* 25:663 (1996).

Paranoia on the Playground, *Los Angeles Times*, November 11, 1996, p. B5.

Crying Wolf over Teen Demons, *Los Angeles Times*, August 19, 1996, p. B5.

Gun Control, *Microsoft's Encarta Encyclopedia* (CD-ROM) (1996).

Crime Is Not the Problem, *Iowa Advocate*, Spring/Summer 1996, p. 34.

Deadly Force: South Africa's Brave and Necessary Gamble with Its Death Penalty, *Chicago Tribune*, July 6, 1995, p. 19.

Will Success Spoil James Q. Wilson?, *Journal of Criminal Law and Criminology* 85:828 (1995).

Introduction to David Indermaur, *Violent Property Crime*, The Federation Press (1995).

For Gun Control, Give Big Cities Local Control, *Los Angeles Times*, May 17, 1995, p. B7.

Death Penalty, *jungeWelt*, April 1, 1995, p. 2.

Don't Bet on Executions Here Any Time Soon, *Newsday*, February 21, 1995, p. A27; also as Executions in New York?  Don't Bet on It, *New York Law Journal*, February 27, 1995.

Clouding the Issue:  Tobacco Industry Tries to Choke Off a Lawsuit, *Los Angeles Daily Journal*, December 12, 1994, p. 4.

The Voodoo Economics of California Crime, *Overcrowded Times*, October 1994, p. 3.

(with Gordon Hawkins) Policy on Crime, in Leonard Levy and Louis Fisher, eds., *Encyclopedia of the American Presidency*, Simon and Schuster (1994).

Tough Crime Laws Are False Promises, *Insight on the News* 10:21 (1994); also in *Federal Sentencing Reporter* 6:61 (1994).

"Three Strikes" Law Is Political Fool's Gold, *The Christian Science Monitor*, April 11, 1994, p. 23.

New Senate, Same Old Crime Debate, *The American Lawyer*, March 1994, p. 25.

To Punish Genocide with Death Is Overkill, *Los Angeles Times*, December 2, 1993, p. B7.

Introduction to Harry Kalven, Jr. and Hans Zeisel, *The American Jury*, Gryphon Editions (1993).

A Country Where There Is No Status Quo, *Los Angeles Times*, June 30, 1993, p. B7.

Hanged If We Do, Or We Don't, *Johannesburg Star*, April 5, 1993.

The Color of Murder, *Legal Times*, February 22, 1993, p. 34.

Intercept Migrating Guns, *Christian Science Monitor*, September 10, 1992, p. 18.

Are State Prisons Undercrowded?, *Federal Sentencing Reporter* 4:347 (1992).

Politics Dictate Wilson's Verdict, *Los Angeles Times*, April 12, 1992, p. M5.

Tribute to Sheldon Messinger, *California Law Review* 80:307 (1992).

(with Gordon Hawkins) Review of Samuel Gross and Robert Mauro, *Death and Discrimination:  Racial Disparities in Capital Sentencing*, *Constitutional Commentary* 9:135 (1992).

(with Gordon Hawkins) Why the S&L Gang Isn't in Jail, *Los Angeles Times*, February 3, 1992, p. B5.

(with Michael Laurence) Capital Punishment, in Leonard Levy, ed., Supplement to the *Encyclopedia of the American Constitution*, Macmillan (1991).

More Jail Cells, Fewer Classrooms, *Los Angeles Times*, May 31, 1991, p. B5.

The Speaking Engagement as One-Night Stand, *California Monthly*, April 1991, p. 17.

The Great American Lockup, *Washington Post*, February 28, 1991, p. A19.

SER0097

Strategies for Arms Control: Trace Illegal Firearms, *New York Times*, January 4, 1991, p. A13.

Foreword to Stephen Sugarman and Herma Hill Kay, eds., *Divorce Reform at the Crossroads*, Yale University Press (1990).

Greenmail Goes Transnational, *Los Angeles Times*, March 23, 1990, p. B7; also as Can East Germany Leverage Its Way to Wealth?, *Newsday*, April 9, 1990, p. 43.

A Solitary Symbol in a Deadly Tug of War, *Los Angeles Times*, January 29, 1990, p. B5.

Review of Donald Downs, *The New Politics of Pornography*, *New York Times Book Review*, January 28, 1990, p. 18.

(with Gordon Hawkins) Bennett's Sham Epidemic, *New York Times*, January 25, 1990, p. A23.

Hardly the Trial of the Century, *Michigan Law Review* 87:1307 (1989).

Foreword to James Jacobs, *Drunk Driving: An American Dilemma*, University of Chicago Press (1989).

Review of Jack Katz, *Seductions of Crime*, *New York Times Book Review*, November 20, 1988, p. 50.

Drug Death Penalty: A Federal Tantrum, *New York Times*, September 16, 1988, p. 19; also as A Temper Tantrum Masquerading as an Act of Government, *Los Angeles Daily Journal*, September 20, 1988.

Pint-Sized Debate on Child Executions: More Jurisprudence from the Briar Patch, *Legal Times*, July 18, 1988, p. 14; also as Can the Bad Die Young?, *The Connecticut Law Tribune*, July 18, 1988, p. 10; Justices Waffle on Death Penalty, *Fulton County Daily Report*, July 19, 1988, p. 2; Decision on Executing Youths Highlights Death Penalty Dilemma, *Manhattan Lawyer*, July 19, 1988, p. 12; The Court's Death Sentence Schizophrenia, *The Texas Lawyer*, July 25, 1988, p. 29; A Stumble at the Finish Line, *The Recorder*, July 28, 1988, p. 4.

If We Have Reached a Landmark in Our Execution Policy, It Is Still One of Confusion, *Los Angeles Times*, March 18, 1988, Part II, p. 7.

NRA's Latest Advice Can Get You Killed, *Los Angeles Times*, December 6, 1987, Part V, p. 5.

Review of James Wright and Peter Rossi, *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*, *American Journal of Sociology* 93:224 (1987).

Why the Goetz Verdict Was Not a Landmark Precedent, *New York Times*, June 21, 1987, p. 25.

Is Court Too Split To Sanction Death?, *Los Angeles Times*, April 27, 1987, Part II, p. 5.

A Frequent Flier Explains the Thrill, *New York Times*, April 20, 1987, p. 19; also as Rewarding the Pinball for Its Tos and Fros, *International Herald Tribune*, April 23, 1987, p. 5; Confessions of a Frequent Flier, *Chemtech*, June 1988, p. 386.

Beyond Solomon: The "Tragic Choice" Cases, *Los Angeles Times*, March 16, 1987, Part II, p. 5.

EF Hutton Goes South, *Michigan Law Review* 85:397 (1987).

Is Retribution Only for a Few?, *Los Angeles Times*, December 4, 1986, Part II, p. 7.

Facing the Threat of a Crippled UC, *Los Angeles Times*, September 3, 1986, Part II, p. 5.

The Death Penalty: Ten Dark Years, *New York Times*, June 19, 1986, p. 27.

Gun Lobby's Victory Can Help Handgun Control, *Los Angeles Times*, April 28, 1986, Part II, p. 5.

Justice Teeters on the Fine Points, *Los Angeles Times*, January 29, 1986, Part II, p. 5.

Review of Henry Pontell, *A Capacity to Punish, American Journal of Sociology* 91:724 (1985).

Two New Books on Guns, *Michigan Law Review* 83:954 (1985).

Lessons for the Urban Jungle, *Los Angeles Times*, March 15, 1985, Part II, p. 5.

Smoking and Public Policy, *Chicago Tribune*, Perspective Section, January 18, 1985, p. 27.

Research Agendas, Information Policies and Program Outcomes, in Alan Westin, ed., *Information Policy and Crime Control Strategies: Proceedings of a Bureau of Justice Statistics/Search Conference*, U.S. Government Printing Office (1984).

Is Crime Going Out of Style?, *Los Angeles Times*, July 12, 1984; also as Is American Crime Up or Down?, *Newsday*, August 30, 1984, p. 89.

The Dan White Case: Justice Is a Victim, *Los Angeles Times*, January 6, 1984, Part II, p. 5.

The Death Penalty's Iron Law, *New York Times*, October 12, 1983, p. 27; also in *Los Angeles Times*, September 21, 1983, Part II, p. 7.

Where Do the New Scholars Learn New Scholarship?, *Journal of Legal Education* 33:453 (1983).

(with Gordon Hawkins) Crime Commissions, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 1, The Free Press, Macmillan (1983).

(with James Lindgren) Regulation of Guns, in Sanford Kadish, ed., *Encyclopedia of Crime and Justice*, Volume 2, The Free Press, Macmillan (1983).

Foreword to John Kaplan, *The Hardest Drug: Heroin and Social Policy*, University of Chicago Press (1983).

Review of Arnold Trebach, *The Heroin Solution*, and John Kaplan, *The Hardest Drug: Heroin and Social Policy, The Times Literary Supplement*, June 10, 1983, p. 610.

Choosing the Right Camp for the Children, *Institutions Etc.* 6:21 (1983).

Idealizing the "Angels" on Death Row, *Los Angeles Times*, February 24, 1983, Part II, p. 7.

Uncle Sam's Wars on Crime, *The New Republic* 186:38 (1982).

Poland's "Real" Problem, *Chicago Tribune*, September 28, 1982, Perspective Section, p. 25.

Will the 21st Century Be Safer?, *Chicago Tribune*, April 13, 1982, Section 1, p. 22.

Crime: The 120-Day Solution, *Chicago Tribune*, September 28, 1981, Perspective Section, p. 25.

Review of Peter Prescott, *The Child Savers: Juvenile Justice Observed, New York Times Book Review*, June 14, 1981, p. 24.

(with Gordon Hawkins) Review of Walter Berns, *For Capital Punishment: Crime and the Morality of the Death Penalty, American Journal of Sociology* 86:1171 (1981).

Portnoy's Real Complaint, *Moment* 6:58 (1980).

SER0099

Taking a Tour of America's Prisons, *Chicago Tribune*, September 14, 1980, Perspective Section, p. 4.

Foreword to Philip Cook and Daniel Nagin, *Does the Weapon Matter?*, Institute for Law and Social Research (1979).

Comment, Current Developments in Judicial Administration, *Federal Rules Decisions* 80:147 (1979).

Crime in the Streets, *Chicago Sun Times Bookweek*, November 27, 1978, p. 14.

Review of The Institute of Judicial Administration and the American Bar Association, *Juvenile Justice Standards Project*, *Harvard Law Review* 91:1934 (1978).

Review of Charles Silberman, *Criminal Justice, Criminal Violence*, *Chicago Tribune*, November 5, 1978, Section 7, p. 1.

Review of John Allen, *Crime in the Streets: Assault with a Deadly Weapon*, Chicago Sun Times, November 27, 1977.

Foreword to Richard Block, *Violent Crime: Environment, Interaction, and Death*, Heath, Lexington (1977).

Comment, *Hastings Center Report*, p. 44 (1977).

Review of Mark Lane and Dick Gregory, *Code Name Zorro*, *Chicago Sun Times*, May 1, 1977.

Illegally Seized Evidence: Exclude It?, *Los Angeles Times*, April 20, 1976.

Review of Pretrial Intervention, in Abt Associates, *Pretrial Services: An Evaluation of Policy Related Research*, p. 152 (1975).

A Tale of Two Cities, *Wall Street Journal*, December 20, 1974, p. 12; also in *Hearings of Senate Subcommittee to Investigate Juvenile Delinquency, Oversight of 1968 Gun Control Act*, Volume 1, p. 11 (1975).

Eight Myths About Gun Control in the United States, *Christian Science Monitor*, July 24, 1972.

Getting Serious About Guns, *The Nation* 214:457 (1972).

Some Facts About Homicide, *The Nation* 214:303 (1972).

Firearms Control: Hard Choices, *Trial*, p. 53 (1972).


WRITING REPRINTED IN:

Funk, Day, Coleman and McMahan, *The Simon and Schuster Short Prose Reader* (2009).

Lee, *Empowered College Reading* (2008).

Feng-Checkett and Checkett, *The Write Start* (2nd edition, 2005).

Anker, *Real Writing with Readings* (2004).

Aaron, *The Complete Reader* (2003).

Nicholas and Nicholl, *Models for Effective Writing* (2000).

Miller, *The Informed Argument* (4th edition, 1995).

SER0100

Eschholtz and Rosa, *Themes for Writers* (1994).

Winterrowd and Winterrowd, *The Critical Reader, Thinker and Writer* (1992).

SER0101

FRANKLIN E. ZIMRING

### REPORTS TO GOVERNMENTAL AGENCIES

(with Peter W. Greenwood) *One More Chance: The Pursuit of Promising Intervention Strategies for Chronic Juvenile Offenders*, Rand Corporation (1985).

(with Peter W. Greenwood and Allan Abrahamse) *Factors Affecting Sentence Severity for Young Adult Offenders*, Rand Corporation (1984).

(with Peter W. Greenwood and Marvin Lavin) *The Transition From Juvenile to Adult Court*, Rand Corporation (1984).

(with Peter W. Greenwood, Albert J. Lipson, and Allan Abrahamse) *Youth Crime and Juvenile Justice: A Report to the California Legislature*, Rand Corporation (1983).

(with Peter W. Greenwood and Joan Petersilia) *Age, Crime, and Sanctions: The Transition From Juvenile To Criminal Court*, Rand Corporation (1980).

*Dealing with Youth Crime: National Needs and Federal Priorities*, a policy paper prepared for the Federal Coordinating Council on Juvenile Justice and Delinquency Prevention (1975) (mimeo).

*The Court Employment Project: A Report to the City of New York* (1974) (mimeo).

# EXHIBIT C

SER0103

# DECLARATION OF JULIE BASCO

I, Julie Basco, declare as follows:

1.    My current position is the Bureau Chief of the Bureau of Criminal Information and Analysis in the Department of Justice.

2.    The Department of Justice has produced a statistical run from the Automated Criminal History System to determine the number of criminal identification and index (CII) number/subjects with a felony arrest from January 1,2010 - December 31, 2010. From this run, 122,948 number/subjects were adults at the time of arrest and had a Los Angeles County Originating Agency Identifier (ORI).

3.    Of these 122,948 number/subjects, 43,440 also had a felony conviction prior to January 1,2010.

I declare under penalty of perjury that the forgoing is true and correct.  Executed at _Sacramento_ , this 28th of July 2011.


_JULIE BASCO, declarant_

1

SER0104

1  JOHN F. KRATTLI, Acting County Counsel
   ROGER H. GRANBO, Assistant County Counsel
2  JENNIFER A.D. LEHMAN, Principal Deputy County Counsel
   (SBN 191477) • jlehman@counsel.lacounty.gov
3  648 Kenneth Hahn Hall of Administration
   500 West Temple Street
4  Los Angeles, California 90012-2713
   Telephone: (213) 974-1908 · Fax: (213) 626-2105
5
   Attorneys for Defendant
6  LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

7

**UNITED STATES DISTRICT COURT**

8

**CENTRAL DISTRICT OF CALIFORNIA**

9

10  SIGITAS RAULINAITIS and RIMA

11  RAULINAITIS,

| | |
|---|---|
| 12      Plaintiffs, | CASE NO. CV 11-08026 MWF (JCGx) |
| 13   v. | **DEFENDANT LOS ANGELES COUNTY SHERIFF'S DEPARTMENT'S REBUTTAL TO PLAINTIFFS' SEPARATE STATEMENT OF UNDISPUTED FACTS & CONCLUSIONS OF LAW; EVIDENCE IN SUPPORT THEREOF** |
| 14  THE LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, | |
| 15   | |
| 16      Defendant. | [Filed concurrently with Reply and Objections to Evidence] |
| 17   | |
| 18   | **MSJ Date:**   **June 11, 2012** <br> Time:   2:00 p.m. <br> Ctrm:   1600 |
| 19   | |
| 20   | Action Filed:   September 25, 2011 <br> Trial Date:   September 4, 2012 |
| 21   | |

22

23      Defendant Los Angeles County Sheriff's Department ("LASD") submits its

24  Rebuttal Separate Statement of Uncontroverted Facts & Conclusions of Law in

25  support of its Motion for Summary Judgment/Partial Summary Judgment pursuant

26  to Local Rule 56-1.

27

28

1 | DATED: May 25, 2012

Respectfully submitted,

2

3

JOHN F. KRATTLI
Acting County Counsel

4

5

By _____

6

JENNIFER A.D. LEHMAN
Principal Deputy County Counsel

7

8

Attorneys for Defendant
LOS ANGELES COUNTY SHERIFF'S
DEPARTMENT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOA.887326.1

## LASD'S UNDISPUTED FACTS AND EVIDENCE

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| 1.    At the time of Plaintiffs' applications to the LASD, Larry L. Waldie was the Undersheriff for Los Angeles County. As part of his responsibilities as Undersheriff, he was designated to act as the Sheriff's sole authorized representative for reviewing applications for concealed weapons (CCW) licenses for the County of Los Angeles. In that role, he and members of his staff evaluate CCW applications.  While members of his staff make recommendations | 1.    Plaintiff do not dispute that this is factually how the department handles CCW applications, but disputes that is legally proper or consistent with the Statutory framework as it is the Sheriff charged with the duty to exercise discretion. | 1.    Plaintiff does not dispute the fact and cites no evidence to the contrary. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| regarding applications, he is the final decision-maker. Exh. A, Waldie Decl. ¶¶ 1-2. | | |
| 2.   As part of his evaluation of CCW applications, he would review the entire application packet and any and all supporting documentation. Exh. A, Waldie Decl. ¶ 2. | 2.   Undisputed. | |
| 3.   In Los Angeles County, there are four distinct categories of CCW licenses: Employment, Standard, Judges, and Reserve Police Officers.  The Employment CCW license is issued only to | 3.   While it is not disputed that this is how Defendant handles the situation, this scheme is not consistent with nor recognized by the applicable Statute. | 3.   Plaintiff does not dispute the fact and cites no evidence to the contrary. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| a person who spends a substantial period of time in his or her principal place of employment or business in Los Angeles County. The Standard CCW license is issued to residents of Los Angeles County or to residents of a particular city within Los Angeles County. The Judge CCW license is issued to California judges, full-time commissioners, and to federal judges and magistrates of the federal courts.  The Reserve Police Officer CCW license may be issued to reserve police officers appointed | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| pursuant to California Penal Code § 830.6. Exh. A, Waldie Decl. ¶ 3. | | |
| 4. If an applicant resides in an incorporated city not policed by the LASD, the applicant must apply to the chief of police of their city of residence for a concealed weapons license and have such application acted upon. Within 60 days after a denial of such application, such city resident may file a separate application with the LASD, attaching a copy of the application denied by the chief of police. The LASD will | 4. Undisputed that this correctly states how the applications are handled, but disputed that it is a legal process consistent with the statutory scheme. Moreover, this process is currently the subject of another lawsuit pending against the Defendant which asserts the process is not legal. | 4. Plaintiff does not dispute the fact and cites no evidence to the contrary. |

HOA.887326.1

CV11-08026 JHN (JCGx)

SER0110

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| exercise independent discretion in granting or denying licenses to such person but may review, consider, and give weight to the grounds upon which such denial was made. Exh. A, Waldie Decl. ¶ 4; exh. 1 to Waldie Decl. | | |
| 5.     California Penal Code sections 26150-26190 (formerly §§ 12050-12054) set forth the general criteria that CCW applicants must meet. Applicants must be of good moral character, be a resident of, or spend substantial time in the County they apply in, take a firearms course, and demonstrate | 5.     Undisputed. | |

| **Moving Party's Undisputed Material Facts and Supporting Evidence** | **Opposing Party's Response and Supporting Evidence** | **Moving Party's Rebuttal and Supporting Evidence** |
|---|---|---|
| good cause for the license. Exh. A, Waldie Decl. ¶ 5. | | |
| 6.    The issuance of licenses enabling a private citizen to carry a CCW is of great concern to the LASD.  The LASD's overriding policy is that no CCW license should be granted merely for the personal convenience of the applicant.  No position or job application in itself shall constitute good cause for the issuance, or for the denial, of a CCW license. Exh. A, Waldie Decl. ¶ 6. | 6.    Undisputed that this how defendant does it, but disputed that this is a legally permissible scheme, or supported b any fact or evidence other that political self-interest. | 6.    Plaintiff does not dispute the fact and cites no evidence to the contrary. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| 7.   The LASD defines "good cause" under California Penal Code section 26150 (formerly 12050) as requiring convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm. | 7.   Undisputed. | |

HOA.887326.1

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| Exh. A, Waldie Decl. ¶ 6, see also exh. 1 to Waldie Decl. | | |
| 8.    Each CCW application is individually reviewed for cause. The LASD's definition of good cause has been in existence since at least 2005, and remains in existence to the present. It is the Undersheriff's understanding that this definition of good cause, or one similar to it, is utilized by many other counties within California, including San Diego. Exh. A, Waldie Decl. ¶ 6. | 8.    Undisputed. | |
| 9.    In evaluating | 9.    Undisputed. | |

HOA.887326.1

CV11-08026 JHN (JCGx)

SER0114

| **Moving Party's** | **Opposing Party's** | **Moving Party's** |
|---|---|---|
| **Undisputed Material** | **Response and** | **Rebuttal and** |
| **Facts and Supporting** | **Supporting Evidence** | **Supporting** |
| **Evidence** | | **Evidence** |
| whether an applicant has | | |
| presented good cause, an | | |
| applicant's stated reason | | |
| of self-defense is not | | |
| enough. | | |
| Exh. A, Waldie Decl. ¶ | | |
| 7. | | |
| 10.    The applicant | 10.    Undisputed. | |
| must demonstrate a | | |
| credible threat of | | |
| violence which would | | |
| justify the need to | | |
| possess a concealed | | |
| weapon.  If an applicant | | |
| claims that he or she has | | |
| been threatened, the | | |
| LASD looks for | | |
| documentation of that | | |
| threat, such as police | | |
| reports or other | | |
| evidence. | | |
| Exh. A, Waldie Decl. ¶ | | |
| 7. | | |

HOA.887326.1

CV11-08026 JHN (ICGx)

SER0115

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| 11. One of the purposes for the LASD's policy is to protect against gun violence to the community at large, as well as to protect officers conducting law enforcement operations on the streets. Exh. A, Tanaka Decl. ¶ 8; see also Exh. B, Zimring Decl., ¶¶ 1-28. | 11. While Plaintiff does not dispute that the LASD holds this "belief" Plaintiff does dispute that this is true, a fact or evidence of anything. | 11. Plaintiff does not dispute the fact and cites no evidence to the contrary. |
| 12. Gun violence is a problem throughout the State of California and Los Angeles County is no exception. The vast majority of homicides in Los Angeles County are committed with the use of guns. Handguns are of particular concern because they are much | 12. Disputed, there is not evidence of any nexus between the facts asserted herein and defendants' policy. Moreover, Plaintiffs expert specifically contradicts this assertion, and defendants | 12. Plaintiff does not dispute the fact and cites no evidence to the contrary. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| more likely to be used than shotguns and rifles. Because handguns are small, easy to conceal, and deadly at short range, they are of paramount concern and danger. Further, most of the violent acts committed in this County involving the use of guns are by gang members. Exh. A, Waldie Decl. ¶ 8; see also Exh, B, Zimring Decl., ¶¶ 3-10. | deposition testimony and discovery responses incorporated herein admit that Defendant has no facts or evidence to support these beliefs other than an outdated and unreliable study from 2001 that suggests more guns equals more crime. | |
| 13.    The presence of more guns on the streets of Los Angeles County creates many problems for law enforcement officers. Officers are often charged with | 13.    Disputed, there is no evidence of any nexus between the facts asserted herein and defendats' policy. Moreover, Plaintiffs expert | 13.    Plaintiff does not dispute the fact and cites no evidence to the contrary. |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| monitoring public gatherings as well as with breaking up public nuisances. Officers must act quickly whenever a disturbance occurs. Often times, this involves isolating one or two problem individuals. However, if multiple persons within a crowd are carrying concealed weapons, this creates an increased likelihood that guns will be brandished or used. Thus, the increased presence of guns creates not only increased safety problems for officers but also for members of the community at large. Exh. A, Tanaka Decl. ¶ | specifically contradicts this assertion, and defendants deposition testimony and discovery responses incorporated herein admit that Defendant has no facts or evidence to support these beliefs other than an outdated and unreliable study from 2001 that suggests more guns equals more crime. | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| 9; Exh,. B, Zimring Decl., ¶¶ 3-28. | | |
| 14.    It is the LASD's position that increasing the numbers of concealed weapons in the community increases the threat of gun violence to the community at large, to those who use the streets and go to public accommodations, and to law enforcement officers patrolling the streets. Further, the increased presence of concealed handguns make law enforcement operations more difficult thus taking away valuable resources which would be better used | 14.    While Plaintiffs does not dispute that the LASD holds this "belief" Plaintiff does dispute that this is true, a fact or evidence of anything. | 14.    Plaintiff does not dispute the fact and cites no evidence to the contrary. |

HOA.887326.1

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| conducting law enforcement operations. Exh. A, Waldie Decl. ¶ 10; Exh. B, Zimring Decl., ¶¶ 3-28. | | |
| 15.   Los Angeles County's "good cause" requirement is intended to drastically restrict the number of persons who are secretly armed in the County. Exh. A, Waldie Decl. ¶ 10; see also, e.g., Exh. B, Zimring Decl., ¶¶ 3-28. | 15.   Undisputed. | |
| 16.   In 2010, there was an average of approximately 400 concealed weapons permits that were issued by the LASD.  The Undersheriff is informed | 16.   Undisputed. | |

| **Moving Party's** | **Opposing Party's** | **Moving Party's** |
|---|---|---|
| **Undisputed Material** | **Response and** | **Rebuttal and** |
| **Facts and Supporting** | **Supporting Evidence** | **Supporting** |
| **Evidence** | | **Evidence** |
| and believe that the | | |
| County's Chief | | |
| Executive Office has | | |
| estimated that the | | |
| population of Los | | |
| Angeles County as of | | |
| January 2010 was | | |
| 10,441,080 people. | | |
| Exh. A, Waldie Decl. ¶ | | |
| 11. | | |
| 17.    On or about April | 17.    Undisputed. | |
| 7, 2011, Plaintiff Sigitas | | |
| Raulinaitis submitted a | | |
| CCW application to the | | |
| LASD. | | |
| Exh. A, Waldie Decl., ¶ | | |
| 12, (and exh. 2 to | | |
| Waldie Decl.) | | |
| 18.    In his application, | 18.    Undisputed. | |
| Sigitas Raulinaitis stated | | |
| that he should be | | |
| allowed to carry a CCW | | |
| because as a | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| construction contractor, real estate broker, and attorney, he has to be present at, and travel to, homes in blighted areas where persons may forcibly deprive him of his property or otherwise pose a danger to him. He also stated that he has two homes which involve travel in sparsely populated areas where "self protection may be required without warning."  He further stated that he sometimes transports large amounts of cash. Exh. A to Waldie Decl., ¶ 12 (and exh. 2 to Waldie Decl., internal page 13) | | |

HOA.887326.1

| **Moving Party's Undisputed Material Facts and Supporting Evidence** | **Opposing Party's Response and Supporting Evidence** | **Moving Party's Rebuttal and Supporting Evidence** |
|---|---|---|
| 19.    The LASD reviewed Plaintiff's application and determined that he failed to show good cause as required by LASD policy, and as defined above.  Specifically, Plaintiff failed to show convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly | 19.    Undisputed. | |

HOA.887326.1

-19-

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| mitigated by the applicant's carrying of a concealed firearm. Exh. A, Waldie Decl., ¶¶ 12-13. | | |
| 20.   On November 10, 2010, Mr. Raulinatis sent a letter to the LASD requesting that the LASD reconsider its denial of his application. In his letter, he states that his claim of "self-defense" is the only "good cause" he needs to obtain a CCW.  Mr. Raulinatis provided no other additional facts to justify his CCW application. Exh. A, Waldie Decl. ¶ 14, exh. 4 to Waldie Decl. | 20.   Undisputed. | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| 21.    On September 28, 2010, Plaintiff Rima Raulinaitis (wife of Sigitas Raulinaitis) submitted a CCW application to the LASD. Exh. A, Waldie Decl., exh. 5 to Waldie Decl. | 21.    Undisputed. | |
| 22.    In support of her application, Ms. Raulinaitis stated two words as justification: "Self Defense." Exh. A, Waldie Decl., exh. 5 to Waldie Dec. internal page 13. | 22.    Undisputed. | |
| 23.    The LASD reviewed Ms. Raulinaitis' application and determined that she failed to show good cause as required by LASD policy, and as | 23.    Undisputed. | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| defined above. Specifically, Plaintiff failed to show convincing evidence of a clear and present danger to life or of great bodily harm to the applicant, his spouse or dependent child, which cannot be adequately dealt with by existing law enforcement resources and which danger cannot be reasonably avoided by alternative measures, and which danger would be significantly mitigated by the applicant's carrying of a concealed firearm. Exh. A., Waldie Decl., ¶¶ 12-13; exh. 6 to Waldie Decl. | | |

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response and Supporting Evidence | Moving Party's Rebuttal and Supporting Evidence |
|---|---|---|
| 24.    Julie Basco of the California Department of Justice supervised an analysis of all 122,948 adult felony arrests in Los Angeles County for 2010 and divided these persons by whether they had a pre-2010 felony conviction. A total of 43,440 subjects had a prior felony that would keep them from being eligible in a "shall issue" mandate or constitutional rule. Sixty-five percent of Los Angeles County felons do not have a prior felony conviction when arrested. These statistics indicate that almost 2/3rds of the known | 24.    Disputed, there is no evidence of any nexus between the facts asserted herein and defendants' policy. Moreover, Plaintiffs expert specifically contradicts this assertion, and defendants deposition testimony and discovery responses incorporated herein admit that Defendant has no facts or evidence to support these beliefs other than an outdated and unreliable study from 2001 that suggests more guns | 24.    Plaintiff does not dispute the fact and cites no evidence to the contrary. |

| **Moving Party's Undisputed Material Facts and Supporting Evidence** | **Opposing Party's Response and Supporting Evidence** | **Moving Party's Rebuttal and Supporting Evidence** |
|---|---|---|
| current felons would not be screened out by a prior felony from CCW permits without further barriers. Exh. B, Zimring Decl. ¶ 23, Exh. C, Basco Decl., ¶ 2-3. | equals more crime. | |

## CONCLUSIONS OF LAW

1. California Penal Code § 12050(a)(1)(A) authorizes a county sheriff to issue a license to carry a concealed pistol, revolver, or other firearm capable of being concealed upon the person (hereinafter "CCW permit") upon the existence of good cause, and provided that the applicant meets other criteria provided for in the Penal Code.

2. Penal Code § 12050 gives extremely broad discretion to the sheriff concerning the issuance of concealed weapons licenses, and explicitly grants discretion to the issuing officer to issue or not issue a license to applicants meeting the minimum statutory requirements. *Gifford v. City of Los Angeles*, 88 Cal.App.4th 801, 805 (2001).

3. In *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 2788, 2822 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026, 3044 (2010), the United States Supreme Court held that the Second Amendment protects an individual's right to possess firearms in the home for self-defense.

4.     The right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. *Heller*, 128 S.Ct. at 2816.

5.     Penal Code sections 12025(a) and 12031(a) have been upheld in California against a Second Amendment challenge after *Heller*. *People v. Flores*, 169 Cal. App. 4th 568, 575-576 (2008); *People v. Yarbrough*, 169 Cal. App. 4th 303, 312-314 (2008).

6.     Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized "threat to public order," and is "prohibited as a means of preventing physical harm to persons other than the offender.' *Yarbrough*, 169 Cal.App.4th at 314, citing *People v. Hale*, 43 Cal.App.3d 353, 356 (1974).

7.     A person who carries a concealed firearm on his person or in a vehicle, which permits the individual immediate access to the firearm but impedes others from detecting its presence, poses an 'imminent threat to public safety. *Id.* at 313-314.

8.     Intermediate scrutiny requires that the challenged statute or regulation "be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

9.     Maintaining public safety and preventing crime are clearly important (if not paramount) government interests and the regulation of concealed firearms is a critical factor in accomplishing that interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

1    DATED: May 25, 2012          Respectfully submitted,

2

3                                        JOHN F. KRATTLI
                                         Acting County Counsel

4

5                                  By                 /S/

6                                          JENNIFER A.D. LEHMAN
                                         Principal Deputy County Counsel

7

8                                  Attorneys for Defendant
                                 LOS ANGELES COUNTY SHERIFF'S

9                                  DEPARTMENT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   JOHN F. KRATTLI, Acting County Counsel
    ROGER H. GRANBO, Assistant County Counsel
2   JENNIFER A.D. LEHMAN, Principal Deputy County Counsel
    (SBN 191477) • *jlehman@counsel.lacounty.gov*
3   648 Kenneth Hahn Hall of Administration
    500 West Temple Street
4   Los Angeles, California 90012-2713
    Telephone: (213) 974-1908 · Fax: (213) 626-2105
5
    Attorneys for Defendant
6   LOS ANGELES COUNTY SHERIFF'S DEPARTMENT

7                    UNITED STATES DISTRICT COURT

8                   CENTRAL DISTRICT OF CALIFORNIA

9

10  SIGITAS RAULINAITIS and RIMA          CASE NO. CV 11-08026 MWF (JCGx)
11  RAULINAITIS,
                                          **OBJECTIONS TO PLAINTIFF'S
12          Plaintiffs,                   EVIDENCE IN OPPOSITION TO
                                          LASD DEFENDANT'S MOTION
13      v.                                FOR SUMMARY JUDGMENT**

14  THE LOS ANGELES COUNTY                [Filed concurrently with Defendant's
    SHERIFF'S DEPARTMENT,                 Reply; Reply Separate Statement; ]
15
            Defendant.
16                                        **MSJ Date:    June 11, 2012**
                                          Time:         2:00 p.m.
17                                        Ctrm:         1600

18                                        Action Filed:  September 25, 2011
                                          Trial Date:    September 4, 2012
19

20

21          Defendant Los Angeles County Sheriff's Department (LASD) objects to

22  Plaintiff's evidence in Opposition to the LASD's Motion for Summary Judgment

23  as follows:

24      **Exhibit F:  Declaration of Lawrence Mudgett**

25          Initially, Plaintiff offers the declaration of Lawrence Mudgett, a retired

26  Chief Firearms Instructor from the Los Angeles Police Department, to opine

27  regarding nationwide public policy and statistics regarding concealed weapons

28  permit (CCW) possession and violence.  Defendant objects under Federal Rule of

---

1  Evidence 702 that Mr. Mudgett is not qualified to provide such testimony.  Mr.

2  Mudgett's credentials and curriculum vitae do not indicate that he has any

3  expertise in nationwide public policy matters related to firearms.

4       Defendant further objects as follows;

5       1.    **Paragraph 3**: "The need to Carry concealed is due only to the

6  decision of the California legislature to make that the only method of permissible

7  carry having, otherwise banned the possession of a loaded firearm by law abiding

8  citizens and further, even the possession of an unloaded weapon within 1000 feet

9  of a school, which in Southern California would make travel nearly an impossible

10 task."

11      ***Objection***: Lacks Foundation, Improper Expert Opinion, Calls for a

12 Legal Conclusion not within Declarant's Expertise.  FRE 402, 602, 701, 702-704,

13 802.

14      2.    **Paragraph 4:** "The reality is 49 states now recognize the citizens to

15 carry a functional handgun in a concealed manner, either by constitutional

16 amendment, "Shall Issue" system or "Good Cause": 35 states have "shall issue"

17 permit laws that usually require states to issue permits to those who meet legal

18 requirements; 10 others have "may issue" or discretionary permit laws.  Vermont,

19 Arizona, Alaska and Wyoming do not require a permit to carry a concealed

20 weapon.

21      ***Objection:*** Irrelevant, Lacks Foundation, Improper Expert Opinion,

22 Calls for a Legal Conclusion not with Declarant's Expertise.  FRE 402, 602, 701,

23 702, 703, 802.

24      3.    **Paragraph 5:** "It is my opinion, based upon my education, training

25 and experience that increased training reduces the risk of accident, injury and

26 misuse of firearms.  For example, when the LAPD Firearms Training Unit

27 increased the quality of their firearms training program, both negligent and

28 accidental discharges were reduced."

-2-

1      *__Objection:__* Irrelevant, Lacks Foundation, Improper Expert Opinion,

2   Calls for a Legal Conclusion not with Declarant's Expertise.  FRE 402, 602, 701,

3   702, 802.

4      4. __Paragraph 6:__ "According to studies armed citizens kill more

5   criminals in self-defense than our Nation's police officers by about 2 to 1.  It is

6   my opinion based upon my education, training, and experience that criminals tend

7   to fear armed citizens more than they fear law enforcement officers and that the

8   increase in the number of citizens who now carry concealed weapons is a

9   significant factor in the distinct and significant drop in violent crime each year

10  (according to the FBI statistics)."

11     *__Objection__*: Lacks Foundation, Improper Expert Opinion, Calls for a

12  Legal Conclusion not Within Declarant's Expertise; Best Evidence Rule. FRE

13  402, 602, 701, 702, 703, 802.

14     5. __Paragraph 7:__ "It is my opinion, based upon my education, training

15  and experience that over the last 30 years the availability of concealed carry has

16  increased dramatically from about 10 states to over 49 currently.  It is also

17  interesting to note that 4 states now have Constitutional Carry Laws.  Wyoming

18  Alaska, Vermont and Arizona allow any citizen who is not prohibited from

19  possessing a handgun to carry it concealed.  The legislatures of Utah and other

20  states are considering adopting similar law.  When considering the success that

21  other states have had with the "shall issue system," we must wonder why LE

22  officials do not believe that the same result would occur in CA.  One can only

23  conclude that LE officials must believe that California residents are somehow

24  different than the residents of other states.  California residents must be deemed

25  less trustworthy, less restrained, more violent, more prone to commit crimes, etc."

26     *__Objection:__* Irrelevant, Lacks Foundation, Improper Expert Opinion,

27  Calls for a Legal Conclusion not with Declarant's Expertise.  FRE 402, 602, 701,

28  702, 703, 802.

-3-

1    6.   **Paragraph 8**:

2    a)   "It is my opinion, based upon my education, training, experience, and

3 being familiar with firearms research, regulation, publications, and studies, that

4 there is no correlation between the issuance of CCW permits and unlawful

5 violence."

6    b)   "...CCW permit holders are not in any way likely to increase crime or

7 violence, and among the gun owning population are safer and more likely to

8 reduce the accident rate because of their increased training and awareness. What

9 facts I am aware of indicate that armed and trained citizens reduce crime by their

10 very existence, as criminals do not know which citizens are in fact armed."

11    *Objection*:  Hearsay, Speculation, Lacks Foundation, Improper

12 Expert Opinion, Calls for a Legal Conclusion not Within Declarant's Expertise.

13 FRE 402, 602, 701, 702, 802.

14    7.   **Paragraph 9**: "The declaration of Franklin Zimring is not consistent

15 with my knowledge, training, or experience.  Mr. Zimring expresses theories

16 which are not related to CCW permits and are not consistent with any peer

17 reviewed statistics.  By way of example, one of the undisputed facts used by

18 Zimring was the so called fact that 39 percent of people who commit murder had

19 at the time no disqualifying convictions.  My first thought is that these are

20 juveniles who commit a good percentage of the crime in Los Angeles.  Their

21 juvenile arrests may not be used against them as adults and they may comprise a

22 portion of this supposed 39 percent.  The second factor is people who are arrested

23 for serious crimes in LA are often allowed to plea the case down to a far lesser

24 crime and the minor crime is the one they are actually convicted of.  These are

25 weaknesses in the criminal justice system that should not be used to deny you the

26 right of self-defense.  I find the statistics suspicious in any case."

27    *Objection*:  Hearsay, Misstates Zimring Declaration; Speculation,

28 Lacks Foundation, Improper Expert Opinion, Calls for a Legal Conclusion not

1   Within Declarant's Expertise. FRE 402, 602, 701, 702, 703, 802.

2   **Exhibit G:  Declaration of Lawrence Mudgett**

3       Plaintiff again offers the declaration of Lawrence Mudgett to opine

4   regarding nationwide public policy and statistics regarding CCW permit possession

5   and violence.  Defendants again object that Mr. Mudgett is not qualified to

6   provide such testimony.  Mr. Mudgett's credentials and curriculum vitae do not

7   indicate that he has any expertise in nationwide public policy matters related to

8   firearms.

9       8.    **Paragraph 3**: The need to Carry concealed is due only to the decision

10  of the California legislature to make that the only method of permissible carry

11  having, otherwise banned the possession of a loaded firearm by law abiding

12  citizens and further, even the possession of an unloaded weapon within 1000 feet

13  of a school, which in Southern California would make travel nearly an impossible

14  task."

15      *Objection*:  Hearsay, Lacks foundation, Improper Expert Opinion,

16  Calls for a Legal Conclusion not within Declarant's Expertise.  FRE 402, 602,

17  701, 702, 802.

18      9.    **Paragraph 4:** "For instance, according to studies armed citizens kill

19  more criminals in self-defense than our Nations police officers by about 2 to 1.

20  Police officers have about 5 times as many "mistake of fact shootings" as armed

21  citizens."

22      *Objection*:  Hearsay, Lacks Foundation, Improper Expert Opinion,

23  Calls for a Legal Conclusion not Within Declarant's Expertise.  FRE 402, 602,

24  701, 702, 802.

25      10.    **Paragraph 5:** "It is my opinion, based upon my education, training,

26  and experience that Law enforcement relies upon FBI Uniform Crime Statistics,

27  which, over the last thirty years have shown a distinct and significant drop in

28  violent crime each year."

1    *Objection*: Hearsay, Lacks Foundation, Improper Expert Opinion, Calls for

2    a Legal Conclusion not Within Declarant's Expertise; Best Evidence Rule. FRE

3    402, 602, 701, 702, 802.

4        11.    **Paragraph 6:** "When considering the success that other state have

5    had with the "shall issue system," we must wonder why LE officials do not

6    believe that the same result would occur in CA. One can only conclude that LE

7    officials must believe that California residents are somehow different than the

8    residents of other states.  California residents must be deemed less trustworthy,

9    less restrained, more violent, more prone to commit crimes, etc."

10        *Objection*: Hearsay, Lacks Foundation, Improper Expert Opinion,

11   Calls for a Legal Conclusion not Within Declarant's Expertise. FRE 402, 602,

12   701, 702, 802.

13       12.    **Paragraph 7:**

14       a)    "It is my opinion, based upon my education, training, experience, and

15   being intimately familiar with firearms research, regulation, publications, and

16   studies, that there is no correlation between the issuance of CCW permits and

17   violence."

18       b)    "...CCW permit holders are not in any way likely to increase crime or

19   violence, and among the gun owning population are safer and more likely to

20   reduce the accident rate because of their increased training and awareness.  What

21   facts I am aware of indicate that armed and trained citizens reduce crime by their

22   very existence, as criminals do not know which citizens are in fact armed."

23       c)    Citation to the Lott-Mustard Report and other published articles and

24   reports.

25       *Objection*: Hearsay, Speculation, Lacks Foundation, Improper

26   Expert Opinion, Calls for a Legal Conclusion not Within Declarant's Expertise.

27   FRE 402, 602, 701, 702, 802.

28       13.    **Paragraph 8:** "The declaration of Franklin Zimring is not consistent

1   with my knowledge, training, or experience.  Mr. Zimring expresses theories

2   which are not related to CCW permits and are not consistent with any peer

3   reviewed statistics.  By way of example, one of the undisputed facts used by

4   Zimring was the so called fact that 39 percent of people who commit murder had

5   at the time no disqualifying convictions.  My first thought is that these are

6   juveniles who commit a good percentage of the crime in Los Angeles.  Their

7   juvenile arrests may not be used against them as adults and they may comprise a

8   portion of this supposed 39 percent.  The second factor is people who are arrested

9   for serious crimes in LA are often allowed to plea the case down to a far lesser

10  crime and the minor crime is the one they are actually convicted of.  These are

11  weaknesses in the criminal justice system that should not be used to deny you the

12  right of self-defense.  I find the statistics suspicious in any case."

13        *Objection*: Hearsay, Speculation, Lacks Foundation, Improper

14  Expert Opinion, Calls for a Legal Conclusion not Within Declarant's Expertise.

15  FRE 402, 602, 701, 702, 802.

16        **Separately Filed Third Declaration of Lawrence Mudgett**

17        Plaintiff also offers the declaration of Lawrence Mudgett with the caption

18  for this case.  For the reasons set forth above, Defendant objects under Federal

19  Rule of Evidence 702 that Mr. Mudgett is not qualified to provide such testimony.

20  Mr. Mudgett's credentials and curriculum vitae do not indicate that he has any

21  expertise in nationwide public policy matters related to firearms.

22        Defendant further objects as follows;

23        14.  **Paragraph 3**: "The need to Carry concealed is due only to the

24  decision of the California legislature to make that the only method of permissible

25  carry having, otherwise banned the possession of a loaded firearm by law abiding

26  citizens and further, even the possession of an unloaded weapon within 1000 feet

27  of a school, which in Southern California would make travel nearly an impossible

28  task."

1        *Objection*: Lacks Foundation, Improper Expert Opinion, Calls for a

2  Legal Conclusion not within Declarant's Expertise.  FRE 402, 602, 701, 702-704,

3  802.

4       15.  **Paragraph 4:**  "The reality is 49 states now recognize the citizens to

5  carry a functional handgun in a concealed manner, either by constitutional

6  amendment, "Shall Issue" system or "Good Cause": 35 states have "shall issue"

7  permit laws that usually require states to issue permits to those who meet legal

8  requirements; 10 others have "may issue" or discretionary permit laws.  Vermont,

9  Arizona, Alaska and Wyoming do not require a permit to carry a concealed

10  weapon.

11       *Objection:* Irrelevant, Lacks Foundation, Improper Expert Opinion,

12  Calls for a Legal Conclusion not with Declarant's Expertise.  FRE 402, 602, 701,

13  702, 703, 802.

14       16.  **Paragraph 5:**  "It is my opinion, based upon my education, training

15  and experience that increased training reduces the risk of accident, injury and

16  misuse of firearms.  For example, when the LAPD Firearms Training Unit

17  increased the quality of their firearms training program, both negligent and

18  accidental discharges were reduced."

19       *Objection:* Irrelevant, Lacks Foundation, Improper Expert Opinion,

20  Calls for a Legal Conclusion not with Declarant's Expertise.  FRE 402, 602, 701,

21  702, 802.

22       17.  **Paragraph 6:** "According to studies armed citizens kill more

23  criminals in self-defense than our Nation's police officers by about 2 to 1.  Police

24  officers have about 5 times as many "mistake of fact shootings" as armed citizens.

25  It is my opinion based upon my education, training, and experience that criminals

26  tend to fear armed citizens more than they fear law enforcement officers and that

27  the increase in the number of citizens who now carry concealed weapons is a

28  significant factor in the distinct and significant drop in violent crime each year

1  (according to the FBI statistics)."

2  *Objection*: Lacks Foundation, Improper Expert Opinion, Calls for a

3  Legal Conclusion not Within Declarant's Expertise; Best Evidence Rule. FRE

4  402, 602, 701, 702, 703, 802.

5  18.  **Paragraph 7:** "It is my opinion, based upon my education, training

6  and experience that over the last 30 years the availability of concealed carry has

7  increased dramatically from about 10 states to over 49 currently.  It is also

8  interesting to note that 4 states now have Constitutional Carry Laws.  Wyoming

9  Alaska, Vermont and Arizona allow any citizen who is not prohibited from

10  possessing a handgun to carry it concealed.  The legislatures of Utah and other

11  states are considering adopting similar law.  When considering the success that

12  other states have had with the "shall issue system," we must wonder why LE

13  officials do not believe that the same result would occur in CA.  One can only

14  conclude that LE officials must believe that California residents are somehow

15  different than the residents of other states.  California residents must be deemed

16  less trustworthy, less restrained, more violent, more prone to commit crimes, etc."

17  *Objection:* Irrelevant, Lacks Foundation, Improper Expert Opinion,

18  Calls for a Legal Conclusion not with Declarant's Expertise.  FRE 402, 602, 701,

19  702, 703, 802.

20  19.  **Paragraph 8:**

21  a)  "It is my opinion, based upon my education, training, experience, and

22  being familiar with firearms research, regulation, publications, and studies, that

23  there is no correlation between the issuance of CCW permits and unlawful

24  violence."

25  b)  "...CCW permit holders are not in any way likely to increase crime or

26  violence, and among the gun owning population are safer and more likely to

27  reduce the accident rate because of their increased training and awareness.  What

28  facts I am aware of indicate that armed and trained citizens reduce crime by their

-9-

1  very existence, as criminals do not know which citizens are in fact armed."

2      *Objection*: Hearsay, Speculation, Lacks Foundation, Improper

3  Expert Opinion, Calls for a Legal Conclusion not Within Declarant's Expertise.

4  FRE 402, 602, 701, 702, 802.

5      20.  **Paragraph 9:** "The declaration of Franklin Zimring is not consistent

6  with my knowledge, training, or experience.  Mr. Zimring expresses theories

7  which are not related to CCW permits and are not consistent with any peer

8  reviewed statistics.  By way of example, one of the undisputed facts used by

9  Zimring was the so called fact that 39 percent of people who commit murder had

10  at the time no disqualifying convictions.  My first thought is that these are

11  juveniles who commit a good percentage of the crime in Los Angeles.  Their

12  juvenile arrests may not be used against them as adults and they may comprise a

13  portion of this supposed 39 percent.  The second factor is people who are arrested

14  for serious crimes in LA are often allowed to plea the case down to a far lesser

15  crime and the minor crime is the one they are actually convicted of.  These are

16  weaknesses in the criminal justice system that should not be used to deny you the

17  right of self-defense.  I find the statistics suspicious in any case."

18      *Objection*: Hearsay, Misstates Zimring Declaration; Speculation,

19  Lacks Foundation, Improper Expert Opinion, Calls for a Legal Conclusion not

20  Within Declarant's Expertise. FRE 402, 602, 701, 702, 703, 802.

21      21.  **Paragraph 10:**  "The last ten years have seen an astronomical rise in

22  the sale of guns and ammunition while at the same time seeing a consistent and

23  yearly drop in violent crime as is commonly known, based upon my knowledge,

24  experience and training and as reflected in the attached FBI crime and NCIS

25  statistics."

26      *Objection*: Hearsay, Speculation, Lacks Foundation, Improper Expert

27  Opinion, Calls for a Legal Conclusion not Within Declarant's Expertise. FRE 402,

28  602, 701, 702, 703, 802

(JCGx),APPEAL,CLOSED,DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:11-cv-08026-MWF-JCG

Sigitas Raulinaitis et al v. Los Angeles County Sheriffs Department

Assigned to: Judge Michael W. Fitzgerald
Referred to: Magistrate Judge Jay C. Gandhi
Case in other court: 9TH CCA, 12-56508
Cause: 42:1983 Civil Rights Act

Date Filed: 09/28/2011
Date Terminated: 08/13/2012
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**
**Sigitas Raulinaitis**

represented by **Jonathan Wesley Birdt**
18252 Bermuda Street
Porter Ranch, CA 91326
818-400-4485
Fax: 818-428-1384
Email: jon@jonbirdt.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**Rima Raulinaitis**

represented by **Jonathan Wesley Birdt**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**
**Los Angeles County Sheriffs Department**
*The*

represented by **Jennifer A D Lehman**
Los Angeles County Counsel
500 West Temple Street
Los Angeles, CA 90012-2713
213-974-1908
Email: jlehman@counsel.lacounty.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/28/2011 | 1 | COMPLAINT against Defendant Los Angeles County Sheriffs Department. Case assigned to Judge Jacqueline H. Nguyen for all further proceedings. Discovery referred to Magistrate Judge Jay C. Gandhi.(Filing fee $ 350:PAID) Jury Demanded., filed by plaintiffs Sigitas Raulinaitis, Rima Raulinaitis.(ghap) (mg). (Additional attachment(s) added on 10/3/2011: # 1 Ntc of Asgmt, # 2 Civil Cover Sheet) (mg). (Entered: 09/28/2011) |

SER 0141

| 09/28/2011 | | 21 DAY Summons Issued re Complaint - (Discovery) 1 as to Defendant Los Angeles County Sheriffs Department. (ghap) (Entered: 09/28/2011) |
|---|---|---|
| 09/28/2011 | 2 | CERTIFICATION AND NOTICE of Interested Parties filed by Plaintiffs Rima Raulinaitis, Sigitas Raulinaitis. (ghap) (mg). (Entered: 09/28/2011) |
| 09/28/2011 | 3 | NOTICE TO PARTIES OF ADR PROGRAM filed.(ghap) (Entered: 09/28/2011) |
| 10/11/2011 | 4 | PROOF OF SERVICE Executed by Plaintiff Sigitas Raulinaitis, Rima Raulinaitis, upon Defendant Los Angeles County Sheriffs Department served on 10/6/2011, answer due 10/27/2011. Service of the Summons and Complaint were executed upon Kathleen Camacho in compliance with California Code of Civil Procedure by personal service. Original Summons NOT returned. (Birdt, Jonathan) (Entered: 10/11/2011) |
| 10/26/2011 | 5 | NOTICE of Interested Parties filed by Defendant Los Angeles County Sheriffs Department, identifying Sigitas Raulinaitis, Rima Raulinaitis, Jonathan Birdt, Los Angeles County Sheriff's Department. (Lehman, Jennifer) (Entered: 10/26/2011) |
| 10/28/2011 | 6 | ANSWER to Complaint - (Discovery), Complaint - (Discovery) 1 filed by Defendant Los Angeles County Sheriffs Department.(Lehman, Jennifer) (Entered: 10/28/2011) |
| 10/31/2011 | 7 | ORDER FOR RULE 26 JOINT SCHEDULING REPORT by Judge Jacqueline H. Nguyen. (bp) (Entered: 10/31/2011) |
| 11/21/2011 | 8 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 3, filed by Defendant Los Angeles County Sheriffs Department.. (Lehman, Jennifer) (Entered: 11/21/2011) |
| 11/29/2011 | 9 | ORDER RE JURY TRIAL and ORDER/REFERRAL TO ADR PROGRAM by Judge Jacqueline H. Nguyen: Final Pretrial Conference set for 8/6/2012 10:30 AM and Jury Trial set for 9/4/2012 08:30 AM before Judge Jacqueline H. Nguyen. (Attachments: # 1 ADR Referral) (ama) (Entered: 11/29/2011) |
| 01/18/2012 | 10 | NOTICE of Related Case(s) filed by Defendant Los Angeles County Sheriffs Department. Related Case(s): 11CV-08026 JHN (JCGx), 10CV-08377 JAK (JEMx), 11CV-06154 SJO (JCx) (Lehman, Jennifer) (Entered: 01/18/2012) |
| 01/18/2012 | 11 | NOTICE of Related Case(s) filed by Defendant Los Angeles County Sheriffs Department. Related Case(s): 11CV-08026 JHN (JCGx), 10CV-08377 JAK (JEMx), 11CV-06154 SJO (JCx) (Lehman, Jennifer) (Entered: 01/18/2012) |
| 01/19/2012 | 12 | AMENDED DOCUMENT filed by Defendant Los Angeles County Sheriffs Department. Amendment to Notice of Related Case(s) 11 *amended to include pages 2 and 3 inadvertently left out when the document was converted to PDF format* (Lehman, Jennifer) (Entered: 01/19/2012) |
| 01/19/2012 | 13 | MEMORANDUM of Points and Authorities in Opposition *to request to relate cases* Re: Amended Document (Non-Motion) 12 , Notice of Related Case(s) 10 , Notice of Related Case(s) 11 (Birdt, Jonathan) (Entered: 01/19/2012) |
| | | |

SER 0142

| 01/20/2012 | 14 | REPLY filed by Defendant Los Angeles County Sheriffs Department to Memorandum of Points and Authorities in Opposition (non-motion) 13 (Lehman, Jennifer) (Entered: 01/20/2012) |
| 01/20/2012 | 15 | REPLY filed by Defendant Los Angeles County Sheriffs Department to Memorandum of Points and Authorities in Opposition (non-motion) 13 (Lehman, Jennifer) (Entered: 01/20/2012) |
| 01/25/2012 | 16 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 08-05 (Related Case) filed. Transfer of case declined by Judge John A Kronstadt, for the reasons set forth on this order. Related Case No. CV 10-08377 JAK(JEMx) (rn) (Entered: 01/25/2012) |
| 05/07/2012 | 17 | NOTICE OF MOTION AND MOTION for Summary Judgment as to Complaint filed by Defendant Los Angeles County Sheriffs Department. Motion set for hearing on 6/11/12 at 02:00 PM before Judge Jacqueline H. Nguyen. (Attachments: # 1 Proposed Order Granting Defendant's Motion for Summary Judgment)(Lehman, Jennifer) (Entered: 05/07/2012) |
| 05/07/2012 | 18 | NOTICE OF LODGING filed *by Defendant* re MOTION for Summary Judgment as to Complaint 17 (Attachments: # 1 Defendant's Separate Statement of Undisputed Facts & Conclusions of Law)(Lehman, Jennifer) (Entered: 05/07/2012) |
| 05/07/2012 | 19 | REQUEST FOR JUDICIAL NOTICE re MOTION for Summary Judgment as to Complaint 17 filed by Defendant Los Angeles County Sheriffs Department. (Lehman, Jennifer) (Entered: 05/07/2012) |
| 05/11/2012 | 20 | ORDER OF THE CHIEF JUDGE (#12-042) approved by Chief Judge Audrey B. Collins. IT IS ORDERED, with the concurrence of the Case Management and Assignment Committee, that this case be reassigned from the calendar of Judge Jacqueline H. Nguyen to the calendar of Judge Michael W Fitzgerald for all further proceedings. The case number will now reflect the initials of the transferee Judge CV 11-8026 MWF(JCGx). (sn) (Entered: 05/14/2012) |
| 05/16/2012 | 21 | OPPOSITION opposition re: MOTION for Summary Judgment as to Complaint 17 filed by Plaintiffs Rima Raulinaitis, Sigitas Raulinaitis. (Attachments: # 1 Exhibit Opposition to Separate Statement, # 2 Declaration of Jonathan Birdt)(Birdt, Jonathan) (Entered: 05/16/2012) |
| 05/16/2012 | 22 | DECLARATION of Lawrence Mudgett in support of Plaintiff's opposition MOTION for Summary Judgment as to Complaint 17 filed by Plaintiffs Rima Raulinaitis, Sigitas Raulinaitis. (Birdt, Jonathan) (Entered: 05/16/2012) |
| 05/16/2012 | 23 | MINUTE IN CHAMBERS TRANSFER OF CASE TO JUDGE FITZGERALD by Judge Michael W Fitzgerald: This action has been reassigned to the HONORABLE MICHAEL W. FITZGERALD, United States District Judge. The magistrate judge's assignment remains the same. Please substitute the initials MWF in place of the initials JHN. The case number will now read: CV 11-8026-MWF (JCGx). As documents are routed using the judge's initials, it is important to use the correct initials on all subsequent filings. (See attached Minute Order for further details). All hearing dates will remain as previously set. (jp) (Entered: 05/16/2012) |

SER 0143

| 05/25/2012 | 24 | REPLY in support of LASD's MOTION for Summary Judgment as to Complaint 17 filed by Defendant Los Angeles County Sheriffs Department. (Lehman, Jennifer) (Entered: 05/25/2012) |
| 05/25/2012 | 25 | OBJECTIONS TO PLAINTIFF'S EVIDENCE IN OPPOSITION TO re: MOTION for Summary Judgment as to Complaint 17 filed by Defendant Los Angeles County Sheriffs Department. (Lehman, Jennifer) (Entered: 05/25/2012) |
| 05/25/2012 | 26 | NOTICE OF LODGING filed *by Defendant Los Angeles County Sheriff's Department* re Reply (Motion related) 24 (Attachments: # 1 Defendants Los Angeles County Sheriff Department's Rebuttal to Plaintiffs' Separate Statement of Undisputed Facts and Conclusions of Law)(Lehman, Jennifer) (Entered: 05/25/2012) |
| 06/04/2012 | 27 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 08-05 (Related Case) filed. Transfer of case declined by Judge S. James Otero, for the reasons set forth on this order. Related Case No. CV 11-06154 SJO(JCx) (rn) (Entered: 06/04/2012) |
| 06/07/2012 | 28 | MINUTES (IN CHAMBERS) ORDER TAKING motion for Summary Judgment 17 OFF CALENDAR and UNDER SUBMISSION by Judge Michael W Fitzgerald: The Court finds the matter appropriate for submission on the papers without oral argument. The matter is therefore removed from the Court's calendar subject to resetting should the Court determine that oral argument is needed. (jp) (Entered: 06/07/2012) |
| 07/02/2012 | 29 | NOTICE OF RECENT DECISION GRANTING SUMMARY JUDGMENT TO LOS ANGELES COUNTY SHERIFF'S DEPARTMENT ON ISSUES WHICH ARE SUBJECT OF DEFENDANTS' PENDING SUMMARY JUDGMENT re MOTION for Summary Judgment as to Complaint 17 filed by Defendant Los Angeles County Sheriffs Department. (Lehman, Jennifer) (Entered: 07/02/2012) |
| 07/19/2012 | 30 | MINUTE ORDER IN CHAMBERS by Judge Michael W Fitzgerald. The Final Pre-Trial Conference scheduled for August 6, 2012, at 10:30 a.m. 9 is hereby VACATED pending the Court's decision on Defendant's Motion for Summary Judgment 17 . (kbr) (Entered: 07/19/2012) |
| 08/10/2012 | 31 | SUPPLEMENT to MOTION for Summary Judgment as to Complaint 17 filed by Plaintiffs Rima Raulinaitis, Sigitas Raulinaitis. (Attachments: # 1 Supplement)(Birdt, Jonathan) (Entered: 08/10/2012) |
| 08/12/2012 | 32 | TRIAL BRIEF Rima Raulinaitis, Sigitas Raulinaitis.. (Birdt, Jonathan) (Entered: 08/12/2012) |
| 08/12/2012 | 33 | TRIAL BRIEF *Amended* Rima Raulinaitis, Sigitas Raulinaitis.. (Birdt, Jonathan) (Entered: 08/12/2012) |
| 08/13/2012 | 34 | MINUTES (IN CHAMBERS) ORDER GRANTING Motion for Summary Judgment 17 by Judge Michael W Fitzgerald: This matter is before the Court on Defendant Motion for Summary Judgment 17 . The Court found the matter appropriate for submission on the papers without oral argument. The matter |

| | | |
|---|---|---|
| | | was therefore removed from the Court's calendar (Docket No. 28). For the reasons discussed in this Order, the LASD's Motion is GRANTED. Because the LASD's policy implementing the California Penal Code's concealed weapons restriction is constitutionally permissible, both facially and as applied to the Raulinaitises, there has been no violation of their constitutional rights, and there was no resulting violation of 42 USC 1983 and 1988. Accordingly, Defendant is entitled to summary judgment as a matter of law. Defendant's Motion is therefore granted. (MD JS-6. Case Terminated.) (jp) (Entered: 08/13/2012) |
| 08/15/2012 | 35 | NOTICE OF APPEAL to the 9th CCA filed by Plaintiffs Rima Raulinaitis, Sigitas Raulinaitis. Appeal of Order on Motion for Summary Judgment,,, 34 (Appeal fee of $455 receipt number 0973-10814894 paid.) (Birdt, Jonathan) (Entered: 08/15/2012) |
| 08/15/2012 | 36 | NOTIFICATION by Circuit Court of Appellate Docket Number 12-56508, 9TH CCA regarding Notice of Appeal to 9th Circuit Court of Appeals 35 as to Plaintiffs Rima Raulinaitis, Sigitas Raulinaitis. (car) (Entered: 08/15/2012) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/08/2013 17:22:17 | | | |
| PACER Login: | la0190 | Client Code: | dbluem |
| Description: | Docket Report | Search Criteria: | 2:11-cv-08026-MWF-JCG End date: 3/8/2013 |
| Billable Pages: | 5 | Cost: | 0.50 |

9th Circuit Case Number(s) | 11CV08026 MWF JCG

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | March 12, 2013 |.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Diana Bluem

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | |.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |